(Slip Opinion)        OCTOBER  TERM,  2005        1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LEAGUE OF UNITED LATIN AMERICAN CITIZENS ET AL. *v*. PERRY, GOVERNOR OF TEXAS, ET AL.

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS

No. 05–204.   Argued March 1, 2006—Decided June 28, 2006*

The 1990 census resulted in a 3-seat increase over the 27 seats previously allotted the Texas congressional delegation.  Although the Democratic Party then controlled 19 of those 27 seats, as well as both state legislative houses and the governorship, change was in the air: The Republican Party had received 47% of the 1990 statewide vote, while the Democrats had received only 51%.  Faced with a possible Republican ascent to majority status, the legislature drew a congressional redistricting plan that favored Democratic candidates.  The Republicans challenged the 1991 Plan as an unconstitutional partisan gerrymander, but to no avail.

The 2000 census authorized two additional seats for the Texas delegation.  The Republicans then controlled the governorship and the State Senate, but did not yet control the State House of Representatives.  So constituted, the legislature was unable to pass a redistricting scheme, resulting in litigation and the necessity of a court-ordered plan to comply with the U. S. Constitution's one-person, one-vote requirement.  Conscious that the primary responsibility for drawing congressional districts lies with the political branches of government, and hesitant to undo the work of one political party for the benefit of another, the three-judge Federal District Court sought to apply only "neutral" redistricting standards when drawing Plan 1151C, including placing the two new seats in high-growth areas, fol-

_____

*Together with No. 05–254, *Travis County, Texas, et al.* v. *Perry, Governor of Texas, et al.,* No. 05–276, *Jackson et al.* v. *Perry, Governor of Texas, et al.,* and No. 05–439, *GI Forum of Texas et al.* v. *Perry, Governor of Texas, et al.,* also on appeal from the same court.

lowing county and voting precinct lines, and avoiding the pairing of
incumbents. Under Plan 1151C, the 2002 congressional elections re-
sulted in a 17-to-15 Democratic majority in the Texas delegation,
compared to a 59% to 40% Republican majority in votes for statewide
office in 2000, thus leaving the 1991 Democratic gerrymander largely
in place.

In 2003, however, Texas Republicans gained control of both houses
of the legislature and set out to increase Republican representation
in the congressional delegation. After a protracted partisan struggle,
the legislature enacted a new congressional districting map, Plan
1374C. In the 2004 congressional elections, Republicans won 21
seats to the Democrats' 11, while also obtaining 58% of the vote in
statewide races against the Democrats' 41%. Soon after Plan 1374C
was enacted, appellants challenged it in court, alleging a host of con-
stitutional and statutory violations. In 2004 the District Court en-
tered judgment for appellees, but this Court vacated the decision and
remanded for consideration in light of *Vieth* v. *Jubelirer,* 541 U. S. 267.
On remand, the District Court, believing the scope of its mandate
was limited to questions of political gerrymandering, again rejected
appellants' claims.

*Held:* The judgment is affirmed in part, reversed in part, and vacated in
part, and the cases are remanded.

399 F. Supp. 2d 756, affirmed in part, reversed in part, vacated in part,
and remanded.

JUSTICE KENNEDY delivered the opinion of the Court with respect to
Parts II–A and III, concluding:

1. This Court held, in *Davis* v. *Bandemer,* 478 U. S. 109, 118–127,
that an equal protection challenge to a political gerrymander pre-
sents a justiciable case or controversy, although it could not agree on
what substantive standard to apply, compare *id.,* at 127–137, with
*id.,* at 161–162. That disagreement persists. The *Vieth* plurality
would have held such challenges nonjusticiable political questions,
but a majority declined to do so, see 541 U. S., at 306, 317, 343, 355.
Justiciability is not revisited here. At issue is whether appellants of-
fer a manageable, reliable measure of fairness for determining
whether a partisan gerrymander is unconstitutional. P. 7.

2. Texas' redrawing of District 23's lines amounts to vote dilution
violative of §2 of the Voting Rights Act of 1965. Pp. 17–36.

(a) Plan 1374C's changes to District 23 served the dual goals of
increasing Republican seats and protecting the incumbent Republi-
can against an increasingly powerful Latino population that threat-
ened to oust him, with the additional political nuance that he would
be reelected in a district that had a Latino majority as to voting age
population, though not a Latino majority as to citizen voting age

population or an effective Latino voting majority. The District 23 changes required adjustments elsewhere, so the State created new District 25 to avoid retrogression under §5 of the Act. Pp. 17–18.

(b) A State violates §2 "if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election . . . are not [as] equally open to . . . members of [a racial group as they are to] other members of the electorate." 42 U. S. C. §1973(b). *Thornburg* v. *Gingles,* 478 U. S. 30, 50–51, identified three threshold conditions for establishing a §2 violation: (1) the racial group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the group must be "politically cohesive"; and (3) the white majority must "vot[e] sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." The legislative history identifies factors that courts can use, once all three threshold requirements are met, in interpreting §2's "totality of circumstances" standard, including the State's history of voting-related discrimination, the extent to which voting is racially polarized, and the extent to which the State has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group. See *id.,* at 44–45. Another relevant consideration is whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area. *Johnson* v. *De Grandy,* 512 U. S. 997, 1000. The district court's determination whether the §2 requirements are satisfied must be upheld unless clearly erroneous. See *Gingles, supra*, at 78–79. Where "the ultimate finding of dilution" is based on "a misreading of the governing law," however, there is reversible error. *De Grandy, supra*, at 1022. Pp. 18–20.

(c) Appellants have satisfied all three *Gingles* requirements as to District 23, and the creation of new District 25 does not remedy the problem.

The second and third *Gingles* factors—Latino cohesion, majority bloc voting—are present, given the District Court's finding of racially polarized voting in the District 23 and throughout the State. As to the first *Gingles* precondition—that the minority group be large and compact enough to constitute a majority in a single-member district, 478 U. S., at 50—appellants have established that Latinos could have had an opportunity district in District 23 had its lines not been altered and that they do not have one now. They constituted a majority of the citizen voting age population in District 23 under Plan 1151C. The District Court suggested incorrectly that the district was not a Latino opportunity district in 2002 simply because the incumbent prevailed. The fact that a group does not win elections does not resolve the vote dilution issue. *De Grandy,* 512 U. S*.,* at 1014, n. 11.

In old District 23 the increase in Latino voter registration and overall population, the concomitant rise in Latino voting power in each successive election, the near victory of the Latino candidate of choice in 2002, and the resulting threat to the incumbent's continued election were the very reasons the State redrew the district lines. Since the redistricting prevented the immediate success of the emergent Latino majority in District 23, there was a denial of opportunity in the real sense of that term. Plan 1374C's version of District 23, by contrast, is unquestionably not a Latino opportunity district. That Latinos are now a bare majority of the district's voting-age population is not dispositive, since the relevant numbers must account for citizenship in order to determine the group's opportunity to elect candidates, and Latinos do not now have a citizen voting-age majority in the district.

The State's argument that it met its §2 obligations by creating new District 25 as an offsetting opportunity district is rejected. In a district line-drawing challenge, "the first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Id.,* at 1008. The District Court's finding that the current plan contains six Latino opportunity districts and that seven reasonably compact districts, as proposed by appellant GI Forum, could not be drawn was not clearly erroneous. However, the court failed to perform the required compactness inquiry between the number of Latino opportunity districts under the challenger's proposal of reinstating Plan 1151C and the "existing number of reasonably compact districts." *Ibid.* Section 2 does not forbid the creation of a noncompact majority-minority district, *Bush* v. *Vera,* 517 U. S. 952, 999, but such a district cannot remedy a violation elsewhere in the State, see *Shaw* v. *Hunt,* 517 U. S. 899, 916. The lower court recognized there was a 300-mile gap between the two Latino communities in District 25, and a similarly large gap between the needs and interests of the two groups. The court's conclusion that the relative smoothness of the district lines made the district compact, despite this combining of discrete communities of interest, is inapposite because the court analyzed the issue only in the equal protection context, where compactness focuses on the contours of district lines to determine whether race was the predominant factor in drawing those lines. See *Miller* v. *Johnson,* 515 U. S. 900, 916–917. Under §2, by contrast, the injury is vote dilution, so the compactness inquiry considers "the compactness of the minority population, not . . . the compactness of the contested district." *Vera,* 517 U. S., at 997. A district that "reaches out to grab small and apparently isolated minority communities" is not reasonably compact. *Id.,* at 979. The lower court's findings regarding the different characteristics, needs, and interests

of the two widely scattered Latino communities in District 23 are well supported and uncontested. The enormous geographical distances separating the two communities, coupled with the disparate needs and interests of these populations—not either factor alone—renders District 25 noncompact for §2 purposes. Therefore, Plan 1374C contains only five reasonably compact Latino opportunity districts, one fewer than Plan 1151C. Pp. 20–29.

(d) The totality of the circumstances demonstrates a §2 violation. The relevant proportionality inquiry, see *De Grandy,* 512 U. S., at 1000, compares the percentage of total districts that are Latino opportunity districts with the Latino share of the citizen voting-age population. The State's contention that proportionality should be decided on a regional basis is rejected in favor of appellants' assertion that their claim requires a statewide analysis because they have alleged statewide vote dilution based on a statewide plan. Looking statewide, there are 32 congressional districts. The five reasonably compact Latino opportunity districts amount to roughly 16% of the total, while Latinos make up 22% of Texas' citizen voting-age population. Latinos are, therefore, two districts shy of proportional representation. Even deeming this disproportionality insubstantial would not overcome the other evidence of vote dilution for Latinos in District 23. The changes there undermined the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active and cohesive. Cf., *e.g., id.,* at 1014. Against this background, the Latinos' diminishing electoral support for the incumbent indicates their belief he was unresponsive to their particularized needs. In essence, the State took away their opportunity because they were about to exercise it. Even accepting the District Court's finding that the State's action was taken primarily for political, not racial, reasons, the redrawing of District 23's lines was damaging to its Latino voters. The State not only made fruitless the Latinos' mobilization efforts but also acted against those Latinos who were becoming most politically active. Although incumbency protection can be a legitimate factor in districting, see *Karcher* v. *Daggett*, 462 U. S. 725, 740, not all of its forms are in the interests of the constituents. If, as here, such protection means excluding some voters from the district simply because they are likely to vote against the officeholder, the change is to benefit the officeholder, not the voters. This policy, whatever its validity in the political realm, cannot justify the effect on Latino voters. See *Gingles, supra*, at 45. Pp. 29–36.

(e) Because Plan 1374C violates §2 in its redrawing of District 23, appellants' First Amendment and equal protection claims with respect to that district need not be addressed. Their equal protection

claim as to the drawing of District 25 need not be confronted because that district will have to be redrawn to remedy the District 23 violation. Pp. 36–37.

JUSTICE KENNEDY concluded in Part II that because appellants have established no legally impermissible use of political classifications, they state no claim on which relief may be granted as to their contention that Texas' statewide redistricting is an unconstitutional political gerrymander. JUSTICE SOUTER and JUSTICE GINSBURG joined Part II–D. Pp. 7–15.

(a) Article I of the Constitution, §§2 and 4, gives "the States primary responsibility for apportionment of their . . . congressional . . . districts," *Growe* v. *Emison,* 507 U. S. 25, 34, but §4 also permits Congress to set further requirements. Neither the Constitution nor Congress has stated any explicit prohibition of mid-decade redistricting to change districts drawn earlier in conformance with a decennial census. Although the legislative branch plays the primary role in congressional redistricting, courts have an important role when a districting plan violates the Constitution. See, *e.g.*, *Wesberry* v. *Sanders,* 376 U. S. 1. That the federal courts sometimes must order legislative redistricting, however, does not shift the primary responsibility away from legislative bodies, see, *e.g., Wise* v. *Lipscomb,* 437 U. S. 535, 540, who are free to replace court-mandated remedial plans by enacting redistricting plans of their own, see, *e.g.*, *Upham* v. *Seamon,* 456 U. S. 37, 44. Judicial respect for legislative plans, however, cannot justify legislative reliance on improper criteria for districting determinations. Pp. 7–10.

(b) Appellants claim unpersuasively that a decision to effect mid-decennial redistricting, when solely motivated by partisan objectives, presumptively violates equal protection and the First Amendment because it serves no legitimate public purpose and burdens one group because of its political opinions and affiliation. For a number of reasons, that test is unconvincing. There is some merit to the State's assertion that partisan gain was not the sole motivation for replacing Plan 1151C: The contours of some contested district lines seem to have been drawn based on more mundane and local interests, and a number of line-drawing requests by Democratic state legislators were honored. Moreover, a successful test for identifying unconstitutional partisan gerrymandering must do what appellants' sole-motivation theory explicitly disavows: show a burden, as measured by a reliable standard, on the complainants' representational rights. See *Vieth, supra*, at 292–295, 307–308. Appellants' sole-intent standard is no more compelling when it is linked to the circumstance that Plan 1374C is mid-decennial legislation. The Constitution's text and structure and this Court's cases indicate there is nothing inherently

suspect about a legislature's decision to replace mid-decade a court-ordered plan with one of its own. Even if there were, the fact of mid-decade redistricting alone is no sure indication of unlawful political gerrymanders. Appellants' test would leave untouched the 1991 Texas redistricting, which entrenched a party on the verge of minority status, while striking down the 2003 redistricting plan, which resulted in the majority Republican Party capturing a larger share of the seats. A test that treats these two similarly effective power plays in such different ways does not have the reliability appellants ascribe to it. Pp. 10–14.

(c) Appellants' political gerrymandering theory that mid-decade redistricting for exclusively partisan purposes violates the one-person, one-vote requirement is rejected. Although conceding that States operate under the legal fiction that their plans are constitutionally apportioned throughout a decade, see, *e.g., Georgia* v. *Ashcroft,* 539 U. S. 461, 488, n. 2, appellants contend that this fiction should not provide a safe harbor for a legislature that enacts a voluntary, mid-decade plan overriding a legal court-drawn plan. This argument mirrors appellants' attack on mid-decennial redistricting solely motivated by partisan considerations and is unsatisfactory for the same reasons. Their further contention that the legislature intentionally sought to manipulate population variances when it enacted Plan 1374C is unconvincing because there is no District Court finding to that effect, and they present no specific evidence to support this serious allegation of bad faith. Because they have not demonstrated that the legislature's decision to enact Plan 1374C constitutes a violation of the equal-population requirement, their subsidiary reliance on *Larios* v. *Cox,* 300 F. Supp. 2d 1320, summarily aff'd, 542 U. S. 947, is unavailing. Pp. 14–16.

JUSTICE KENNEDY, joined by THE CHIEF JUSTICE and JUSTICE ALITO, concluded in Part IV that the Dallas area redistricting does not violate §2 of the Voting Rights Act. Appellants allege that the Dallas changes dilute African-American voting strength because an African-American minority effectively controlled District 24 under Plan 1151C. However, before Plan 1374C, District 24 had elected an Anglo Democrat to Congress in every election since 1978. Since then, moreover, the incumbent has had no opposition in any of his primary elections, and African-Americans have consistently voted for him. African-Americans were the second-largest racial group in the district after Anglos, but had only 25.7% of the citizen voting age population. Even assuming that the first *Gingles* prong can accommodate appellants' assertion that a §2 claim may be stated for a racial group that makes up less than 50% of the population, see, *e.g., De Grandy, supra,* at 1009, they must show they constitute "a sufficiently large

minority to elect their candidate of choice with the assistance of cross-over votes," *Voinovich* v. *Quilter,* 507 U. S. 146, 158. The District Court committed no clear error in rejecting questionable evidence that African-Americans have the ability to elect their candidate of choice in favor of other evidence that an African-American candidate of choice would not prevail. See *Anderson* v. *Bessemer City,* 470 U. S. 564, 574. That African-Americans had influence in the district does not suffice to state a §2 claim. If it did, it would unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions. See *Georgia* v. *Ashcroft,* 539 U. S. 461, 491. *Id.,* at 480, 482, distinguished. Appellants do not raise a district-specific political gerrymandering claim against District 24. Pp. 37–41.

THE CHIEF JUSTICE, joined by JUSTICE ALITO, agreed that appellants have not provided a reliable standard for identifying unconstitutional political gerrymanders, but noted that the question whether any such standard exists—*i.e.,* whether a challenge to such a gerrymander presents a justiciable case or controversy—has not been argued in these cases. THE CHIEF JUSTICE and JUSTICE ALITO therefore take no position on that question, which has divided the Court, see *Vieth* v. *Jubelirer,* 541 U. S. 267, and join the plurality's Part II disposition without specifying whether appellants have failed to state a claim on which relief can be granted or failed to present a justiciable controversy. Pp. 1–2.

JUSTICE SCALIA, joined by JUSTICE THOMAS, concluded that appellants' claims of unconstitutional political gerrymandering do not present a justiciable case or controversy, see *Vieth* v. *Jubelirer*, 541 U. S. 267, 271–306 (plurality opinion), and that their vote-dilution claims premised on §2 of the Voting Rights Act of 1965 lack merit for the reasons set forth in JUSTICE THOMAS's opinion concurring in the judgment in *Holder* v. *Hall*, 512 U. S. 874, 891–946. Reviewing appellants' race-based equal protection claims, JUSTICE SCALIA, joined by THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE ALITO, concluded that the District Court did not commit clear error in rejecting appellant GI Forum's assertion that the removal of Latino residents from District 23 constituted intentional vote dilution. JUSTICE SCALIA, joined by THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE ALITO, subjected the intentional creation of District 25 as a majority-minority district to strict scrutiny and held that standard satisfied because appellants conceded that the creation of this district was reasonably necessary to comply with §5 of the Voting Rights Act of 1965, which is a compelling state interest, and did not argue that Texas did more than that provision required it to do. Pp. 2–11.

KENNEDY, J., announced the judgment of the Court and delivered the

Syllabus

opinion of the Court with respect to Parts II–A and III, in which STE-VENS, SOUTER, GINSBURG, AND BREYER, JJ., joined, an opinion with respect to Parts I and IV, in which ROBERTS, C. J., and ALITO, J., joined, an opinion with respect to Parts II–B and II–C, and an opinion with respect to Part II–D, in which SOUTER and GINSBURG, JJ., joined. STE-VENS, J., filed an opinion concurring in part and dissenting in part, in which BREYER, J., joined as to Parts I and II. SOUTER, J., filed an opinion concurring in part and dissenting in part, in which GINSBURG, J., joined. BREYER, J., filed an opinion concurring in part and dissenting in part. ROBERTS, C. J., filed an opinion concurring in part, concurring in the judgment in part, and dissenting in part, in which ALITO, J., joined. SCALIA, J., filed an opinion concurring in the judgment in part and dissenting in part, in which THOMAS, J., joined, and in which ROBERTS, C. J., and ALITO, J., joined as to Part III.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 05–204, 05–254, 05–276 and 05–439

————

LEAGUE OF UNITED LATIN AMERICAN CITIZENS, ET AL., APPELLANTS

05–204              *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.

TRAVIS COUNTY, TEXAS, ET AL., APPELLANTS

05–254              *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.

EDDIE JACKSON, ET AL., APPELLANTS

05–276              *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.

GI FORUM OF TEXAS, ET AL., APPELLANTS

05–439              *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.

ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS

[June 28, 2006]

JUSTICE KENNEDY announced the judgment of the Court and delivered the opinion of the Court with respect to Parts II–A and III, an opinion with respect to Parts I and IV, in which THE CHIEF JUSTICE and JUSTICE ALITO join, an opinion with respect to Parts II–B and II–C, and an opinion with respect to Part II–D, in which JUSTICE

SOUTER and JUSTICE GINSBURG join.

These four consolidated cases are appeals from a judgment entered by the United States District Court for the Eastern District of Texas. Convened as a three-judge court under 28 U. S. C. §2284, the court heard appellants' constitutional and statutory challenges to a 2003 enactment of the Texas State Legislature that drew new district lines for the 32 seats Texas holds in the United States House of Representatives. (Though appellants do not join each other as to all claims, for the sake of convenience we refer to appellants collectively.) In 2004 the court entered judgment for appellees and issued detailed findings of fact and conclusions of law. *Session* v. *Perry*, 298 F. Supp. 2d 451 *(per curiam)*. This Court vacated that decision and remanded for consideration in light of *Vieth* v. *Jubelirer,* 541 U. S. 267 (2004). 543 U. S. 941 (2004). The District Court reexamined appellants' political gerrymandering claims and, in a second careful opinion, again held for the defendants. *Henderson* v. *Perry*, 399 F. Supp. 2d 756 (2005). These appeals followed, and we noted probable jurisdiction. 546 U. S. ___ (2005).

Appellants contend the new plan is an unconstitutional partisan gerrymander and that the redistricting statewide violates §2 of the Voting Rights Act of 1965, 79 Stat. 437, as amended, 42 U. S. C. §1973. Appellants also contend that the use of race and politics in drawing lines of specific districts violates the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. The three-judge panel, consisting of Circuit Judge Higginbotham and District Judges Ward and Rosenthal, brought considerable experience and expertise to the instant case, based on their knowledge of the State's people, history, and geography. Judges Higginbotham and Ward, moreover, had served on the three-judge court that drew the plan the Texas Legislature replaced in 2003, so they were intimately familiar with the history and intrica-

cies of the cases.

We affirm the District Court's dispositions on the statewide political gerrymandering claims and the Voting Rights Act claim against District 24. We reverse and remand on the Voting Rights Act claim with respect to District 23. Because we do not reach appellants' race-based equal protection claim or the political gerrymandering claim as to District 23, we vacate the judgment of the District Court on these claims.

I

To set out a proper framework for the case, we first recount the history of the litigation and recent districting in Texas. An appropriate starting point is not the reapportionment in 2000 but the one from the census in 1990.

The 1990 census resulted in a 30-seat congressional delegation for Texas, an increase of 3 seats over the 27 representatives allotted to the State in the decade before. See *Bush* v. *Vera,* 517 U. S. 952, 956–957 (1996). In 1991 the Texas Legislature drew new district lines. At the time, the Democratic Party controlled both houses in the state legislature, the governorship, and 19 of the State's 27 seats in Congress. Yet change appeared to be on the horizon. In the previous 30 years the Democratic Party's post-Reconstruction dominance over the Republican Party had eroded, and by 1990 the Republicans received 47% of the statewide vote, while the Democrats received 51%. *Henderson, supra,* at 763; Brief for Appellee Perry et al. in No. 05–204, etc., p. 2 (hereinafter Brief for State Appellees).

Faced with a Republican opposition that could be moving toward majority status, the state legislature drew a congressional redistricting plan designed to favor Democratic candidates. Using then-emerging computer technology to draw district lines with artful precision, the legislature enacted a plan later described as the "shrewdest

gerrymander of the 1990s." M. Barone, R. Cohen, & C. Cook, Almanac of American Politics 2002, p. 1448 (2001). See *Henderson*, *supra*, at 767, and n. 47. Although the 1991 plan was enacted by the state legislature, Democratic Congressman Martin Frost was acknowledged as its architect. *Session*, *supra*, at 482. The 1991 plan "carefully constructs democratic districts 'with incredibly convoluted lines' and packs 'heavily Republican' suburban areas into just a few districts." *Henderson*, *supra*, at 767, n. 47 (quoting M. Barone & R. Cohen, Almanac of American Politics 2004, p. 1510 (2003) (hereinafter 2004 Almanac)).

Voters who considered this unfair and unlawful treatment sought to invalidate the 1991 plan as an unconstitutional partisan gerrymander, but to no avail. See *Terrazas* v. *Slagle*, 789 F. Supp. 828, 833 (WD Tex. 1992); *Terrazas* v. *Slagle*, 821 F. Supp. 1162, 1175 (WD Tex. 1993). The 1991 plan realized the hopes of Democrats and the fears of Republicans with respect to the composition of the Texas congressional delegation. The 1990's were years of continued growth for the Texas Republican Party, and by the end of the decade it was sweeping elections for statewide office. Nevertheless, despite carrying 59% of the vote in statewide elections in 2000, the Republicans only won 13 congressional seats to the Democrats' 17. *Henderson*, *supra*, at 763.

These events likely were not forgotten by either party when it came time to draw congressional districts in conformance with the 2000 census and to incorporate two additional seats for the Texas delegation. The Republican Party controlled the governorship and the State Senate; it did not yet control the State House of Representatives, however. As so constituted, the legislature was unable to pass a redistricting scheme, resulting in litigation and the necessity of a court-ordered plan to comply with the Constitution's one-person, one-vote requirement. See *Balderas* v. *Texas*, Civ. Action No. 6:01CV158 (ED Tex., Nov.

14, 2001) *(per curiam),* summarily aff'd, 536 U. S. 919 (2002), App. E to Juris. Statement in No. 05–276, p. 202a. The congressional districting map resulting from the *Balderas* litigation is known as Plan 1151C.

As we have said, two members of the three-judge court that drew Plan 1151C later served on the three-judge court that issued the judgment now under review. Thus we have the benefit of their candid comments concerning the redistricting approach taken in the *Balderas* litigation. Conscious that the primary responsibility for drawing congressional districts is given to political branches of government, and hesitant to "und[o] the work of one political party for the benefit of another," the three-judge *Balderas* court sought to apply "only 'neutral' redistricting standards" when drawing Plan 1151C. *Henderson*, 399 F. Supp. 2d, at 768. Once the District Court applied these principles—such as placing the two new seats in high-growth areas, following county and voting precinct lines, and avoiding the pairing of incumbents—"the drawing ceased, leaving the map free of further change except to conform it to one-person, one-vote." *Ibid.* Under Plan 1151C, the 2002 congressional elections resulted in a 17-to-15 Democratic majority in the Texas delegation, compared to a 59% to 40% Republican majority in votes for statewide office in 2000. *Id.*, at 763–764. Reflecting on the *Balderas* Plan, the District Court in *Henderson* was candid to acknowledge "[t]he practical effect of this effort was to leave the 1991 Democratic Party gerrymander largely in place as a 'legal' plan." *Id.*, at 768.

The continuing influence of a court-drawn map that "perpetuated much of [the 1991] gerrymander," *ibid.*, was not lost on Texas Republicans when, in 2003, they gained control of the State House of Representatives and, thus, both houses of the legislature. The Republicans in the legislature "set out to increase their representation in the congressional delegation." *Session*, 298 F. Supp. 2d, at

471. See also *id.*, at 470 ("There is little question but that
the single-minded purpose of the Texas Legislature in
enacting [a new plan] was to gain partisan advantage").
After a protracted partisan struggle, during which Democ-
ratic legislators left the State for a time to frustrate quo-
rum requirements, the legislature enacted a new congres-
sional districting map in October 2003. It is called Plan
1374C. The 2004 congressional elections did not disap-
point the plan's drafters. Republicans won 21 seats to the
Democrats' 11, while also obtaining 58% of the vote in
statewide races against the Democrats' 41%. *Henderson*,
*supra*, at 764.

Soon after Texas enacted Plan 1374C, appellants chal-
lenged it in court, alleging a host of constitutional and
statutory violations. Initially, the District Court entered
judgment against appellants on all their claims. See
*Session*, 298 F. Supp. 2d, at 457; *id.*, at 515 (Ward, J.,
concurring in part and dissenting in part). Appellants
sought relief here and, after their jurisdictional state-
ments were filed, this Court issued *Vieth* v. *Jubelirer*. Our
order vacating the District Court judgment and remand-
ing for consideration in light of *Vieth* was issued just
weeks before the 2004 elections. See 543 U. S. 941 (Oct.
18, 2004). On remand, the District Court, believing the
scope of its mandate was limited to questions of political
gerrymandering, again rejected appellants' claims. *Hen-
derson*, 399 F. Supp. 2d, at 777–778. Judge Ward would
have granted relief under the theory—presented to the
court for the first time on remand—that mid-decennial
redistricting violates the one-person, one-vote require-
ment, but he concluded such an argument was not within
the scope of the remand mandate. *Id.*, at 779, 784–785
(specially concurring).

## II

## A

Based on two similar theories that address the mid-decade character of the 2003 redistricting, appellants now argue that Plan 1374C should be invalidated as an unconstitutional partisan gerrymander. In *Davis* v. *Bandemer,* 478 U. S. 109 (1986), the Court held that an equal protection challenge to a political gerrymander presents a justiciable case or controversy, *id.*, at 118–127, but there was disagreement over what substantive standard to apply. Compare *id.*, at 127–137 (plurality opinion) with *id.*, at 161–162 (Powell, J., concurring in part and dissenting in part). That disagreement persists. A plurality of the Court in *Vieth* v. *Jubelirer* would have held such challenges to be nonjusticiable political questions, but a majority declined to do so. See 541 U. S., at 306 (KENNEDY, J., concurring in judgment); *id.*, at 317 (STEVENS, J., dissenting); *id.*, at 343 (SOUTER, J., dissenting); *id.*, at 355 (BREYER, J., dissenting). We do not revisit the justiciability holding but do proceed to examine whether appellants' claims offer the Court a manageable, reliable measure of fairness for determining whether a partisan gerrymander violates the Constitution.

## B

Before addressing appellants' arguments on mid-decade redistricting, it is appropriate to note some basic principles on the roles the States, Congress, and the courts play in determining how congressional districts are to be drawn. Article I of the Constitution provides:

> "Section 2. The House of Representatives shall be composed of Members chosen every second Year by the People of the several States . . . .
>
> .        .        .        .        .
>
> "Section 4. The Times, Places and Manner of holding Elections for . . . Representatives, shall be prescribed in each State by the Legislature thereof; but

the Congress may at any time by Law make or alter such Regulations . . . ."

This text, we have explained, "leaves with the States primary responsibility for apportionment of their federal congressional . . . districts." *Growe* v. *Emison,* 507 U. S. 25, 34 (1993); see also *Chapman* v. *Meier,* 420 U. S. 1, 27 (1975) ("[R]eapportionment is primarily the duty and responsibility of the State through its legislature or other body"); *Smiley* v. *Holm,* 285 U. S. 355, 366–367 (1932) (reapportionment implicated State's powers under Art. I, §4). Congress, as the text of the Constitution also provides, may set further requirements, and with respect to districting it has generally required single-member districts. See U. S. Const., Art. I, §4; 81 Stat. 581, 2 U. S. C. §2c; *Branch* v. *Smith,* 538 U. S. 254, 266–267 (2003). But see *id.*, at 275 (plurality opinion) (multimember districts permitted by 55 Stat. 762, 2 U. S. C. §2a(c) in limited circumstances). With respect to a mid-decade redistricting to change districts drawn earlier in conformance with a decennial census, the Constitution and Congress state no explicit prohibition.

Although the legislative branch plays the primary role in congressional redistricting, our precedents recognize an important role for the courts when a districting plan violates the Constitution. See, *e.g.*, *Wesberry* v. *Sanders,* 376 U. S. 1 (1964). This litigation is an example, as we have discussed. When Texas did not enact a plan to comply with the one-person, one-vote requirement under the 2000 census, the District Court found it necessary to draw a redistricting map on its own. That the federal courts sometimes are required to order legislative redistricting, however, does not shift the primary locus of responsibility.

> "Legislative bodies should not leave their reapportionment tasks to the federal courts; but when those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for

Opinion of KENNEDY, J.

them to do so, it becomes the 'unwelcome obligation' of the federal court to devise and impose a reapportionment plan pending later legislative action." *Wise* v. *Lipscomb,* 437 U. S. 535, 540 (1978) (principal opinion) (quoting *Connor* v. *Finch,* 431 U. S. 407, 415 (1977)).

Quite apart from the risk of acting without a legislature's expertise, and quite apart from the difficulties a court faces in drawing a map that is fair and rational, see *id.*, at 414–415, the obligation placed upon the Federal Judiciary is unwelcome because drawing lines for congressional districts is one of the most significant acts a State can perform to ensure citizen participation in republican self-governance. That Congress is the federal body explicitly given constitutional power over elections is also a noteworthy statement of preference for the democratic process. As the Constitution vests redistricting responsibilities foremost in the legislatures of the States and in Congress, a lawful, legislatively enacted plan should be preferable to one drawn by the courts.

It should follow, too, that if a legislature acts to replace a court-drawn plan with one of its own design, no presumption of impropriety should attach to the legislative decision to act. As the District Court noted here, *Session*, 298 F. Supp. 2d, at 460–461, our decisions have assumed that state legislatures are free to replace court-mandated remedial plans by enacting redistricting plans of their own. See, *e.g.*, *Upham* v. *Seamon,* 456 U. S. 37, 44 (1982) *(per curiam); Wise*, *supra*, at 540 (principal opinion) (quoting *Connor*, *supra*, at 415); *Burns* v. *Richardson*, 384 U. S. 73, 85 (1966); *Reynolds* v. *Sims,* 377 U. S. 533, 587 (1964). Underlying this principle is the assumption that to prefer a court-drawn plan to a legislature's replacement would be contrary to the ordinary and proper operation of the political process. Judicial respect for legislative plans, however, cannot justify legislative reliance on improper criteria for

districting determinations.  With these considerations in mind, we next turn to consider appellants' challenges to the new redistricting plan.

C

Appellants claim that Plan 1374C, enacted by the Texas Legislature in 2003, is an unconstitutional political gerrymander.  A decision, they claim, to effect mid-decennial redistricting, when solely motivated by partisan objectives, violates equal protection and the First Amendment because it serves no legitimate public purpose and burdens one group because of its political opinions and affiliation.  The mid-decennial nature of the redistricting, appellants say, reveals the legislature's sole motivation.  Unlike *Vieth*, where the legislature acted in the context of a required decennial redistricting, the Texas Legislature voluntarily replaced a plan that itself was designed to comply with new census data.  Because Texas had "no constitutional obligation to act at all" in 2003, Brief for Appellant Jackson et al. in No. 05–276, p. 26, it is hardly surprising, according to appellants, that the District Court found "[t]here is little question but that the single-minded purpose of the Texas Legislature in enacting Plan 1374C was to gain partisan advantage" for the Republican majority over the Democratic minority, *Session*, *supra*, at 470.

A rule, or perhaps a presumption, of invalidity when a mid-decade redistricting plan is adopted solely for partisan motivations is a salutary one, in appellants' view, for then courts need not inquire about, nor parties prove, the discriminatory effects of partisan gerrymandering—a matter that has proved elusive since *Bandemer*.  See *Vieth*, 541 U. S., at 281 (plurality opinion); *Bandemer*, 478 U. S., at 127.  Adding to the test's simplicity is that it does not quibble with the drawing of individual district lines but challenges the decision to redistrict at all.

For a number of reasons, appellants' case for adopting

their test is not convincing. To begin with, the state appellees dispute the assertion that partisan gain was the "sole" motivation for the decision to replace Plan 1151C. There is some merit to that criticism, for the pejorative label overlooks indications that partisan motives did not dictate the plan in its entirety. The legislature does seem to have decided to redistrict with the sole purpose of achieving a Republican congressional majority, but partisan aims did not guide every line it drew. As the District Court found, the contours of some contested district lines were drawn based on more mundane and local interests. *Session*, *supra*, at 472–473. The state appellees also contend, and appellants do not contest, that a number of line-drawing requests by Democratic state legislators were honored. Brief for State Appellees 34.

Evaluating the legality of acts arising out of mixed motives can be complex, and affixing a single label to those acts can be hazardous, even when the actor is an individual performing a discrete act. See, *e.g.*, *Hartman* v. *Moore*, 547 U. S. ___, ___ (2006) (slip op., at 9–10). When the actor is a legislature and the act is a composite of manifold choices, the task can be even more daunting. Appellants' attempt to separate the legislature's sole motive for discarding Plan 1151C from the complex of choices it made while drawing the lines of Plan 1374C seeks to avoid that difficulty. We are skeptical, however, of a claim that seeks to invalidate a statute based on a legislature's unlawful motive but does so without reference to the content of the legislation enacted.

Even setting this skepticism aside, a successful claim attempting to identify unconstitutional acts of partisan gerrymandering must do what appellants' sole-motivation theory explicitly disavows: show a burden, as measured by a reliable standard, on the complainants' representational rights. For this reason, a majority of the Court rejected a test proposed in *Vieth* that is markedly similar to the one

appellants present today. Compare 541 U. S., at 336 (STEVENS, J., dissenting) ("Just as race can be a factor in, but cannot dictate the outcome of, the districting process, so too can partisanship be a permissible consideration in drawing district lines, so long as it does not predominate"), and *id.*, at 338 ("[A]n acceptable rational basis can be neither purely personal nor purely partisan"), with *id.*, at 292–295 (plurality opinion), and *id.*, at 307–308 (KENNEDY, J., concurring in judgment).

The sole-intent standard offered here is no more compelling when it is linked to the circumstance that Plan 1374C is mid-decennial legislation. The text and structure of the Constitution and our case law indicate there is nothing inherently suspect about a legislature's decision to replace mid-decade a court-ordered plan with one of its own. And even if there were, the fact of mid-decade redistricting alone is no sure indication of unlawful political gerrymanders. Under appellants' theory, a highly effective partisan gerrymander that coincided with decennial redistricting would receive less scrutiny than a bumbling, yet solely partisan, mid-decade redistricting. More concretely, the test would leave untouched the 1991 Texas redistricting, which entrenched a party on the verge of minority status, while striking down the 2003 redistricting plan, which resulted in the majority Republican Party capturing a larger share of the seats. A test that treats these two similarly effective power plays in such different ways does not have the reliability appellants ascribe to it.

Furthermore, compared to the map challenged in *Vieth*, which led to a Republican majority in the congressional delegation despite a Democratic majority in the statewide vote, Plan 1374C can be seen as making the party balance more congruent to statewide party power. To be sure, there is no constitutional requirement of proportional representation, and equating a party's statewide share of the vote with its portion of the congressional delegation is

a rough measure at best. Nevertheless, a congressional plan that more closely reflects the distribution of state party power seems a less likely vehicle for partisan discrimination than one that entrenches an electoral minority. See *Gaffney* v. *Cummings,* 412 U. S. 735, 754 (1973). By this measure, Plan 1374C can be seen as fairer than the plan that survived in *Vieth* and the two previous Texas plans—all three of which would pass the modified sole-intent test that Plan 1374C would fail.

A brief for one of the *amici* proposes a symmetry standard that would measure partisan bias by "compar[ing] how both parties would fare hypothetically if they each (in turn) had received a given percentage of the vote." Brief for Gary King et al. 5. Under that standard the measure of a map's bias is the extent to which a majority party would fare better than the minority party should their respective shares of the vote reverse. In our view *amici*'s proposed standard does not compensate for appellants' failure to provide a reliable measure of fairness. The existence or degree of asymmetry may in large part depend on conjecture about where possible vote-switchers will reside. Even assuming a court could choose reliably among different models of shifting voter preferences, we are wary of adopting a constitutional standard that invalidates a map based on unfair results that would occur in a hypothetical state of affairs. Presumably such a challenge could be litigated if and when the feared inequity arose. Cf. *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 148 (1967). More fundamentally, the counterfactual plaintiff would face the same problem as the present, actual appellants: providing a standard for deciding how much partisan dominance is too much. Without altogether discounting its utility in redistricting planning and litigation, we conclude asymmetry alone is not a reliable measure of unconstitutional partisanship.

In the absence of any other workable test for judging

partisan gerrymanders, one effect of appellants' focus on mid-decade redistricting could be to encourage partisan excess at the outset of the decade, when a legislature redistricts pursuant to its decennial constitutional duty and is then immune from the charge of sole-motivation. If mid-decade redistricting were barred or at least subject to close judicial oversight, opposition legislators would also have every incentive to prevent passage of a legislative plan and try their luck with a court that might give them a better deal than negotiation with their political rivals. See *Henderson,* 399 F. Supp. 2d, at 776–777.

## D

Appellants' second political gerrymandering theory is that mid-decade redistricting for exclusively partisan purposes violates the one-person, one-vote requirement. They observe that population variances in legislative districts are tolerated only if they "are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown." *Karcher* v. *Daggett,* 462 U. S. 725, 730 (1983) (quoting *Kirkpatrick* v. *Preisler,* 394 U. S. 526, 531 (1969); internal quotation marks omitted). Working from this unchallenged premise, appellants contend that, because the population of Texas has shifted since the 2000 census, the 2003 redistricting, which relied on that census, created unlawful interdistrict population variances.

To distinguish the variances in Plan 1374C from those of ordinary, 3-year-old districting plans or belatedly drawn court-ordered plans, appellants again rely on the voluntary, mid-decade nature of the redistricting and its partisan motivation. Appellants do not contend that a decennial redistricting plan would violate equal representation three or five years into the decade if the State's population had shifted substantially. As they must, they concede that States operate under the legal fiction that their plans are

constitutionally apportioned throughout the decade, a presumption that is necessary to avoid constant redistricting, with accompanying costs and instability. See *Georgia* v. *Ashcroft,* 539 U. S. 461, 488, n. 2 (2003); *Reynolds*, 377 U. S., at 583. Appellants agree that a plan implemented by a court in 2001 using 2000 population data also enjoys the benefit of the so-called legal fiction, presumably because belated court-drawn plans promote other important interests, such as ensuring a plan complies with the Constitution and voting rights legislation.

In appellants' view, however, this fiction should not provide a safe harbor for a legislature that enacts a voluntary, mid-decade plan overriding a legal court-drawn plan, thus "'unnecessarily'" creating population variance "when there was no legal compulsion" to do so. Brief for Appellant Travis County et al. in No. 05–254, p. 18. This is particularly so, appellants say, when a legislature acts because of an exclusively partisan motivation. Under appellants' theory this improper motive at the outset seems enough to condemn the map for violating the equal-population principle. For this reason, appellants believe that the State cannot justify under *Karcher* v. *Daggett* the population variances in Plan 1374C because they are the product of partisan bias and the desire to eliminate all competitive districts.

As the District Court noted, this is a test that turns not on whether a redistricting furthers equal-population principles but rather on the justification for redrawing a plan in the first place. *Henderson*, *supra*, at 776. In that respect appellants' approach merely restates the question whether it was permissible for the Texas Legislature to redraw the districting map. Appellants' answer, which mirrors their attack on mid-decennial redistricting solely motivated by partisan considerations, is unsatisfactory for reasons we have already discussed.

Appellants also contend that the legislature intention-

ally sought to manipulate population variances when it enacted Plan 1374C. There is, however, no District Court finding to that effect, and appellants present no specific evidence to support this serious allegation of bad faith. Because appellants have not demonstrated that the legislature's decision to enact Plan 1374C constitutes a violation of the equal-population requirement, we find unavailing their subsidiary reliance on *Larios* v. *Cox*, 300 F. Supp. 2d 1320 (ND Ga. 2004) *(per curiam),* summarily aff'd, 542 U. S. 947 (2004). In *Larios*, the District Court reviewed the Georgia Legislature's decennial redistricting of its State Senate and House of Representatives districts and found deviations from the equal-population requirement. The District Court then held the objectives of the drafters, which included partisan interests along with regionalist bias and inconsistent incumbent protection, did not justify those deviations. 300 F. Supp. 2d, at 1351–1352. The *Larios* holding and its examination of the legislature's motivations were relevant only in response to an equal-population violation, something appellants have not established here. Even in addressing political motivation as a justification for an equal-population violation, moreover, *Larios* does not give clear guidance. The panel explained it "need not resolve the issue of whether or when partisan advantage alone may justify deviations in population" because the plans were "plainly unlawful" and any partisan motivations were "bound up inextricably" with other clearly rejected objectives. *Id.*, at 1352.

In sum, we disagree with appellants' view that a legislature's decision to override a valid, court-drawn plan middecade is sufficiently suspect to give shape to a reliable standard for identifying unconstitutional political gerrymanders. We conclude that appellants have established no legally impermissible use of political classifications. For this reason, they state no claim on which relief may be granted for their statewide challenge.

## III

Plan 1374C made changes to district lines in south and west Texas that appellants challenge as violations of §2 of the Voting Rights Act and the Equal Protection Clause of the Fourteenth Amendment. The most significant changes occurred to District 23, which—both before and after the redistricting—covers a large land area in west Texas, and to District 25, which earlier included Houston but now includes a different area, a north-south strip from Austin to the Rio Grande Valley.

After the 2002 election, it became apparent that District 23 as then drawn had an increasingly powerful Latino population that threatened to oust the incumbent Republican, Henry Bonilla. Before the 2003 redistricting, the Latino share of the citizen voting-age population was 57.5%, and Bonilla's support among Latinos had dropped with each successive election since 1996. *Session,* 298 F. Supp. 2d, at 488–489. In 2002, Bonilla captured only 8% of the Latino vote, *ibid.*, and 51.5% of the overall vote. Faced with this loss of voter support, the legislature acted to protect Bonilla's incumbency by changing the lines— and hence the population mix—of the district. To begin with, the new plan divided Webb County and the city of Laredo, on the Mexican border, that formed the county's population base. Webb County, which is 94% Latino, had previously rested entirely within District 23; under the new plan, nearly 100,000 people were shifted into neighboring District 28. *Id.,* at 489. The rest of the county, approximately 93,000 people, remained in District 23. To replace the numbers District 23 lost, the State added voters in counties comprising a largely Anglo, Republican area in central Texas. *Id.,* at 488. In the newly drawn district, the Latino share of the citizen voting-age population dropped to 46%, though the Latino share of the total voting-age population remained just over 50%. *Id.,* at 489.

These changes required adjustments elsewhere, of course, so the State inserted a third district between the two districts to the east of District 23, and extended all three of them farther north. New District 25 is a long, narrow strip that winds its way from McAllen and the Mexican border towns in the south to Austin, in the center of the State and 300 miles away. *Id.,* at 502. In between it includes seven full counties, but 77% of its population resides in split counties at the northern and southern ends. Of this 77%, roughly half reside in Hidalgo County, which includes McAllen, and half are in Travis County, which includes parts of Austin. *Ibid.* The Latinos in District 25, comprising 55% of the district's citizen voting-age population, are also mostly divided between the two distant areas, north and south. *Id.,* at 499. The Latino communities at the opposite ends of District 25 have divergent "needs and interests," *id.,* at 502, owing to "differences in socio-economic status, education, employment, health, and other characteristics," *id.*, at 512.

The District Court summed up the purposes underlying the redistricting in south and west Texas: "The change to Congressional District 23 served the dual goal of increasing Republican seats in general and protecting Bonilla's incumbency in particular, with the additional political nuance that Bonilla would be reelected in a district that had a majority of Latino voting age population—although clearly not a majority of citizen voting age population and certainly not an effective voting majority." *Id.,* at 497. The goal in creating District 25 was just as clear: "[t]o avoid retrogression under §5" of the Voting Rights Act given the reduced Latino voting strength in District 23. *Id.,* at 489.

### A

The question we address is whether Plan 1374C violates §2 of the Voting Rights Act. A State violates §2

"if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of [a racial group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U. S. C. §1973(b).

The Court has identified three threshold conditions for establishing a §2 violation: (1) the racial group is "'"sufficiently large and geographically compact to constitute a majority in a single-member district"'"; (2) the racial group is "'"politically cohesive"'"; and (3) the majority "'"vot[es] sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."'" *Johnson* v. *De Grandy,* 512 U. S. 997, 1006–1007 (1994) (quoting *Growe,* 507 U. S., at 40 (in turn quoting *Thornburg* v. *Gingles,* 478 U. S. 30, 50–51 (1986))). These are the so-called *Gingles* requirements.

If all three *Gingles* requirements are established, the statutory text directs us to consider the "totality of circumstances" to determine whether members of a racial group have less opportunity than do other members of the electorate. *De Grandy, supra,* at 1011–1012; see also *Abrams* v. *Johnson,* 521 U. S. 74, 91 (1997). The general terms of the statutory standard "totality of circumstances" require judicial interpretation. For this purpose, the Court has referred to the Senate Report on the 1982 amendments to the Voting Rights Act, which identifies factors typically relevant to a §2 claim, including:

"the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or pro-

cedures that tend to enhance the opportunity for discrimination against the minority group . . . ; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.  The Report notes also that evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value." *Gingles, supra*, at 44–45 (citing S. Rep. No. 97–417 (1982) (hereinafter Senate Report); pinpoint citations omitted).

Another relevant consideration is whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area. *De Grandy, supra*, at 1000.

The District Court's determination whether the §2 requirements are satisfied must be upheld unless clearly erroneous.  See *Gingles, supra*, at 78–79.  Where "the ultimate finding of dilution" is based on "a misreading of the governing law," however, there is reversible error. *De Grandy, supra*, at 1022.

B

Appellants argue that the changes to District 23 diluted the voting rights of Latinos who remain in the district. Specifically, the redrawing of lines in District 23 caused the Latino share of the citizen voting-age population to drop from 57.5% to 46%.  The District Court recognized that "Latino voting strength in Congressional District 23

is, unquestionably, weakened under Plan 1374C." *Session,* 298 F. Supp. 2d, at 497. The question is whether this weakening amounts to vote dilution.

To begin the *Gingles* analysis, it is evident that the second and third *Gingles* preconditions—cohesion among the minority group and bloc voting among the majority population—are present in District 23. The District Court found "racially polarized voting" in south and west Texas, and indeed "throughout the State." *Session, supra,* at 492–493. The polarization in District 23 was especially severe: 92% of Latinos voted against Bonilla in 2002, while 88% of non-Latinos voted for him. App. 134, Table 20 (expert Report of Allan J. Lichtman on Voting-Rights Issues in Texas Congressional Redistricting (Nov. 14, 2002) (hereinafter Lichtman Report)). Furthermore, the projected results in new District 23 show that the Anglo citizen voting-age majority will often, if not always, prevent Latinos from electing the candidate of their choice in the district. *Session, supra*, at 496–497. For all these reasons, appellants demonstrated sufficient minority cohesion and majority bloc voting to meet the second and third *Gingles* requirements.

The first *Gingles* factor requires that a group be "sufficiently large and geographically compact to constitute a majority in a single-member district." 478 U. S., at 50. Latinos in District 23 could have constituted a majority of the citizen voting-age population in the district, and in fact did so under Plan 1151C. Though it may be possible for a citizen voting-age majority to lack real electoral opportunity, the Latino majority in old District 23 did possess electoral opportunity protected by §2.

While the District Court stated that District 23 had not been an effective opportunity district under Plan 1151C, it recognized the district was "moving in that direction." *Session,* 298 F. Supp. 2d, at 489. Indeed, by 2002 the Latino candidate of choice in District 23 won the majority

of the district's votes in 13 out of 15 elections for statewide officeholders. *Id.,* at 518 (Ward, J., concurring in part and dissenting in part). And in the congressional race, Bonilla could not have prevailed without some Latino support, limited though it was. State legislators changed District 23 specifically because they worried that Latinos would vote Bonilla out of office. *Id.,* at 488.

Furthermore, to the extent the District Court suggested that District 23 was not a Latino opportunity district in 2002 simply because Bonilla prevailed, see *id.,* at 488, 495, it was incorrect. The circumstance that a group does not win elections does not resolve the issue of vote dilution. We have said that "the ultimate right of §2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *De Grandy,* 512 U. S., at 1014, n. 11. In old District 23 the increase in Latino voter registration and overall population, *Session,* 298 F. Supp. 2d, at 523 (Ward, J., concurring in part and dissenting in part), the concomitant rise in Latino voting power in each successive election, the near-victory of the Latino candidate of choice in 2002, and the resulting threat to the Bonilla incumbency, were the very reasons that led the State to redraw the district lines. Since the redistricting prevented the immediate success of the emergent Latino majority in District 23, there was a denial of opportunity in the real sense of that term.

Plan 1374C's version of District 23, by contrast, "is unquestionably not a Latino opportunity district." *Id.,* at 496. Latinos, to be sure, are a bare majority of the voting-age population in new District 23, but only in a hollow sense, for the parties agree that the relevant numbers must include citizenship. This approach fits the language of §2 because only eligible voters affect a group's opportunity to elect candidates. In sum, appellants have established that Latinos could have had an opportunity district in District 23 had its lines not been altered and that they

do not have one now.

Considering the district in isolation, the three *Gingles* requirements are satisfied. The State argues, nonetheless, that it met its §2 obligations by creating new District 25 as an offsetting opportunity district. It is true, of course, that "States retain broad discretion in drawing districts to comply with the mandate of §2." *Shaw* v. *Hunt,* 517 U. S. 899, 917, n. 9 (1996) *(Shaw II)*. This principle has limits, though. The Court has rejected the premise that a State can always make up for the less-than-equal opportunity of some individuals by providing greater opportunity to others. See *id.,* at 917 ("The vote-dilution injuries suffered by these persons are not remedied by creating a safe majority-black district somewhere else in the State"). As set out below, these conflicting concerns are resolved by allowing the State to use one majority-minority district to compensate for the absence of another only when the racial group in each area had a §2 right and both could not be accommodated.

As to the first *Gingles* requirement, it is not enough that appellants show the possibility of creating a majority-minority district that would include the Latinos in District 23. See *Shaw II, supra,* at 917, n. 9 (rejecting the idea that "a §2 plaintiff has the right to be placed in a majority-minority district once a violation of the statute is shown"). If the inclusion of the plaintiffs would necessitate the exclusion of others, then the State cannot be faulted for its choice. That is why, in the context of a challenge to the drawing of district lines, "the first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *De Grandy, supra*, at 1008.

The District Court found that the current plan contains six Latino opportunity districts and that seven reasonably compact districts could not be drawn. Appellant GI Forum

presented a plan with seven majority-Latino districts, but the District Court found these districts were not reasonably compact, in part because they took in "disparate and distant communities." *Session, supra*, at 491–492, and n. 125. While there was some evidence to the contrary, the court's resolution of the conflicting evidence was not clearly erroneous.

A problem remains, though, for the District Court failed to perform a comparable compactness inquiry for Plan 1374C as drawn. *De Grandy* requires a comparison between a challenger's proposal and the "existing number of reasonably compact districts." 512 U. S., at 1008. To be sure, §2 does not forbid the creation of a noncompact majority-minority district. *Bush* v. *Vera,* 517 U. S., at 999 (KENNEDY, J., concurring). The noncompact district cannot, however, remedy a violation elsewhere in the State. See *Shaw II, supra*, at 916 (unless "the district contains a 'geographically compact' population" of the racial group, "where that district sits, 'there neither has been a wrong nor can be a remedy'" (quoting *Growe,* 507 U. S., at 41)). Simply put, the State's creation of an opportunity district for those without a §2 right offers no excuse for its failure to provide an opportunity district for those with a §2 right. And since there is no §2 right to a district that is not reasonably compact, see *Abrams,* 521 U. S., at 91–92, the creation of a noncompact district does not compensate for the dismantling of a compact opportunity district.

THE CHIEF JUSTICE claims compactness should be only a factor in the analysis, see *post,* at 16 (opinion concurring in part, concurring in judgment in part, and dissenting in part), but his approach comports neither with our precedents nor with the nature of the right established by §2. *De Grandy* expressly stated that the first *Gingles* prong looks only to the number of "reasonably compact districts." 512 U. S., at 1008. *Shaw II*, moreover, refused to consider a noncompact district as a possible remedy for a §2 viola-

tion. 517 U. S., at 916. It is true *Shaw II* applied this analysis in the context of a State's using compliance with §2 as a defense to an equal protection challenge, but the holding was clear: A State cannot remedy a §2 violation through the creation of a noncompact district. *Ibid. Shaw II* also cannot be distinguished based on the relative location of the remedial district as compared to the district of the alleged violation. The remedial district in *Shaw II* had a 20% overlap with the district the plaintiffs sought, but the Court stated "[w]e do not think this degree of incorporation could mean [the remedial district] substantially addresses the §2 violation." *Id.,* at 918; see also *De Grandy, supra*, at 1019 (expressing doubt about the idea that even within the same county, vote dilution in half the county could be compensated for in the other half). The overlap here is not substantially different, as the majority of Latinos who were in the old District 23 are still in the new District 23, but no longer have the opportunity to elect their candidate of choice.

Apart from its conflict with *De Grandy* and *Shaw II*, THE CHIEF JUSTICE's approach has the deficiency of creating a one-way rule whereby plaintiffs must show compactness but States need not (except, it seems, when using §2 as a defense to an equal protection challenge). THE CHIEF JUSTICE appears to accept that a plaintiff, to make out a §2 violation, must show he or she is part of a racial group that could form a majority in a reasonably compact district. *Post,* at 15. If, however, a noncompact district cannot make up for the lack of a compact district, then this is equally true whether the plaintiff or the State proposes the noncompact district.

The District Court stated that Plan 1374C created "six *Gingles* Latino" districts, *Session,* 298 F. Supp. 2d, at 498, but it failed to decide whether District 25 was reasonably compact for §2 purposes. It recognized there was a 300-mile gap between the Latino communities in District 25,

and a similarly large gap between the needs and interests of the two groups. *Id.*, at 502. After making these observations, however, it did not make any finding about compactness. *Id.,* at 502–504. It ruled instead that, despite these concerns, District 25 would be an effective Latino opportunity district because the combined voting strength of both Latino groups would allow a Latino-preferred candidate to prevail in elections. *Ibid.* The District Court's general finding of effectiveness cannot substitute for the lack of a finding on compactness, particularly because the District Court measured effectiveness simply by aggregating the voting strength of the two groups of Latinos. *Id.,* at 503–504. Under the District Court's approach, a district would satisfy §2 no matter how noncompact it was, so long as all the members of a racial group, added together, could control election outcomes.

The District Court did evaluate compactness for the purpose of deciding whether race predominated in the drawing of district lines. The Latinos in the Rio Grande Valley and those in Central Texas, it found, are "disparate communities of interest," with "differences in socioeconomic status, education, employment, health, and other characteristics." *Id.,* at 512. The court's conclusion that the relative smoothness of the district lines made the district compact, despite this combining of discrete communities of interest, is inapposite because the court analyzed the issue only for equal protection purposes. In the equal protection context, compactness focuses on the contours of district lines to determine whether race was the predominant factor in drawing those lines. See *Miller* v. *Johnson,* 515 U. S. 900, 916–917 (1995). Under §2, by contrast, the injury is vote dilution, so the compactness inquiry embraces different considerations. "The first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district." *Vera, supra*, at 997 (KENNEDY, J., concurring); see

also *Abrams, supra*, at 111 (BREYER, J., dissenting) (compactness to show a violation of equal protection, "which concerns the shape or boundaries of a district, differs from §2 compactness, which concerns a minority group's compactness"); *Shaw II, supra*, at 916 (the inquiry under §2 is whether "the minority group is geographically compact" (internal quotation marks omitted)).

While no precise rule has emerged governing §2 compactness, the "inquiry should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'" *Abrams, supra*, at 92 (quoting *Vera,* 517 U. S., at 977 (plurality opinion)); see also *id.,* at 979 (A district that "reaches out to grab small and apparently isolated minority communities" is not reasonably compact). The recognition of nonracial communities of interest reflects the principle that a State may not "assum[e] from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *Miller, supra*, at 920 (quoting *Shaw* v. *Reno,* 509 U. S. 630, 647 (1993)). In the absence of this prohibited assumption, there is no basis to believe a district that combines two far-flung segments of a racial group with disparate interests provides the opportunity that §2 requires or that the first *Gingles* condition contemplates. "The purpose of the Voting Rights Act is to prevent discrimination in the exercise of the electoral franchise and to foster our transformation to a society that is no longer fixated on race." *Georgia* v. *Ashcroft,* 539 U. S. 461, 490 (2003); cf. *post,* at 20 (opinion of ROBERTS, C. J.). We do a disservice to these important goals by failing to account for the differences between people of the same race.

While the District Court recognized the relevant differences, by not performing the compactness inquiry it failed to account for the significance of these differences under §2. In these cases the District Court's findings regarding

the different characteristics, needs, and interests of the Latino community near the Mexican border and the one in and around Austin are well supported and uncontested. Legitimate yet differing communities of interest should not be disregarded in the interest of race. The practical consequence of drawing a district to cover two distant, disparate communities is that one or both groups will be unable to achieve their political goals. Compactness is, therefore, about more than "style points," *post,* at 3 (opinion of ROBERTS, C. J.); it is critical to advancing the ultimate purposes of §2, ensuring minority groups equal "opportunity . . . to participate in the political process and to elect representatives of their choice." 42 U. S. C. §1973(b). (And if it were just about style points, it is difficult to understand why a plaintiff would have to propose a compact district to make out a §2 claim.) As witnesses who know the south and west Texas culture and politics testified, the districting in Plan 1374C "could make it more difficult for thinly financed Latino-preferred candidates to achieve electoral success and to provide adequate and responsive representation once elected." *Session,* 298 F. Supp. 2d, at 502; see also *id.,* at 503 (Elected officials from the region "testified that the size and diversity of the newly-configured districts could make it more difficult for the constituents in the Rio Grande Valley to control election outcomes"). We do not question the District Court's finding that the groups' combined voting strength would enable them to elect a candidate each prefers to the Anglos' candidate of choice. We also accept that in some cases members of a racial group in different areas—for example, rural and urban communities—could share similar interests and therefore form a compact district if the areas are in reasonably close proximity. See *Abrams, supra*, at 111–112 (BREYER, J., dissenting). When, however, the only common index is race and the result will be to cause internal friction, the State

cannot make this a remedy for a §2 violation elsewhere. We emphasize it is the enormous geographical distance separating the Austin and Mexican-border communities, coupled with the disparate needs and interests of these populations—not either factor alone—that renders District 25 noncompact for §2 purposes. The mathematical possibility of a racial bloc does not make a district compact.

Since District 25 is not reasonably compact, Plan 1374C contains only five reasonably compact Latino opportunity districts. Plan 1151C, by contrast, created six such districts. The District Court did not find, and the State does not contend, that any of the Latino opportunity districts in Plan 1151C are noncompact. Contrary to THE CHIEF JUSTICE's suggestion, *post,* at 10–11, moreover, the Latino population in old District 23 is, for the most part, in closer geographic proximity than is the Latino population in new District 25. More importantly, there has been no contention that different pockets of the Latino population in old District 23 have divergent needs and interests, and it is clear that, as set out below, the Latino population of District 23 was split apart particularly because it was becoming so cohesive. The Latinos in District 23 had found an efficacious political identity, while this would be an entirely new and difficult undertaking for the Latinos in District 25, given their geographic and other differences.

Appellants have thus satisfied all three *Gingles* requirements as to District 23, and the creation of new District 25 does not remedy the problem.

C

We proceed now to the totality of the circumstances, and first to the proportionality inquiry, comparing the percentage of total districts that are Latino opportunity districts with the Latino share of the citizen voting-age population. As explained in *De Grandy*, proportionality is "a relevant fact in the totality of circumstances." 512 U. S.,

at 1000. It does not, however, act as a "safe harbor" for States in complying with §2. *Id.,* at 1017–1018; see also *id.,* at 1025 (O'Connor, J., concurring) (proportionality "is *always* relevant evidence in determining vote dilution, but is *never* itself dispositive"); *id.,* at 1027–1028 (KENNEDY, J., concurring in part and concurring in judgment) (proportionality has "some relevance," though "placing undue emphasis upon proportionality risks defeating the goals underlying the Voting Rights Act"). If proportionality could act as a safe harbor, it would ratify "an unexplored premise of highly suspect validity: that in any given voting jurisdiction . . . , the rights of some minority voters under §2 may be traded off against the rights of other members of the same minority class." *Id.,* at 1019; see also *Shaw II,* 517 U. S., at 916–918.

The State contends that proportionality should be decided on a regional basis, while appellants say their claim requires the Court to conduct a statewide analysis. In *De Grandy*, the plaintiffs "passed up the opportunity to frame their dilution claim in statewide terms." 512 U. S., at 1022. Based on the parties' apparent agreement that the proper frame of reference was the Dade County area, the Court used that area to decide proportionality. *Id.,* at 1022–1023. In these cases, on the other hand, appellants allege an "injury to African American and Hispanic voters throughout the State." Complaint in Civ. Action No. 03C–356 (ED Tex.), pp. 1–2; see also First Amended Complaint in Civ. Action No. 2:03–354 (ED Tex.), pp. 1, 5, 7; Plaintiff's First Amended Complaint in Civ. Action No. 2:03cv354 etc. (ED Tex.), pp. 4–5. The District Court, moreover, expressly considered the statewide proportionality argument. As a result, the question of the proper geographic scope for assessing proportionality now presents itself.

We conclude the answer in these cases is to look at proportionality statewide. The State contends that the

seven districts in south and west Texas correctly delimit the boundaries for proportionality because that is the only area of the State where reasonably compact Latino opportunity districts can be drawn. This argument, however, misunderstands the role of proportionality. We have already determined, under the first *Gingles* factor, that another reasonably compact Latino district can be drawn. The question now is whether the absence of that additional district constitutes impermissible vote dilution. This inquiry requires an "'intensely local appraisal'" of the challenged district. *Gingles,* 478 U. S., at 79 (quoting *Rogers* v. *Lodge,* 458 U. S. 613, 622 (1982)); see also *Gingles, supra,* at 101 (O'Connor, J., concurring in judgment). A local appraisal is necessary because the right to an undiluted vote does not belong to the "minority as a group," but rather to "its individual members." *Shaw II, supra*, at 917. And a State may not trade off the rights of some members of a racial group against the rights of other members of that group. See *De Grandy, supra*, at 1019; *Shaw II, supra,* at 916–918. The question is therefore not "whether line-drawing in the challenged area as a whole dilutes minority voting strength," *post,* at 13 (opinion of ROBERTS, C. J.), but whether line-drawing dilutes the voting strength of the Latinos in District 23.

The role of proportionality is not to displace this local appraisal or to allow the State to trade off the rights of some against the rights of others. Instead, it provides some evidence of whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation." 42 U. S. C. §1973(b). For this purpose, the State's seven-district area is arbitrary. It just as easily could have included six or eight districts. Appellants have alleged statewide vote dilution based on a statewide plan, so the electoral opportunities of Latinos across the State can bear on whether the lack of electoral opportunity for Latinos in District 23

is a consequence of Plan 1374C's redrawing of lines or simply a consequence of the inevitable 'win some, lose some' in a State with racial bloc voting. Indeed, several of the other factors in the totality of circumstances have been characterized with reference to the State as a whole. *Gingles, supra,* at 44–45 (listing Senate Report factors). Particularly given the presence of racially polarized voting—and the possible submergence of minority votes— throughout Texas, it makes sense to use the entire State in assessing proportionality.

Looking statewide, there are 32 congressional districts. The five reasonably compact Latino opportunity districts amount to roughly 16% of the total, while Latinos make up 22% of Texas' citizen voting-age population. (Appellant GI Forum claims, based on data from the 2004 American Community Survey of the U. S. Census Bureau, that Latinos constitute 24.5% of the statewide citizen voting-age population, but as this figure was neither available at the time of the redistricting, nor presented to the District Court, we accept the District Court's finding of 22%.) Latinos are, therefore, two districts shy of proportional representation. There is, of course, no "magic parameter," *De Grandy,* 512 U. S., at 1017, n. 14, and "rough proportionality," *id.,* at 1023, must allow for some deviations. We need not decide whether the two-district deficit in these cases weighs in favor of a §2 violation. Even if Plan 1374C's disproportionality were deemed insubstantial, that consideration would not overcome the other evidence of vote dilution for Latinos in District 23. "[T]he degree of probative value assigned to proportionality may vary with other facts," *id.,* at 1020, and the other facts in these cases convince us that there is a §2 violation.

District 23's Latino voters were poised to elect their candidate of choice. They were becoming more politically active, with a marked and continuous rise in Spanish-surnamed voter registration. See Lichtman Report, App.

142–143. In successive elections Latinos were voting against Bonilla in greater numbers, and in 2002 they almost ousted him. Webb County in particular, with a 94% Latino population, spurred the incumbent's near defeat with dramatically increased turnout in 2002. See 2004 Almanac 1579. In response to the growing participation that threatened Bonilla's incumbency, the State divided the cohesive Latino community in Webb County, moving about 100,000 Latinos to District 28, which was already a Latino opportunity district, and leaving the rest in a district where they now have little hope of electing their candidate of choice.

The changes to District 23 undermined the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active and cohesive. Cf. *De Grandy, supra*, at 1014 (finding no §2 violation where "the State's scheme would thwart the historical tendency to exclude Hispanics, not encourage or perpetuate it"); *White* v. *Regester,* 412 U. S. 755, 769 (1973) (looking in the totality of the circumstances to whether the proposed districting would "remedy the effects of past and present discrimination against Mexican-Americans, and to bring the community into the full stream of political life of the county and State by encouraging their further registration, voting, and other political activities" (citation and internal quotation marks omitted)). The District Court recognized "the long history of discrimination against Latinos and Blacks in Texas," *Session,* 298 F. Supp. 2d, at 473, and other courts have elaborated on this history with respect to electoral processes:

> "Texas has a long, well-documented history of discrimination that has touched upon the rights of African-Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices

> such as the poll tax, an all-white primary system, and restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history.  The history of official discrimination in the Texas election process—stretching back to Reconstruction—led to the inclusion of the State as a covered jurisdiction under Section 5 in the 1975 amendments to the Voting Rights Act.  Since Texas became a covered jurisdiction, the Department of Justice has frequently interposed objections against the State and its subdivisions." *Vera* v. *Richards,* 861 F. Supp. 1304, 1317 (SD Tex. 1994) (citations omitted).

See also *Vera,* 517 U. S., at 981–982; *Regester, supra*, at 767–769.  In addition, the "political, social, and economic legacy of past discrimination" for Latinos in Texas, *Session, supra*, at 492, may well "hinder their ability to participate effectively in the political process," *Gingles,* 478 U. S., at 45 (citing Senate Report factors).

Against this background, the Latinos' diminishing electoral support for Bonilla indicates their belief he was "unresponsive to the particularized needs of the members of the minority group." *Ibid.* (same).  In essence the State took away the Latinos' opportunity because Latinos were about to exercise it.  This bears the mark of intentional discrimination that could give rise to an equal protection violation.  Even if we accept the District Court's finding that the State's action was taken primarily for political, not racial, reasons, *Session, supra*, at 508, the redrawing of the district lines was damaging to the Latinos in District 23.  The State not only made fruitless the Latinos' mobilization efforts but also acted against those Latinos who were becoming most politically active, dividing them with a district line through the middle of Laredo.

Furthermore, the reason for taking Latinos out of District 23, according to the District Court, was to protect

Congressman Bonilla from a constituency that was increasingly voting against him. The Court has noted that incumbency protection can be a legitimate factor in districting, see *Karcher* v. *Daggett*, 462 U. S., at 740, but experience teaches that incumbency protection can take various forms, not all of them in the interests of the constituents. If the justification for incumbency protection is to keep the constituency intact so the officeholder is accountable for promises made or broken, then the protection seems to accord with concern for the voters. If, on the other hand, incumbency protection means excluding some voters from the district simply because they are likely to vote against the officeholder, the change is to benefit the officeholder, not the voters. By purposely redrawing lines around those who opposed Bonilla, the state legislature took the latter course. This policy, whatever its validity in the realm of politics, cannot justify the effect on Latino voters. See *Gingles, supra*, at 45 (citing Senate Report factor of whether "the policy underlying" the State's action "is tenuous"). The policy becomes even more suspect when considered in light of evidence suggesting that the State intentionally drew District 23 to have a nominal Latino voting-age majority (without a citizen voting-age majority) for political reasons. *Session, supra*, at 497. This use of race to create the façade of a Latino district also weighs in favor of appellants' claim.

Contrary to THE CHIEF JUSTICE's suggestion that we are reducing the State's needed flexibility in complying with §2, see *post,* at 15–16, the problem here is entirely of the State's own making. The State chose to break apart a Latino opportunity district to protect the incumbent congressman from the growing dissatisfaction of the cohesive and politically active Latino community in the district. The State then purported to compensate for this harm by creating an entirely new district that combined two groups of Latinos, hundreds of miles apart, that represent differ-

ent communities of interest. Under §2, the State must be
held accountable for the effect of these choices in denying
equal opportunity to Latino voters. Notwithstanding
these facts, THE CHIEF JUSTICE places great emphasis on
the District Court's statement that "new District 25 is 'a
more effective Latino opportunity district than Congres-
sional District 23 had been.'" *Post,* at 2–3 (quoting *Ses-
sion,* 298 F. Supp. 2d, at 503). Even assuming this state-
ment, expressed in the context of summarizing witnesses'
testimony, qualifies as a finding of the District Court, two
points make it of minimal relevance. First, as previously
noted, the District Court measured the effectiveness of
District 25 without accounting for the detrimental conse-
quences of its compactness problems. Second, the District
Court referred only to how effective District 23 "had been,"
not to how it would operate today, a significant distinction
given the growing Latino political power in the district.

Based on the foregoing, the totality of the circumstances
demonstrates a §2 violation. Even assuming Plan 1374C
provides something close to proportional representation
for Latinos, its troubling blend of politics and race—and
the resulting vote dilution of a group that was beginning
to achieve §2's goal of overcoming prior electoral discrimi-
nation—cannot be sustained.

D

Because we hold Plan 1374C violates §2 in its redrawing
of District 23, we do not address appellants' claims that
the use of race and politics in drawing that district vio-
lates the First Amendment and equal protection. We also
need not confront appellants' claim of an equal protection
violation in the drawing of District 25. The districts in
south and west Texas will have to be redrawn to remedy
the violation in District 23, and we have no cause to pass
on the legitimacy of a district that must be changed. See
*Session, supra,* at 528 (Ward, J., concurring in part and

dissenting in part). District 25, in particular, was formed to compensate for the loss of District 23 as a Latino opportunity district, and there is no reason to believe District 25 will remain in its current form once District 23 is brought into compliance with §2. We therefore vacate the District Court's judgment as to these claims.

## IV

Appellants also challenge the changes to district lines in the Dallas area, alleging they dilute African-American voting strength in violation of §2 of the Voting Rights Act. Specifically, appellants contend that an African-American minority effectively controlled District 24 under Plan 1151C, and that §2 entitles them to this district.

Before Plan 1374C was enacted, District 24 had elected Anglo Democrat Martin Frost to Congress in every election since 1978. *Session, supra*, at 481–482. Anglos were the largest racial group in the district, with 49.8% of the citizen voting-age population, and third largest were Latinos, with 20.8%. State's Exh. 57, App. 339. African-Americans were the second-largest group, with 25.7% of the citizen voting-age population, *ibid.,* and they voted consistently for Frost. The new plan broke apart this racially diverse district, assigning its pieces into several other districts.

Accepting that African-Americans would not be a majority of the single-member district they seek, and that African-Americans do not vote cohesively with Hispanics, *Session, supra*, at 484, appellants nonetheless contend African-Americans had effective control of District 24. As the Court has done several times before, we assume for purposes of this litigation that it is possible to state a §2 claim for a racial group that makes up less than 50% of the population. See *De Grandy,* 512 U. S., at 1009; *Voinovich* v. *Quilter,* 507 U. S. 146, 154 (1993); *Gingles,* 478 U. S., at 46–47, n. 12. Even on the assumption that the first

*Gingles* prong can accommodate this claim, however, appellants must show they constitute "a sufficiently large minority to elect their candidate of choice with the assistance of cross-over votes." *Voinovich, supra*, at 158 (emphasis omitted).

The relatively small African-American population can meet this standard, according to appellants, because they constituted 64% of the voters in the Democratic primary. Since a significant number of Anglos and Latinos voted for the Democrat in the general election, the argument goes, African-American control of the primary translated into effective control of the entire election.

The District Court found, however, that African-Americans could not elect their candidate of choice in the primary. In support of this finding, it relied on testimony that the district was drawn for an Anglo Democrat, the fact that Frost had no opposition in any of his primary elections since his incumbency began, and District 24's demographic similarity to another district where an African-American candidate failed when he ran against an Anglo. *Session,* 298 F. Supp. 2d, at 483–484. "In short, that Anglo Democrats control this district is," according to the District Court, "the most rational conclusion." *Id.,* at 484.

Appellants fail to demonstrate clear error in this finding. In the absence of any contested Democratic primary in District 24 over the last 20 years, no obvious benchmark exists for deciding whether African-Americans could elect their candidate of choice. The fact that African-Americans voted for Frost—in the primary and general elections—could signify he is their candidate of choice. Without a contested primary, however, it could also be interpreted to show (assuming racial bloc voting) that Anglos and Latinos would vote in the Democratic primary in greater numbers if an African-American candidate of choice were to run, especially given Texas' open primary

system. The District Court heard trial testimony that would support both explanations, and we cannot say that it erred in crediting the testimony that endorsed the latter interpretation. Compare App. 242–243 (testimony of Tarrant County Precinct Administrator that Frost is the "favored candidate of the African-American community" and that he has gone unopposed in primary challenges because he "serves [the African-American community's] interests"), with *id.,* at 262–264 (testimony of Congresswoman Eddie Bernice Johnson that District 24 was drawn for an Anglo Democrat (Martin Frost, in particular) in 1991 by splitting a minority community), and *id.,* at 277–280 (testimony of State Representative Ron Wilson that African-Americans did not have the ability to elect their preferred candidate, particularly an African-American candidate, in District 24 and that Anglo Democrats in such "influence [d]istricts" were not fully responsive to the needs of the African-American community).

The analysis submitted by appellants' own expert was also inconsistent. Of the three elections for statewide office he examined, in District 24 the African-American candidate of choice would have won one, lost one, and in the third the African-American vote was split. See Lichtman Report, *id.,* at 75–76, 92–96; State's Exh. 20 in Civ. Action No. 2:03–CV–354 (ED Tex.), p. 138; State's Exh. 21 in Civ. Action No. 2:03–CV–354 (ED Tex.). The District Court committed no clear error in rejecting this questionable showing that African-Americans have the ability to elect their candidate of choice in favor of other evidence that an African-American candidate of choice would not prevail. See *Anderson* v. *Bessemer City,* 470 U. S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous").

That African-Americans had influence in the district, *Session, supra,* at 485, does not suffice to state a §2 claim

in these cases.  The opportunity "to elect representatives of their choice," 42 U. S. C. §1973(b), requires more than the ability to influence the outcome between some candidates, none of whom is their candidate of choice.  There is no doubt African-Americans preferred Martin Frost to the Republicans who opposed him.  The fact that African-Americans preferred Frost to some others does not, however, make him their candidate of choice.  Accordingly, the ability to aid in Frost's election does not make the old District 24 an African-American opportunity district for purposes of §2.  If §2 were interpreted to protect this kind of influence, it would unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions.    See *Georgia* v. *Ashcroft,* 539 U. S., at 491 (KENNEDY, J., concurring).

Appellants respond by pointing to *Georgia* v. *Ashcroft,* where the Court held that the presence of influence districts is a relevant consideration under §5 of the Voting Rights Act.  The inquiry under §2, however, concerns the opportunity "to elect representatives of their choice," 42 U. S. C. §1973(b), not whether a change has the purpose or effect of "denying or abridging the right to vote," §1973c. *Ashcroft* recognized the differences between these tests, 539 U. S., at 478, and concluded that the ability of racial groups to elect candidates of their choice is only one factor under §5, *id.,* at 480.  So while the presence of districts "where minority voters may not be able to elect a candidate of choice but can play a substantial, if not decisive, role in the electoral process" is relevant to the §5 analysis, *id.,* at 482, the lack of such districts cannot establish a §2 violation.  The failure to create an influence district in these cases thus does not run afoul of §2 of the Voting Rights Act.

Appellants do not raise a district-specific political gerrymandering claim against District 24.  Even if the claim were cognizable as part of appellants' statewide challenge,

it would be unpersuasive. Just as for the statewide claim, appellants would lack any reliable measure of partisan fairness. JUSTICE STEVENS suggests the burden on representational rights can be measured by comparing the success of Democrats in old District 24 with their success in the new districts they now occupy. *Post,* at 31–32 (opinion concurring in part and dissenting in part). There is no reason, however, why the old district has any special claim to fairness. In fact, old District 24, no less than the old redistricting plan as a whole, was formed for partisan reasons. See *Session,* 298 F. Supp. 2d, at 484; see also *Balderas* v. *Texas*, Civ. Action No. 6:01CV158 (ED Tex., Nov. 14, 2001) *(per curiam),* summarily aff'd, 536 U. S. 919 (2002), App. E to Juris. Statement in No. 05–276, p. 208a. Furthermore, JUSTICE STEVENS' conclusion that the State has not complied with §5 of the Voting Rights Act, *post,* at 33–37—effectively overruling the Attorney General without briefing, argument, or a lower court opinion on the issue—does not solve the problem of determining a reliable measure of impermissible partisan effect.

\*     \*     \*

We reject the statewide challenge to Texas' redistricting as an unconstitutional political gerrymander and the challenge to the redistricting in the Dallas area as a violation of §2 of the Voting Rights Act. We do hold that the redrawing of lines in District 23 violates §2 of the Voting Rights Act. The judgment of the District Court is affirmed in part, reversed in part, and vacated in part, and the cases are remanded for further proceedings.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

————

Nos. 05–204, 05–254, 05–276 and 05–439

————

LEAGUE OF UNITED LATIN AMERICAN CITIZENS,
ET AL., APPELLANTS
05–204          *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.


TRAVIS COUNTY, TEXAS, ET AL., APPELLANTS
05–254          *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.


EDDIE JACKSON, ET AL., APPELLANTS
05–276          *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.


GI FORUM OF TEXAS, ET AL., APPELLANTS
05–439          *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.

ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TEXAS

[June 28, 2006]

JUSTICE STEVENS, with whom JUSTICE BREYER joins as
to Parts I and II, concurring in part and dissenting in
part.

This is a suit in which it is perfectly clear that judicially
manageable standards enable us to decide the merits of a
statewide challenge to a political gerrymander. Applying
such standards, I shall explain why the wholly unneces-
sary replacement of the neutral plan fashioned by the
three-judge court in *Balderas* v. *Texas,* Civ. Action No.
6:01CV158 (ED Tex., Nov. 14, 2001) (Plan 1151C or *Bal-*

*deras* Plan) with Plan 1374C, which creates districts with
less compact shapes, violates the Voting Rights Act, and
fragments communities of interest—all for purely partisan
purposes—violated the State's constitutional duty to
govern impartially. Prior misconduct by the Texas Legis-
lature neither excuses nor justifies that violation. Accord-
ingly, while I join the Court's decision to invalidate Dis-
trict 23, I would hold that Plan 1374C is entirely invalid
and direct the District Court to reinstate Plan 1151C.
Moreover, as I shall explain, even if the remainder of the
plan were valid, the cracking of *Balderas* District 24 would
still be unconstitutional.

I

The maintenance of existing district boundaries is ad-
vantageous to both voters and candidates. Changes, of
course, must be made after every census to equalize the
population of each district or to accommodate changes in
the size of a State's congressional delegation. Similarly,
changes must be made in response to a finding that a
districting plan violates §2 or §5 of the Voting Rights Act,
42 U. S. C. §§1973, 1973c. But the interests in orderly
campaigning and voting, as well as in maintaining com-
munication between representatives and their constitu-
ents, underscore the importance of requiring that any
decision to redraw district boundaries—like any other
state action that affects the electoral process—must, at the
very least, serve some legitimate governmental purpose.
See, *e.g.*, *Burdick* v. *Takushi,* 504 U. S. 428, 434, 440
(1992); *id.*, at 448–450 (KENNEDY, J., joined by Blackmun
and STEVENS, JJ., dissenting). A purely partisan desire
"to minimize or cancel out the voting strength of racial or
political elements of the voting population," *Fortson* v.
*Dorsey,* 379 U. S. 433, 439 (1965), is not such a purpose.
Because a desire to minimize the strength of Texas De-
mocrats was the sole motivation for the adoption of Plan

1374C, see *Session* v. *Perry*, 298 F. Supp. 2d 451, 470, 472 (ED Tex. 2004) *(per curiam),* the plan cannot withstand constitutional scrutiny.

The districting map that Plan 1374C replaced, Plan 1151C, was not only manifestly fair and neutral, it may legitimately be described as a milestone in Texas' political history because it put an end to a long history of Democratic misuse of power in that State. For decades after the Civil War, the political party associated with the former Commander in Chief of the Union Army attracted the support of former slaves and a handful of "carpetbaggers," but had no significant political influence in Texas. The Democrats maintained their political power by excluding black voters from participating in primary elections, see, *e.g.*, *Smith* v. *Allwright,* 321 U. S. 649, 656–661 (1944), by the artful management of multimember electoral schemes, see, *e.g.*, *White* v. *Regester,* 412 U. S. 755, 765–770 (1973)*,* and, most recently, by outrageously partisan gerrymandering, see *ante*, at 3–4 (opinion of KENNEDY, J.); *Bush* v. *Vera,* 517 U. S. 952, 987–990 (1996) (appendices in plurality opinion), *id.*, at 1005–1007, 1042–1045 (STEVENS, J., dissenting). Unfortunately, some of these tactics are not unique to Texas Democrats; the apportionment scheme they devised in the 1990's is only one example of the excessively gerrymandered districting plans that parties with control of their States' governing bodies have implemented in recent years. See, *e.g.*, *Cox* v. *Larios*, 542 U. S. 947, 947–950 (2004) (STEVENS, J., joined by BREYER, J., concurring) (Democratic gerrymander in Georgia); *Vieth* v. *Jubelirer,* 541 U. S. 267, 272 (2004) (plurality opinion); *id.*, at 342 (STEVENS, J., dissenting) (Republican gerrymander in Pennsylvania); *Karcher* v. *Daggett,* 462 U. S. 725, 744 (1983) (Democratic gerrymander in New Jersey); *Badham* v. *Eu*, 694 F. Supp. 664, 666 (ND Cal. 1988), summarily aff'd, 488 U. S. 1024 (1989) (Democratic gerrymander in California).

Despite the Texas Democratic Party's sordid history of manipulating the electoral process to perpetuate its stranglehold on political power, the Texas Republican Party managed to become the State's majority party by 2002. If, after finally achieving political strength in Texas, the Republicans had adopted a new plan in order to remove the excessively partisan Democratic gerrymander of the 1990's, the decision to do so would unquestionably have been supported by a neutral justification. But that is not what happened. Instead, as the following discussion of the relevant events that transpired in Texas following the release of the 2000 census data demonstrates, Texas Republicans abandoned a neutral apportionment map for the sole purpose of manipulating district boundaries to maximize their electoral advantage and thus create their own impermissible stranglehold on political power.

By 2001, Texas Republicans had overcome many of the aforementioned tactics designed to freeze the Democrats' status as the State's dominant party, and Republicans controlled the governorship and the State Senate. Democrats, however, continued to constitute a majority of the State House of Representatives. In March of that year, the results of the 2000 decennial census revealed that, as a result of its population growth, Texas was entitled to two additional seats in the United States House of Representatives, bringing the size of the Texas congressional delegation to 32. Texas, therefore, was required to draw 32 equipopulous districts to account for its additional representation and to comply with the one-person, one-vote mandate of Article I, §2, see, *e.g.*, *Karcher,* 462 U. S. 725. Under Texas law, the Texas Legislature was required to draw these new districts. See *Session*, 298 F. Supp. 2d, at 457–458.

The Texas Legislature, divided between a Republican Senate and a Democratic House, did not reach agreement on a new congressional map in the regular legislative

session, and Governor Rick Perry declined to call a special session. Litigation in the Texas state courts also failed to result in a plan, as the Texas Supreme Court vacated the map created by a state trial judge. See *Perry* v. *Del Rio*, 67 S. W. 3d 85 (2001). This left a three-judge Federal District Court in the Eastern District of Texas with "'the unwelcome obligation of performing in the legislature's stead.'" *Balderas* v. *Texas*, Civ. Action No. 6:01CV158 (Nov. 14, 2001) *(per curiam),* App. E to Juris. Statement in No. 05–276, p. 202a (hereinafter App. to Juris Statement) (quoting *Connor* v. *Finch,* 431 U. S. 407, 415 (1977)).

After protracted proceedings which included the testimony of an impartial expert as well as representatives of interested groups supporting different plans, the court prepared its own plan. "Conscious that the primary responsibility for drawing congressional districts is given to political branches of government, and hesitant to 'und[o] the work of one political party for the benefit of another,' the three-judge *Balderas* court sought to apply 'only "neutral" redistricting standards' when drawing Plan 1151C." *Ante*, at 4 (opinion of KENNEDY, J.) (quoting *Henderson* v. *Perry*, 399 F. Supp. 2d 756, 768 (ED Tex. 2005)). As the court explained, it started with a blank map of Texas, drew in the existing districts protected by the Voting Rights Act, located the new Districts 31 and 32 where the population growth that produced them had occurred, and then applied the neutral criteria of "compactness, contiguity, and respecting county and municipal boundaries." App. to Juris. Statement 205a. See *id.*, at 206a–209a. The District Court purposely "eschewed an effort to treat old lines as an independent locator," and concluded that its plan had done much "to end most of the below-the-surface 'ripples' of the 1991 plan and the myriad of submissions before us. For example, the patently irrational shapes of Districts 5 and 6 under the 1991 plan, widely-cited as the most extreme but successful gerrymandering

in the country, are no more." *Id.*, at 207a–208a.

At the conclusion of this process, the court believed that it had fashioned a map that was "likely to produce a congressional delegation roughly proportional to the party voting breakdown across the state." *Id.*, at 209a. Indeed, reflecting the growing strength of the Republican Party, the District Court's plan, Plan 1151C, offered that party an advantage in 20 of the 32 congressional seats. See *Session*, 298 F. Supp. 2d, at 471 (describing Plan 1151C). The State's expert in this litigation testified that the *Balderas* Plan was not biased in favor of Democrats and that it was "[m]aybe slightly" biased in favor of Republicans. App. 224 (deposition of Ronald Keith Gaddie, Ph.D.). Although groups of Latino voters challenged Plan 1151C on appeal, neither major political party did so, and the State of Texas filed a motion asking this Court to affirm the District Court's judgment, which we did, see *Balderas* v. *Texas,* 536 U. S. 919 (2002).

In the 2002 congressional elections, however, Republicans were not able to capitalize on the advantage that the *Balderas* plan had provided them. A number of Democratic incumbents were able to attract the votes of ticket-splitters (individuals who voted for candidates from one party in statewide elections and for a candidate from a different party in congressional elections), and thus won elections in some districts that favored Republicans. As a result, Republicans carried only 15 of the districts drawn by the *Balderas* court.[1]

_____

[1] It was apparently these electoral results that later caused the District Court to state that "the practical effect" of Plan 1151C "was to leave the 1991 Democratic Party gerrymander largely in place as a 'legal' plan." *Henderson* v. *Perry*, 399 F. Supp. 2d 756, 768 (ED Tex. 2005); see *id.*, at 768, n. 52. But the existence of ticket-splitting voters hardly demonstrates that Plan 1151C was biased in favor of Democrats. Instead, as noted above, even the State's expert in this litigation concluded that Plan 1151C was, if anything, biased in favor of Republi-

While the Republicans did not do as well as they had hoped in elections for the United States House of Representatives, they made gains in the Texas House of Representatives and won a majority of seats in that body. This gave Texas Republicans control over both bodies of the state legislature, as well as the Governor's mansion, for the first time since Reconstruction.

With full control of the State's legislative and executive branches, the Republicans "decided to redraw the state's congressional districts solely for the purpose of seizing between five and seven seats from Democratic incumbents." *Session*, 298 F. Supp. 2d, at 472 (citation and internal quotation marks omitted). According to former Lieutenant Governor Bill Ratliff, a highly regarded Republican member of the State Senate, "political gain for the Republicans was 110% of the motivation for the Plan, . . . it was 'the entire motivation.'" *Id.*, at 473 (quoting trial transcript). Or, as the District Court stated in the first of its two decisions in this litigation, "[t]here is little question but that the single-minded purpose of the Texas Legislature in enacting Plan 1374C was to gain partisan advantage." *Id.,* at 470. See also *ante*, at 5 (quoting District Court's conclusion). Indeed, as the State itself argued before the District Court: "The overwhelming evidence demonstrated that partisan gain was the motivating force behind the decision to redistrict in 2003." State Defendants' Post-Trial Brief in No. 2:03–CV–354 (ED Tex.), p. 51 (hereinafter State Post-Trial Brief).

This desire for political gain led to a series of dramatic confrontations between Republicans and Democrats, and

---

cans. Nor do the circumstances surrounding the replacement of Plan 1151C suggest that the legislature was motivated by a misimpression that Plan 1151C was unfair to Republicans, and accordingly should be replaced with a more equitable map. Rather, as discussed in detail below, it is clear that the sole motivation for enacting a new districting map was to maximize Republican advantage.

ultimately resulted in the adoption of a plan that violated
the Voting Rights Act.  The legislature did not pass a new
map in the regular 2003 session, in part because Democ-
ratic House members absented themselves and thus de-
nied the body a quorum.  Governor Perry then called a
special session to take up congressional redistricting—the
same step he had declined to take in 2001 after the release
of the decennial census figures, when Republicans lacked
a majority in the House.  During the first special session,
the House approved a new congressional map, but the
Senate's longstanding tradition requiring two-thirds of
that body to support a measure before the full Senate will
consider it allowed Democrats to block the plan.

Lieutenant Governor Dewhurst then announced that he
would suspend operation of the two-thirds rule in any
future special session considering congressional redistrict-
ing.  Nonetheless, in a second special session, Senate
Democrats again prevented the passage of a new district-
ing map by leaving the State and depriving the Senate of a
quorum.  When a lone Senate Democrat returned to Texas,
Governor Perry called a third special session to consider
congressional redistricting.

During that third special session, the State Senate and
the State House passed maps that would have apparently
avoided any violation of the Voting Rights Act, because
they would have, *inter alia*, essentially preserved *Balderas*
District 23, a majority-Latino district in southwest Texas,
and *Balderas* District 24, a majority-minority district in
the Dallas-Fort Worth area, where black voters consti-
tuted a significant majority of voters in the Democratic
primary and usually elected their candidate of choice in
the general election.  Representative Phil King, the redis-
tricting legislation's chief sponsor in the Texas House, had
previously proposed fragmenting District 24, but, after
lawyers reviewed the map, King expressed concern that
redrawing District 24 might violate the Voting Rights Act,

and he drafted a new map that left District 24 largely unchanged.

Nonetheless, the conferees seeking to reconcile the House and Senate plans produced a map that, as part of its goal of maximizing Republican political advantage, significantly altered both Districts 23 and 24 as they had existed in the *Balderas* Plan. *Balderas* District 23 was extended north to take in roughly 100,000 new people who were predominately Anglo and Republican, and was also moved west, thus splitting Webb County and the City of Laredo, and pushing roughly 100,000 people who were predominately Latino and Democratic into an adjacent district. *Session*, 298 F. Supp. 2d, at 488–489. Black voters who previously resided in *Balderas* District 24 were fragmented into five new districts, each of which is predominately Anglo and Republican. See App. 104–106. Representative King testified at trial that District 24 was cracked even though cracking the district was not "'the path of least resistance'" in terms of avoiding Voting Rights Act liability, because leaving *Balderas* District 24 intact would not "accomplish our political objectives." State Post-Trial Brief 51–52 (quoting transcript). This map was ultimately enacted into law as Plan 1374C.

The overall effect of Plan 1374C was to shift more than *eight million* Texans into new districts, and to split more counties into more pieces than the *Balderas* Plan. Moreover, the 32 districts in Plan 1374C are, on average, much less compact under either of two standard measures than their counterparts had been under the *Balderas* Plan. See App. 177–178 (expert report of Professor Gaddie).[2]

Numerous parties filed suit in federal court challenging

_____

[2] These two standard measures of compactness are the perimeter-to-area score, which compares the relative length of the perimeter of a district to its area, and the smallest circle score, which compares the ratio of space in the district to the space in the smallest circle that could encompass the district. App. 178.

Plan 1374C on the grounds that it violated §2 of the Voting Rights Act and that it constituted an unconstitutional partisan gerrymander. A three-judge panel—two of whom also were members of the *Balderas* court—rejected these challenges, over Judge Ward's partial dissent on the §2 claims. See *Session*, 298 F. Supp. 2d 451. Responding to plaintiffs' appeals, we remanded for reconsideration in light of *Vieth*, 541 U. S. 267. See 543 U. S. 941 (2004).

In a characteristically thoughtful opinion written by Judge Higginbotham, the District Court again rejected all challenges to the constitutionality of Plan 1374C. See *Henderson*, 399 F. Supp. 2d 756. It correctly found that the Constitution does not prohibit a state legislature from redrawing congressional districts in the middle of a census cycle, see *id.*, at 766, and it also correctly recognized that this Court has not yet endorsed clear standards for judging the validity of partisan gerrymanders, see *id.*, at 760–762. Because the District Court's original decision, and its reconsideration of the case in the light of the several opinions in *Vieth* v. *Jubelirer*, are successive chapters in the saga that began with *Balderas*, it is appropriate to quote this final comment from that opinion before addressing the principal question that is now presented. The *Balderas* court concluded:

> "Finally, to state directly what is implicit in all that we have said: political gerrymandering, a purely partisan exercise, is inappropriate for a federal court drawing a congressional redistricting map. Even at the hands of a legislative body, political gerrymandering is much a bloodfeud, in which revenge is exacted by the majority against its rival. We have left it to the political arena, as we must and wisely should. We do so because our role is limited and not because we see gerrymandering as other than what it is: an abuse of power that, at its core, evinces a fundamental distrust

of voters, serving the self-interest of the political parties at the expense of the public good." App. to Juris. Statement 209a–210a (footnote omitted).

## II

The unique question of law that is raised in this appeal is one that the Court has not previously addressed. That narrow question is whether it was unconstitutional for Texas to replace a lawful districting plan "in the middle of a decade, for the sole purpose of maximizing partisan advantage." Juris. Statement in No. 05–276, p. i. This question is both different from, and simpler than, the principal question presented in *Vieth* v. *Jubelirer,* in which the "'lack of judicially discoverable and manageable standards'" prevented the plurality from deciding the merits of a statewide challenge to a political gerrymander. 541 U. S., at 277–278.

As the State points out, "in every political-gerrymandering claim the Court has considered, the focus has been on the *map* itself, not on the decision to create the map in the first place." Brief for State Appellees 33. In defense of the map itself, rather than the basic decision whether to draw the map in the first place, the State notes that Plan 1374C's district borders frequently follow county lines and other neutral criteria. At what the State describes as the relevant "level of granularity," the State correctly points out that appellants have not even attempted to argue that every district line was motivated solely for partisan gain. *Ibid.* See also *ante*, at 11 (opinion of KENNEDY, J.) (noting that "partisan aims did not guide every line" in Plan 1374C). Indeed, the multitude of "granular" decisions that are made during redistricting was part of why the *Vieth* plurality concluded, in the context of a statewide challenge to a redistricting plan promulgated in response to a legal obligation to redistrict, that there are no manageable standards to govern

whether the predominant motivation underlying the entire redistricting map was partisan. See 541 U. S., at 285. But see *id.*, at 355 (BREYER, J., dissenting) (arguing that there are judicially manageable standards to assess statewide districting challenges even when a plan is enacted in response to a legal obligation to redistrict).

Unlike *Vieth,* the narrow question presented by the statewide challenge in this litigation is whether the State's decision to draw the map in the first place, when it was under no legal obligation to do so, was permissible. It is undeniable that identifying the motive for making that basic decision is a readily manageable judicial task. See *Gomillion* v. *Lightfoot,* 364 U. S. 339, 341 (1960) (noting that plaintiffs' allegations, if true, would establish by circumstantial evidence "tantamount for all practical purposes to a mathematical demonstration," that redistricting legislation had been enacted "solely" to segregate voters along racial lines); cf. *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S. 256, 276–280 (1979) (analyzing whether the purpose of a law was to discriminate against women). Indeed, although the Constitution places no *per se* ban on midcycle redistricting, a legislature's decision to redistrict in the middle of the census cycle, when the legislature is under no legal obligation to do so, makes the judicial task of identifying the legislature's motive simpler than it would otherwise be. As JUSTICE BREYER has pointed out, "the presence of midcycle redistricting, for any reason, raises a fair inference that partisan machinations played a major role in the map-drawing process." *Vieth*, 541 U. S., at 367 (dissenting opinion).

The conclusion that courts can easily identify the motive for redistricting when the legislature is under no legal obligation to act is reinforced by the record in this very case. The District Court unambiguously identified the sole purpose behind the decision to promulgate Plan 1374C: a desire to maximize partisan advantage. See

*Session*, 298 F. Supp. 2d, at 472 ("It was clear from the evidence" that Republicans "'decided to redraw the state's congressional districts solely for the purpose of seizing between five and seven seats from Democratic incumbents'" (quoting *amicus* brief filed in *Vieth* v. *Jubelirer*); 298 F. Supp., at 470 ("There is little question but that the single-minded purpose of the Texas Legislature in enacting Plan 1374C was to gain partisan advantage"). It does not matter whether the District Court's description of that purpose qualifies as a specific finding of fact because it is perfectly clear that there is more than ample evidence in the record to support such a finding. This evidence includes: (1) testimony from state legislators; (2) the procedural irregularities described above that accompanied the adoption of Plan 1374C, including the targeted abolition of the longstanding two-thirds rule, designed to protect the rights of the minority party, in the Texas Senate; (3) Plan 1374C's significant departures from the neutral districting criteria of compactness and respect for county lines; (4) the plan's excessive deviations from prior districts, which interfere with the development of strong relationships between Members of Congress and their constituents; and (5) the plan's failure to comply with the Voting Rights Act. Indeed, the State itself conceded that "[t]he overwhelming evidence demonstrated that partisan gain was the motivating force behind the decision to redistrict in 2003." State Post-Trial Brief 51. In my judgment, there is not even a colorable basis for contending that the relevant intent—in this case a purely partisan intent[3]—cannot be

_____

[3] The State suggests that in the process of drawing districts the architects of Plan 1374C frequently followed county lines, made an effort to keep certain entire communities within a given district and otherwise followed certain neutral principles. But these facts are not relevant to the narrow question presented by these cases: Neutral motivations in the implementation of particular features of the redistricting do not qualify the solely partisan motivation behind the basic decision to adopt

identified on the basis of admissible evidence in the
record.[4]

Of course, the conclusions that courts are fully capable
of analyzing the intent behind a decision to redistrict, and
that desire for partisan gain was the sole factor motivating
the decision to redistrict at issue here, do not resolve the
question whether proof of a single-minded partisan intent
is sufficient to establish a constitutional violation.

On the merits of that question, the State seems to as-
sume that our decision in *Upham* v. *Seamon,* 456 U. S. 37
(1982) *(per curiam),* has already established the legisla-
ture's right to replace a court-ordered plan with a plan
drawn for purely partisan purposes. JUSTICE KENNEDY
ultimately indulges in a similar assumption, relying on
*Upham* for the proposition that "our decisions have as-
sumed that state legislatures are free to replace court-
mandated remedial plans by enacting redistricting plans
of their own." *Ante*, at 9. JUSTICE KENNEDY recognizes
that "[j]udicial respect for legislative plans, however,
cannot justify legislative reliance on improper criteria for
districting determinations." *Ibid*. But JUSTICE KENNEDY
then incorrectly concludes that the singular intent to

_____

an entirely unnecessary plan in the first place.

[4]As noted above, rather than identifying any arguably neutral rea-
sons for adopting Plan 1374C, the record establishes a purely partisan
single-minded motivation with unmistakable clarity. Therefore, there
is no need at this point to discuss standards that would guide judges in
enforcing a rule allowing legislatures to be motivated in part by parti-
san considerations, but which would impose an "obligation not to apply
*too much* partisanship in districting." *Vieth* v. *Jubelirer,* 541 U. S. 267,
286 (2004) (plurality opinion). Deciding that 100% is "too much" is not
only a manageable decision, but, as explained below, it is also an
obviously correct one. Nonetheless, it is worth emphasizing that courts
do, in fact, possess the tools to employ standards that permit legisla-
tures to consider partisanship in the redistricting process, but which do
not allow legislatures to use partisanship as the predominant motiva-
tion for their actions. See Part IV, *infra.*

maximize partisan advantage is not, in itself, such an improper criterion. *Ante,* at 11.

This reliance on *Upham* overlooks critical distinctions between the redistricting plan the District Court drew in *Upham* and the redistricting plan the District Court drew in *Balderas.* The judicial plan in *Upham* was created to provide an interim response to an objection by the Attorney General that two contiguous districts in a plan originally drafted by the Texas Legislature violated §5 of the Voting Rights Act. We concluded that, in fashioning its interim remedy, the District Court had erroneously "substituted its own reapportionment preferences for those of the state legislature." 456 U. S., at 40. We held that when judicial relief was necessary because a state legislature had failed "'to reapportion according to federal constitutional [or statutory] requisites in a timely fashion after having had an adequate opportunity to do so,'" the federal court should, as much as possible "'follow the policies and preferences of the State,'" in creating a new map. *Id.*, at 41 (quoting *White* v. *Weiser,* 412 U. S. 783, 794–795 (1973)). We did not suggest that federal courts should honor partisan concerns, but rather identified the relevant state policies as those "'expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution.'" *Upham,* 456 U. S., at 41 (quoting *White*, 412 U. S., at 794–795). Because the District Court in *Upham* had exceeded its authority in drawing a new districting map, we made clear that the legislature was authorized to remedy the §5 violation with a map of its own choosing. See 456 U. S., at 44. *Upham*, then, stands only for the proposition that a state legislature is authorized to redraw a court-drawn congressional districting map when a district court has exceeded its remedial authority. *Upham* does not stand for the proposition that,

after a State embraces a valid, neutral court-drawn plan by asking this Court to affirm the opinion creating that plan, the State may then redistrict for the sole purpose of disadvantaging a minority political party.

Indeed, to conclude otherwise would reflect a fundamental misunderstanding of the reason why we have held that state legislatures, rather than federal courts, should have the primary task of creating apportionment plans that comport with federal law. We have so held because "a state legislature is the institution that is by far the best situated to identify and then reconcile traditional state policies" with the requirements of federal law, *Finch,* 431 U. S., at 414–415, not because we wish to supply a dominant party with an opportunity to disadvantage its political opponents. Indeed, a straightforward application of settled constitutional law leads to the inescapable conclusion that the State may not decide to redistrict if its sole motivation is "to minimize or cancel out the voting strength of racial *or political* elements of the voting population," *Fortson,* 379 U. S., at 439 (emphasis added).

The requirements of the Federal Constitution that limit the State's power to rely exclusively on partisan preferences in drawing district lines are the Fourteenth Amendment's prohibition against invidious discrimination, and the First Amendment's protection of citizens from official retaliation based on their political affiliation. The equal protection component of the Fourteenth Amendment requires actions taken by the sovereign to be supported by some legitimate interest, and further establishes that a bare desire to harm a politically disfavored group is not a legitimate interest. See, *e.g., Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432, 447 (1985). Similarly, the freedom of political belief and association guaranteed by the First Amendment prevents the State, absent a compelling interest, from "penalizing citizens because of their participation in the electoral process, . . .

their association with a political party, or their expression of political views." *Vieth*, 541 U. S., at 314 (KENNEDY, J., concurring in judgment) (citing *Elrod* v. *Burns*, 427 U. S. 347 (1976) (plurality opinion)). These protections embodied in the First and Fourteenth Amendments reflect the fundamental duty of the sovereign to govern impartially. *E.g., Lehr* v. *Robertson,* 463 U. S. 248, 265 (1983); *New York City Transit Authority* v. *Beazer,* 440 U. S. 568 (1979).

The legislature's decision to redistrict at issue in this litigation was entirely inconsistent with these principles. By taking an action for the sole purpose of advantaging Republicans and disadvantaging Democrats, the State of Texas violated its constitutional obligation to govern impartially. "If a State passed an enactment that declared 'All future apportionment shall be drawn so as most to burden Party X's rights to fair and effective representation, though still in accord with one-person, one-vote principles,' we would surely conclude the Constitution had been violated." *Vieth*, 541 U. S., at 312 (KENNEDY, J., concurring in judgment).

### III

Relying solely on *Vieth,* JUSTICE KENNEDY maintains that even if legislation is enacted based solely on a desire to harm a politically unpopular minority, this fact is insufficient to establish unconstitutional partisan gerrymandering absent proof that the legislation did in fact burden "the complainants' representative rights." *Ante*, at 11. This conclusion—which clearly goes to the merits, rather than the manageability, of a partisan gerrymandering claim—is not only inconsistent with the constitutional requirement that state action must be supported by a legitimate interest, but also provides an insufficient response to appellants' claim on the merits.

JUSTICE KENNEDY argues that adopting "the modified

sole-intent test" could "encourage partisan excess at the outset of the decade, when a legislature redistricts pursuant to its decennial constitutional duty and is then immune from the charge of sole-motivation." *Ante,* at 12–13. But this would be a problem of the Court's own making. As the decision in *Cox* v. *Larios*, 542 U. S. 947, demonstrates, there are, in fact, readily manageable judicial standards that would allow injured parties to challenge excessive (and unconstitutional) partisan gerrymandering undertaken in response to the release of the decennial census data.[5]    See also *Vieth*, 541 U. S., at 328–339 (STEVENS, J., dissenting); *id.*, at 347–353 (SOUTER, J., joined by GINSBURG, J., dissenting); *id.*, at 365–367 (BREYER, J., dissenting).    JUSTICE KENNEDY's concern about a heightened incentive to engage in such excessive partisan gerrymandering would be avoided if the Court were willing to enforce those standards.

In any event, JUSTICE KENNEDY's additional requirement that there be proof that the gerrymander did in fact burden the complainants' representative rights is clearly satisfied by the record in this litigation.    Indeed, the

——————

[5] See *Larios* v. *Cox,* 300 F. Supp. 2d 1320, 1342–1353 (ND Ga. 2004) *(per curiam).*    In *Cox*, the three-judge District Court undertook a searching review of the entire record in concluding that the population deviations in the state legislative districts created for the Georgia House and Senate after the release of the 2000 census data were not driven by any traditional redistricting criteria, such as compactness or preserving county lines, but were instead driven by the impermissible factors of regional favoritism and the discriminatory protection of Democratic incumbents. If there were no judicially manageable standards to assess whether a State's adoption of a redistricting map was based on valid governmental objectives, we would not have summarily affirmed the decision in *Cox* over the dissent of only one Justice.    See 542 U. S. 947; *id.*, at 951 (SCALIA, J., dissenting).    In addition, as Part III of the Court's opinion and this Part of my opinion demonstrate, assessing whether a redistricting map has a discriminatory impact on the opportunities for voters and candidates of a particular party to influence the political process is a manageable judicial task.

Court's accurate exposition of the reasons why the changes to District 23 diluted the voting rights of Latinos who remain in that district simultaneously explains why those changes also disadvantaged Democratic voters and thus demonstrates that the effects of a political gerrymander can be evaluated pursuant to judicially manageable standards.

In my judgment the record amply supports the conclusion that Plan 1374C not only burdens the minority party in District 23, but also imposes a severe statewide burden on the ability of Democratic voters and politicians to influence the political process.[6]

In arguing that Plan 1374C does not impose an unconstitutional burden on Democratic voters and candidates, the State takes the position that the plan has resulted in an equitable distribution of political power between the State's two principal political parties. The State emphasizes that in the 2004 elections—held pursuant to Plan 1374C—Republicans won 21 of 32, or 66%, of the congressional seats. That same year, Republicans carried 58% of the vote in statewide elections. Admittedly, these numbers do suggest that the State's congressional delegation was "roughly proportional" to the parties' share of the statewide vote, Brief for State Appellees 44, particularly in light of the fact that our electoral system tends to produce a "seat bonus" in which a party that wins a majority of the vote generally wins an even larger majority of the seats, see Brief for Alan Heslop et al. as *Amici Curiae* (describing the seat bonus phenomenon). Cf. *ante*, at 12 (opinion of KENNEDY, J.) (arguing that, compared to the redistricting plan challenged in *Vieth*, "Plan 1374C can be seen as

_____

[6] Although the burdened group at issue in this litigation consists of Democratic voters and candidates, the partisan gerrymandering analysis throughout this opinion would be equally applicable to any "politically coherent group whose members engaged in bloc voting." *Vieth,* 541 U. S., at 347 (SOUTER, J., joined by GINSBURG, J., dissenting).

making the party balance more congruent to statewide party power").

That Plan 1374C produced a "roughly proportional" congressional delegation in 2004 does not, however, answer the question whether the plan has a discriminatory effect against Democrats. As appellants point out, whether a districting map is biased against a political party depends upon the bias in the map itself—in other words, it depends upon the opportunities that the map offers each party, regardless of how candidates perform in a given year. And, as the State's expert found in this litigation, Plan 1374C clearly has a discriminatory effect in terms of the opportunities it offers the two principal political parties in Texas. Indeed, that discriminatory effect is severe.

According to Professor Gaddie, the State's expert, Plan 1374C gives Republicans an advantage in 22 of 32 congressional seats. The plaintiffs' expert, Professor Alford, who had been cited favorably by the *Balderas* Court as having applied a "neutral approach" to redistricting in that litigation, App. to Juris. Statement 207a, agreed. He added that, in his view, the only surprise from the 2004 elections was "how far things moved" toward achieving a 22-to-10 pro-Republican split "in a single election year," *id.*, at 226a (declaration of John R. Alford, Ph.D.).[7] But this 22-to-10 advantage does not depend on Republicans winning the 58% share of the statewide vote that they

_____

[7] In the 2004 congressional elections, Republicans won 21 of the 22 seats that had been designed to favor Republicans in Plan 1374C. One Democratic incumbent, Representative Chet Edwards, narrowly defeated (with 51% of the vote) his nonincumbent Republican challenger in a Republican-leaning district; Edwards outspent his challenger, who lacked strong ties to the principal communities in the district. Republicans are likely to spend more money and find a stronger challenger in 2006, which will create a "very significant chance" of a Republican defeating Edwards. App. to Juris. Statement 224a, 226a.

received in 2004. Instead, according to Professor Gaddie, Republicans would be likely to carry 22 of 32 congressional seats if they won only 52% of the statewide vote. App. 216, 229. Put differently, Plan 1374C ensures that, even if the Democratic Party succeeds in convincing 10% of the people who voted for Republicans in the last statewide elections to vote for Democratic congressional candidates,[8] which would constitute a major electoral shift, there is unlikely to be *any* change in the number of congressional seats that Democrats win. Moreover, Republicans would still have an overwhelming advantage if Democrats achieved full electoral parity. According to Professor Gaddie's analysis, Republicans would be likely to carry 20 of the 32 congressional seats even if they only won 50% (or, for that matter, 49%) of the statewide vote. *Id.*, at 216, 229–230. This demonstrates that Plan 1374C is inconsistent with the symmetry standard, a measure social scientists use to assess partisan bias, which is undoubtedly "a reliable standard" for measuring a "burden . . . on the complainants' representative rights," *ante*, at 11 (opinion of KENNEDY, J.).

The symmetry standard "requires that the electoral system treat similarly-situated parties equally, so that each receives the same fraction of legislative seats for a particular vote percentage as the other party would receive if it had received the same percentage." Brief for Gary King et al. as *Amici Curiae* 4–5. This standard is widely accepted by scholars as providing a measure of partisan fairness in electoral systems. See, *e.g.*, Tufte, The Relationship Between Seats and Votes in Two-Party Systems, 67 Am. Pol. Sci. Rev. 540, 542–543 (1973); Gel-

─────────

[8] If 10% of Republican voters decided to vote for Democratic candidates, and if there were no other changes in voter turnout or preferences, the Republicans' share of the statewide vote would be reduced from 58% to 52%.

man & King, Enhancing Democracy Through Legislative
Redistricting, 88 Am. Pol. Sci. Rev. 541, 545 (1994);
Thompson, Election Time: Normative Implications of
Temporal Properties of the Electoral Process in the United
States, 98 Am. Pol. Sci. Rev. 51, 53, and n. 7 (2004); Eng-
strom & Kernell, Manufactured Responsiveness: The
Impact of State Electoral Laws on Unified Party Control of
the Presidency and House of Representatives, 1840–1940,
49 Am. J. Pol. Sci. 531, 541 (2005).  Like other models that
experts use in analyzing vote dilution claims, compliance
with the symmetry standard is measured by extrapolating
from a sample of known data, see, *e.g.*, *Thornburg* v.
*Gingles,* 478 U. S. 30, 53 and n. 20 (1986) (discussing ex-
treme case analysis and bivariate ecological regression
analysis).  In this litigation, the symmetry standard was
not simply proposed by an *amicus* to this Court, it was
also used by the expert for plaintiffs and the expert for the
State in assessing the degree of partisan bias in Plans
1151C and 1374C.  See App. 34–42 (report of Professor
Alford); *id.*, at 189–193, 216 (report of Professor Gaddie).

Because, as noted above, Republicans would have an
advantage in a significant majority of seats even if the
statewide vote were equally distributed between Republi-
cans and Democrats, Plan 1374C constitutes a significant
departure from the symmetry standard.  By contrast,
based on Professor Gaddie's evaluation, the *Balderas* Plan,
though slightly biased in favor of Republicans, provided
markedly more equitable opportunities to Republicans and
Democrats.  For example, consistent with the symmetry
standard, under Plan 1151C the parties were likely to
each take 16 congressional seats if they won 50% of the
statewide vote.  See App. 216.

Plan 1374C then, clearly has a discriminatory impact on
the opportunities that Democratic citizens have to elect
candidates of their choice.  Moreover, this discriminatory
effect cannot be dismissed as *de minimis*.  According to the

State's expert, if each party receives half the statewide vote, under Plan 1374C the Republicans would carry 62.5% (20) of the congressional seats, whereas the Democrats would win 37.5% (12) of those seats. In other words, at the vote distribution point where a politically neutral map would result in zero differential in the percentage of seats captured by each party, Plan 1374C is structured to create a 25% differential. When a redistricting map imposes such a significant disadvantage on a politically salient group of voters, the State should shoulder the burden of defending the map. Cf. *Brown* v. *Thomson,* 462 U. S. 835, 842–843 (1983) (holding that the implementation of a redistricting plan for state legislative districts with population deviations over 10% creates a prima facie case of discrimination under the Equal Protection Clause, thus shifting the burden to the State to defend the plan); *Larios* v. *Cox,* 300 F. Supp. 2d 1320, 1339–1340 (ND Ga.) *(per curiam),* summarily aff'd, 542 U. S. 947 (2004) (same, but further pointing out that the "'ten percent rule'" is not a safe harbor, and concluding that, under the circumstances of the case before it, a state legislative districting plan was unconstitutional even though population deviations were under 10%). At the very least, once plaintiffs have established that the legislature's sole purpose in adopting a plan was partisan—as plaintiffs have established in this action, see Part II, *supra*—such a severe discriminatory effect should be sufficient to meet any additional burden they have to demonstrate that the redistricting map accomplishes its discriminatory purpose.[9]

———————

[9] JUSTICE KENNEDY faults proponents of the symmetry standard for not "providing a standard for deciding how much partisan bias is too much," *ante*, at 13. But it is this Court, not proponents of the symmetry standard, that has the judicial obligation to answer the question of how much unfairness is too much. It would, of course, be an eminently manageable standard for the Court to conclude that deviations of over

The bias in Plan 1374C is most striking with regard to its effect on the ability of Democratic voters to elect candidates of their choice, but its discriminatory effect does not end there. Plan 1374C also lessens the influence Democratic voters are likely to be able to exert over Republican lawmakers, thus further minimizing Democrats' capacity to play a meaningful role in the political process.

Even though it "defies political reality to suppose that members of a losing party have as much political influence over . . . government as do members of the victorious party," *Davis* v. *Bandemer,* 478 U. S. 109, 170 (1986) (Powell, J., concurring in part and dissenting in part), the Court has recognized that "the power to influence the political process is not limited to winning elections," *id.*, at 132 (plurality opinion); see also *Georgia* v. *Ashcroft,* 539 U. S. 461, 482 (2003). In assessing whether members of a group whose candidate is defeated at the polls can nonetheless influence the elected representative, it is "important to consider 'the likelihood that candidates elected without decisive minority support would be willing to take the minority's interests into account.'" *Id.,* at 482 (quoting *Gingles,* 478 U. S., at 100 (O'Connor, J., concurring in judgment)). One justification for majority rule is that elected officials *will* generally "take the minority's interests into account," in part because the majority recognizes

––––––––

10% from symmetry create a prima facie case of an unconstitutional gerrymander, just as population deviations among districts of more than 10% create such a prima facie case. Or, the Court could conclude that a significant departure from symmetry is one relevant factor in analyzing whether, under the totality of the circumstances, a districting plan is an unconstitutional partisan gerrymander. See n. 11, *infra.* At any rate, proponents of the symmetry standard have provided a helpful (though certainly not talismanic) tool in this type of litigation. While I appreciate JUSTICE KENNEDY's leaving the door open to the use of the standard in future cases, see *ante,* at 13, I believe it is the role of this Court, not social scientists, to determine how much partisan dominance is too much.

that preferences shift and today's minority could be tomorrow's majority. See, *e.g.*, L. Guinier, Tyranny of the Majority 77 (1994); J. Ely, Democracy and Distrust 84 (1980); cf. Letter from James Madison to Thomas Jefferson, (Oct. 24, 1787), reprinted in Republic of Letters 502 (J. Smith ed. 1995) (arguing that "[t]he great desideratum in Government is . . . to modify the sovereignty as that it may be sufficiently neutral between different parts of the Society" and thus prevent a fixed majority from oppressing the minority). Indeed, this Court has concluded that our system of representative democracy is premised on the assumption that elected officials will seek to represent their constituency as a whole, rather than any dominant faction within that constituency. See *Shaw* v. *Reno,* 509 U. S. 630, 648 (1993).

Plan 1374C undermines this crucial assumption that congressional representatives from the majority party (in this case Republicans) will seek to represent their entire constituency. "When a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole." *Ibid. Shaw*'s analysis of representational harms in the racial gerrymandering context applies with at least as much force in the partisan gerrymandering context because, in addition to the possibility that a representative may believe her job is only to represent the interests of a dominant constituency, a representative may feel more beholden to the cartographers who drew her district than to the constituents who live there. See *Vieth*, 541 U. S., at 329–331 (STEVENS, J., dissenting). In short, Plan 1374C reduces the likelihood that Republican representatives elected from gerrymandered districts will act as vigorous advocates for the needs and interests of Democrats who reside within their districts.

In addition, Plan 1374C further weakens the incentives
for members of the majority party to take the interests of
the minority party into account, because it locks in a
Republican congressional majority of 20–22 seats, so long
as Republicans achieve at least 49% of the vote.    The
result of this lock-in is that, according to the State's ex-
pert, between 19 and 22 of these Republican seats are safe
seats, meaning seats where one party has at least a 10%
advantage over the other.    See App. 227–228 (expert re-
port of Professor Gaddie).    Members of Congress elected
from such safe districts need not worry much about the
possibility of shifting majorities, so they have little reason
to be responsive to political minorities within their
district.[10]

––––––––––

[10] Safe seats may harm the democratic process in other ways as well.
According to one recent article co-authored by a former Chairman of the
Federal Election Commission, electoral competition "plainly has a
positive effect on the interest and participation of voters in the electoral
process."    Potter & Viray, Election Reform: Barriers to Participation, 36
U. Mich. J. L. Reform 547, 575 (2003) (hereinafter Potter & Viray); see
also L. Guinier, Tyranny of the Majority 85 (1994).    The impact of
noncompetitive elections in depressing voter turnout is especially
troubling in light of the fact that voter participation in the United
States lags behind, often well behind, participation rates in other
democratic nations.    Potter & Viray 575–576, and n. 200.    In addition,
the creation of safe seats tends to polarize decisionmaking bodies.    See,
*e.g.*, *Clingman* v. *Beaver,* 544 U. S. 581, 620 (2005) (STEVENS, J., joined by
GINSBURG, J., dissenting) (noting that safe districts can "increase the
bitter partisanship that has already poisoned some of those [legislative]
bodies that once provided inspiring examples of courteous adversary
debate and deliberation"); Cox, Partisan Gerrymandering and Disaggre-
gated Redistricting, 2004 S. Ct. Rev. 409, 430 (arguing that "safe seats
produce more polarized representatives because, by definition, the
median voter in a district that is closely divided between the two major
parties is more centrist than the median voter in a district dominated
by one party"); Raviv, Unsafe Harbors: One Person, One Vote and
Partisan Redistricting, 7 U. Pa. J. Const. L. 1001, 1068 (2005) (arguing
that safe districts encourage polarization in decisionmaking bodies
because representatives from those districts have to cater only to voters

In sum, I think it is clear that Plan 1374C has a severe burden on the capacity of Texas Democrats to influence the political process. Far from representing an example of "one of the most significant acts a State can perform to ensure citizen participation in republican self-governance," *ante*, at 9 (opinion of KENNEDY, J.), the plan guarantees that the Republican-dominated membership of the Texas congressional delegation will remain constant notwithstanding significant pro-Democratic shifts in public opinion. Moreover, the harms Plan 1374C imposes on Democrats are not "hypothetical" or "counterfactual," *id.*, at 13, simply because, in the 2004 elections, Republicans won a share of seats roughly proportional to their statewide voting strength. By creating 19–22 safe Republican seats, Plan 1374C has already harmed Democrats because, as explained above, it significantly undermines the likelihood that Republican lawmakers from those districts will be responsive to the interests of their Democratic constituents. In addition, Democrats will surely have a more difficult time recruiting strong candidates, and mobilizing voters and resources, in these safe Republican districts. Thus, appellants have satisfied any requisite obligation to demonstrate that they have been harmed by the adoption of Plan 1374C.

Furthermore, as discussed in Part II, *supra*, the sole intent motivating the Texas Legislature's decision to replace Plan 1151C with Plan 1374C was to benefit Republicans and burden Democrats. Accordingly, in terms of both its intent and effect, Plan 1374C violates the sovereign's duty to govern impartially.

––––––––––

from one party). See generally Issacharoff & Karlan, Where to Draw the Line? 153 U. Pa. L. Rev. 541, 574 (providing data about the large percentage of safe seats in recent congressional and state legislative elections, and concluding that "[n]oncompetitive elections threaten both the legitimacy and the vitality of democratic governance").

> "When a State adopts rules governing its election ma-
> chinery or defining electoral boundaries, those rules
> must serve the interests of the entire community.  If
> they serve no purpose other than to favor one seg-
> ment—whether racial, ethnic, religious, or political—
> that may occupy a position of strength at a particular
> point in time, or to disadvantage a politically weak
> segment of the community, they violate the constitu-
> tional guarantee of equal protection."  *Karcher*,
> 462 U. S., at 748 (STEVENS, J., concurring) (citation
> omitted).

Accordingly, even accepting the Court's view that a ger-
rymander is tolerable unless it in fact burdens the minor-
ity's representative rights, I would hold that Plan 1374C is
unconstitutional.[11]

## IV

Even if I thought that Plan 1374C were not unconstitu-
tional in its entirety, I would hold that the cracking of
District 24—which, under the *Balderas* Plan, was a major-
ity-minority district that consistently elected Democratic
Congressman Martin Frost—was unconstitutional.  Read-

---

[11] In this litigation expert testimony provided the principal evidence
about the effects of the plan that satisfy the test JUSTICE KENNEDY
would impose.  In my judgment, however, most statewide challenges to
an alleged gerrymander should be evaluated primarily by examining
these objective factors: (1) the number of people who have been moved
from one district to another, (2) the number of districts that are less
compact than their predecessors, (3) the degree to which the new plan
departs from other neutral districting criteria, including respect for
communities of interest and compliance with the Voting Rights Act, (4)
the number of districts that have been cracked in a manner that
weakens an opposition party incumbent, (5) the number of districts
that include two incumbents from the opposite party, (6) whether the
adoption of the plan gave the opposition party, and other groups, a fair
opportunity to have input in the redistricting process, (7) the number of
seats that are likely to be safe seats for the dominant party, and (8) the
size of the departure in the new plan from the symmetry standard.

ily manageable standards enable us to analyze both the purpose and the effect of the "granular" decisions that produced the replacements for District 24. Applying these standards, which I set forth below, I believe it is clear that the manipulation of this district for purely partisan gain violated the First and Fourteenth Amendments.

The same constitutional principles discussed above concerning the sovereign's duty to govern impartially inform the proper analysis for claims that a particular district is an unconstitutional partisan gerrymander. We have on several occasions recognized that a multimember district is subject to challenge under the Fourteenth Amendment if it operates "'to minimize or cancel out the voting strength of racial *or political* elements of the voting population.'" *E.g.*, *Gaffney* v. *Cummings,* 412 U. S. 735, 751 (1973) (emphasis added); *Burns* v. *Richardson,* 384 U. S. 73, 88 (1966). There is no constitutionally relevant distinction between the harms inflicted by single-member district gerrymanders that minimize or cancel out the voting strength of a political element of the population and the same harms inflicted by multimember districts. In both situations, the State has interfered with the voter's constitutional right to "engage in association for the advancement of beliefs and ideas," *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 460 (1958).

I recognize that legislatures will always be aware of politics and that we must tolerate some consideration of political goals in the redistricting process. See *Cousins* v. *City Council of Chicago*, 466 F. 2d 830, 847 (CA7 1972) (Stevens, J., dissenting). However, I think it is equally clear that, when a plaintiff can prove that a legislature's predominant motive in drawing a particular district was to disadvantage a politically salient group, and that the decision has the intended effect, the plaintiff's constitutional rights have been violated. See *id.*, at 859–860. Indeed, in *Vieth*, five Members of this Court explicitly

recognized that extreme partisan gerrymandering violates
the Constitution. See 541 U. S., at 307, 312–316
(KENNEDY, J., concurring in judgment); *id.*, at 317–318
(STEVENS, J., dissenting); *id.*, at 343, 347–352 (SOUTER, J.,
joined by GINSBURG, J., dissenting); *id.*, at 356–357, 366–
367 (BREYER, J., dissenting). The other four Justices in
*Vieth* stated that they did not disagree with that conclu-
sion. See *id.*, at 292 (plurality opinion). The *Vieth* plural-
ity nonetheless determined that there were no judicially
manageable standards to assess partisan gerrymandering
claims. *Id.*, at 305–306. However, the following test,
which shares some features of the burden-shifting stan-
dard for assessing unconstitutional partisan gerrymander-
ing proposed by JUSTICE SOUTER's opinion in *Vieth*, see
*id.,* at 348–351, would provide a remedy for at least the
most blatant unconstitutional partisan gerrymanders and
would also be eminently manageable.

First, to have standing to challenge a district as an un-
constitutional partisan gerrymander, a plaintiff would have
to prove that he is either a candidate or a voter who re-
sided in a district that was changed by a new districting
plan. See *id.*, at 327–328 (STEVENS, J., dissenting) (dis-
cussing *United States* v. *Hays,* 515 U. S. 737 (1995)). See
also 541 U. S., at 347–348 (SOUTER, J., joined by GINSBURG,
J., dissenting) (citing *Hays*). A plaintiff with standing would
then be required to prove both improper purpose and effect.

With respect to the "purpose" portion of the inquiry, I
would apply the standard fashioned by the Court in its
racial gerrymandering cases. Under the Court's racial
gerrymandering jurisprudence, judges must analyze
whether plaintiffs have proved that race was the predomi-
nant factor motivating a districting decision such that
other, race-neutral districting principles were subordi-
nated to racial considerations. If so, strict scrutiny ap-
plies, see, *e.g.*, *Vera*, 517 U. S., at 958–959 (plurality opin-
ion), and the State must justify its districting decision by

establishing that it was narrowly tailored to serve a com-
pelling state interest, such as compliance with §2 of the
Voting Rights Act, see *King* v. *Illinois Bd. of Elections*, 979
F. Supp. 619 (ND Ill. 1997), aff'd, 522 U. S. 1087 (1998);
*Vera*, 517 U. S., at 994 (O'Connor, J., concurring).[12]　How-
ever, strict scrutiny does not apply merely because race
was one motivating factor behind the drawing of a major-
ity-minority district.　*Id.,* at 958–959 (plurality opinion);
see also *Easley* v. *Cromartie,* 532 U. S. 234, 241 (2001).
Applying these standards to the political gerrymandering
context, I would hold that, if a plaintiff carried her burden
of demonstrating that redistricters subordinated neutral
districting principles to political considerations and that
their predominant motive was to maximize one party's
power, she would satisfy the intent prong of the constitu-
tional inquiry.[13]　Cf. *Vieth*, 541 U. S., at 349–350 (SOUTER,
J., joined by GINSBURG, J., dissenting) (discussing the
importance of a district's departures from traditional
districting principles in determining whether the district
is an unconstitutional gerrymander).

　With respect to the effects inquiry, a plaintiff would be
required to demonstrate the following three facts: (1) her
candidate of choice won election under the old plan; (2) her

---

　[12]JUSTICE BREYER has authorized me to state that he agrees with
JUSTICE SCALIA that compliance with §5 of the Voting Rights Act is also
a compelling state interest.　See *post*, at 9.　I too agree with JUSTICE
SCALIA on this point.

　[13]If, on the other hand, the State could demonstrate, for example,
that the new district was part of a statewide scheme designed to
apportion power fairly among politically salient groups, or to enhance
the political power of an underrepresented community of interest (such
as residents of an economically distressed region), the State would
avoid liability even if the results of such statewide districting had
predictably partisan effects.　See generally *Vieth,* 541 U. S., at 351–352
(SOUTER, J., joined by GINSBURG, J., dissenting) (discussing legitimate
interests that a State could posit as a defense to a prima facie case of
partisan gerrymandering).

residence is now in a district that is a safe seat for the opposite party; and (3) her new district is less compact than the old district. The first two prongs of this effects inquiry would be designed to measure whether or not the plaintiff has been harmed, whereas the third prong would be relevant because the shape of the gerrymander has always provided crucial evidence of its character, see *Karcher,* 462 U. S., at 754–758, 762–763 (STEVENS, J., concurring); see also *Vieth*, 541 U. S., at 348 (SOUTER, J., joined by GINSBURG, J., dissenting) (noting that compactness is a traditional districting principle, which "can be measured quantitatively"). Moreover, a safe harbor for more compact districts would allow a newly elected majority to eliminate a prior partisan gerrymander without fear of liability or even the need to devote resources to litigating whether or not the legislature had acted with an impermissible intent.

If a plaintiff with standing could meet the intent and effects prong of the test outlined above, that plaintiff would clearly have demonstrated a violation of her constitutional rights. Moreover, I do not think there can be any colorable claim that this test would not be judicially manageable.

Applying this test to the facts of this case, I think plaintiffs in new Districts 6, 24, 26, and 32—four of the districts in Plan 1374C that replaced parts of *Balderas* District 24—can demonstrate that their constitutional rights were violated by the cracking of *Balderas* District 24. First, I assume that there are plaintiffs who reside in Districts 6, 24, 26, and 32, and whose homes were previously located in *Balderas* District 24.[14] Accordingly, I assume that there

―――――――

[14] This assumption is justified based on counsel's undisputed representations at oral argument. See Tr. Oral Arg. 35. However, if there were any genuine dispute about whether there are plaintiffs whose residences were previously located in *Balderas* District 24, but which are now incorporated into Districts 6, 24, 26, and 32, a remand would

are plaintiffs who have standing to challenge the creation of these districts.

Second, plaintiffs could easily satisfy their burden of proving predominant partisan purpose. Indeed, in this litigation, the State has acknowledged that its predominant motivation for cracking District 24 was to achieve partisan gain. See State Post-Trial Brief 51–52 (noting that, in spite of concerns that the cracking of District 24 could lead to Voting Rights Act liability, "[t]he Legislature . . . chose to pursue a political goal of unseating Congressman Frost instead of following a course that might have lowered risks [of such liability]").

The District Court agreed with the State's analysis on this issue. In the District Court, plaintiffs claimed that the creation of District 26 violated the Equal Protection Clause because the decision to create District 26 was motivated by unconstitutional racial discrimination against black voters. The District Court rejected this argument, concluding that the State's decision to crack *Balderas* District 24 was driven not by racial prejudice, but rather by the political desire to maximize Republican advantage and to "remove Congressman Frost," which required that Frost "lose a large portion of his Democratic constituency, many of whom lived in a predominately Black area of Tarrant County." *Session*, 298 F. Supp. 2d, at 471.

That an impermissible, predominantly partisan, purpose motivated the cracking of former District 24 is further demonstrated by the fact that, in my judgment, this cracking caused Plan 1374C to violate §5 of the Voting Rights Act, 42 U. S. C. §1973c. The State's willingness to adopt a plan that violated its legal obligations under the Voting Rights Act, combined with the other indicia of partisan intent in this litigation, is compelling evidence

————

be appropriate to allow the District Court to address this issue.

that politics was not simply one factor in the cracking of District 24, but rather that it was an impermissible, predominant factor.

Section 5 of the Voting Rights Act "was intended 'to insure that that [the gains thus far achieved in minority political participation] shall not be destroyed through new [discriminatory] procedures and techniques.'" *Beer* v. *United States,* 425 U. S. 130, 140–141 (1976) (quoting S. Rep. No. 94–295, p. 19 (1975) (alteration in *Beer*)). To effectuate this goal, §5 prevents covered jurisdictions, such as Texas, from making changes to their voting procedures "that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Georgia*, 539 U. S., at 477 (internal quotation marks and citations omitted). In other words, during the redistricting process, covered jurisdictions may not "leave minority voters with less chance to be effective in electing preferred candidates than they were" under the prior districting plan. See *id.*, at 494 (SOUTER, J., dissenting). By cracking *Balderas* District 24, and by not offsetting the loss in black voters' ability to elect preferred candidates elsewhere, Plan 1374C resulted in impermissible retrogression.

Under the *Balderas* Plan, black Americans constituted a majority of Democratic primary voters in District 24. According to the unanimous report authored by staff attorneys in the Voting Section of the Department of Justice, black voters in District 24 generally voted cohesively, and thus had the ability to elect their candidate of choice in the Democratic primary. Section 5 Recommendation Memorandum 33 (Dec. 12, 2003), available at http://www.washingtonpost.com/wp-srv/nation/documents/ texasDOJmemo.pdf (all Internet materials as visited June 21, 2006, and available in Clerk of Court's case file). Moreover, the black community's candidates of choice could consistently attract sufficient crossover voting from

nonblacks to win the general election, even though blacks did not constitute a majority of voters in the general election. *Id.*, at 33–34. Representative Frost, who is white, was clearly the candidate of choice of the black community in District 24, based on election returns, testimony of community leaders, and "scorecards" he received from groups dedicated to advancing the interests of African-Americans. See *id.*, at 35.

As noted above, in Plan 1374C, "the minority community in [*Balderas* District] 24 [was] splintered and submerged into majority Anglo districts in the Dallas-Fort Worth area." *Id.*, at 67. By dismantling one district where blacks had the ability to elect candidates of their choice,[15] and by not offsetting this loss of a district with another district where black voters had a similar opportunity, Plan 1374C was retrogressive, in violation of §5 of the Voting Rights Act. See *id.*, at 31, 67–69.

Notwithstanding the unanimous opinion of the staff attorneys in the Voting Section of the Justice Department that Plan 1374C was retrogressive and that the Attorney General should have interposed an objection, the Attorney General elected to preclear the map, thus allowing it to

--------------------------------------------------

[15] In the decision below, the District Court concluded that black voters did not in fact "control" electoral outcomes in District 24. See *Session* v. *Perry*, 298 F. Supp. 2d 451, 498 (2004). Even assuming, as JUSTICE KENNEDY concludes, see *ante*, at 34, that the District Court did not commit reversible error in its analysis of this issue, the lack of "control" might be relevant in analyzing plaintiffs' vote dilution claim under §2, but it is not relevant in evaluating whether Plan 1374C is retrogressive under §5. It is indisputable that, at the very least, *Balderas* District 24 was a strong influence district for black voters, that is, a district where voters of color can "play a substantial, if not decisive, role in the electoral process." *Georgia* v. *Ashcroft*, 539 U. S. 461, 482 (2003). Accordingly, by dismantling *Balderas* District 24, and by failing to create a strong influence district elsewhere, Plan 1374C was retrogressive. See 539 U. S., at 482 (explaining that, in deciding whether a plan is retrogressive, "a court must examine whether a new plan adds or subtracts 'influence districts'").

take effect. We have held that, under the statutory
scheme, voters may not directly challenge the Attorney
General's decision to preclear a redistricting plan, see
*Morris* v. *Gressette,* 432 U. S. 491 (1977), which means that
the Attorney General's vigilant enforcement of the Act is
critical, and which also means that plaintiffs could not
bring a §5 challenge as part of this litigation.[16] However,
judges are frequently called upon to consider whether a
redistricting plan violates §5, because a covered jurisdic-
tion has the option of seeking to achieve preclearance by
either submitting its plan to the Attorney General or filing
a declaratory judgment action in the District Court for the
District of Columbia, whose judgment is subject to review
by this Court, see, *e.g.*, *Georgia*, 539 U. S. 461. Accord-
ingly, we have the tools to analyze whether a redistricting
plan is retrogressive.

Even though the §5 issue is not directly before this
Court, for the reasons stated above, I believe that the
cracking of District 24 caused Plan 1374C to be retrogres-
sive. And the fact that the legislature promulgated a retro-
gressive plan is relevant, because it provides additional
evidence that the legislature acted with a predominantly
partisan purpose. Complying with §5 is a neutral districting
principle, and the legislature's promulgation of a retrogres-
sive redistricting plan buttresses my conclusion that the
"legislature subordinated traditional [politically-]neutral
districting principles . . . to [political] considerations." *Miller*

-------

[16] As JUSTICE KENNEDY explains, see *ante*, at 33–36, plaintiffs did,
however, challenge District 24 under §2. I am in substantial agreement
with JUSTICE SOUTER's discussion of this issue. See *post*, at 3–8.
Specifically, I agree with JUSTICE SOUTER that the "50% rule," which
finds no support in the text, history, or purposes of §2, is not a proper
part of the statutory vote dilution inquiry. For the reasons stated in
my analysis of the "unique question of law . . . raised in this appeal,"
*supra* at 11, and in this part of my opinion, however, it is so clear that
the cracking of District 24 created an unconstitutional gerrymander
that I find it unnecessary to address the statutory issue separately.

v. *Johnson,* 515 U. S. 900, 916 (1995). This evidence is particularly compelling in light of the State's acknowledgment that "[t]he Legislature . . . chose to pursue a political goal of unseating Congressman Frost instead of following a course that might have lowered risks in the preclearance process." State Post-Trial Brief 52 (citing, *inter alia,* trial testimony of state legislators).

In sum, the record in this litigation makes clear that the predominant motive underlying the fragmentation of *Balderas* District 24 was to maximize Republicans' electoral opportunities and ensure that Congressman Frost was defeated.

Turning now to the effects test I have proposed, plaintiffs in new Districts 6, 24, 36, and 32 could easily meet the three parts of that test because: (1) under the *Balderas* plan, they lived in District 24 and their candidate of choice (Frost) was the winning candidate; (2) under Plan 1374C, they have been placed in districts that are safe seats for the Republican party, see App. 106 (showing that the Democratic share of the two-party vote in statewide elections from 1996 to 2002 was 40% or less in Districts 6, 24, 26, and 32); and (3) their new districts are less compact than *Balderas* District 24, see App. 319–320 (compactness scores for districts under the *Balderas* Plan and Plan 1374C).[17]

JUSTICE KENNEDY rejects my proposed effects test, as applied in this case, because, in his view *Balderas* District 24 lacks "any special claim to fairness," *ante,* at 36. But my analysis in no way depends on the proposition that *Balderas* District 24 was fair. The district *was* more

---

[17] Because new District 12, another district that covers portions of former District 24, is more compact than *Balderas* District 24, voters in new District 12 who previously resided in *Balderas* District 24 would not be able to bring a successful partisan gerrymandering claim under my proposed test, even though new District 12 is also a safe Republican district. See App. 106, 319–320.

compact than four of the districts that replaced it, and, as explained above, compactness serves important values in the districting process. This is why, in my view, a State that creates more compact districts should enjoy a safe harbor from partisan gerrymandering claims. However, the mere fact that a prior district was unfair should surely not provide a safe harbor for the creation of an even more unfair district. Conversely, a State may of course create less compact districts without violating the Constitution so long as its purpose is not to disadvantage a politically disfavored group. See *supra*, at 31–32 and n. 13. The reason I focus on *Balderas* District 24 is not because the district was fair, but because the prior district provides a clear benchmark in analyzing whether plaintiffs have been harmed.

In sum, applying the judicially manageable test set forth in this Part of my opinion reveals that the cracking of *Balderas* District 24 created several unconstitutional partisan gerrymanders. Even if I believed that Plan 1374C were not invalid in its entirety, I would reverse the judgment below with regard to Districts 6, 24, 26, and 32.

\*    \*    \*

For the foregoing reasons, although I concur with the majority's decision to invalidate District 23 under §2 of the Voting Rights Act, I respectfully dissent from the Court's decision to affirm the judgment below with respect to plaintiffs' partisan gerrymandering claim. I would reverse with respect to the plan as a whole, and also, more specifically, with respect to Districts 6, 24, 26, and 32.

# SUPREME COURT OF THE UNITED STATES

Nos. 05–204, 05–254, 05–276 and 05–439

LEAGUE OF UNITED LATIN AMERICAN CITIZENS,
ET AL., APPELLANTS
05–204　　　　　*v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.

TRAVIS COUNTY, TEXAS, ET AL., APPELLANTS
05–254　　　　　*v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.

EDDIE JACKSON, ET AL., APPELLANTS
05–276　　　　　*v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.

GI FORUM OF TEXAS, ET AL., APPELLANTS
05–439　　　　　*v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.

ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TEXAS

[June 28, 2006]

JUSTICE SOUTER, with whom JUSTICE GINSBURG joins, concurring in part and dissenting in part.

I join Part II–D of the principal opinion, rejecting the one-person, one-vote challenge to Plan 1374C based simply on its mid-decade timing, and I also join Part II–A, in which the Court preserves the principle that partisan gerrymandering can be recognized as a violation of equal protection, see *Vieth* v. *Jubelirer,* 541 U. S. 267, 306 (2004) (KENNEDY, J., concurring in judgment); *id.,* at 317 (STEVENS, J., dissenting); *id.,* at 346 (SOUTER, J., dissent-

ing); *id.*, at 355 (BREYER, J., dissenting). I see nothing to be gained by working through these cases on the standard I would have applied in *Vieth, supra,* at 346–355 (dissenting opinion), because here as in *Vieth* we have no majority for any single criterion of impermissible gerrymander (and none for a conclusion that Plan 1374C is unconstitutional across the board). I therefore treat the broad issue of gerrymander much as the subject of an improvident grant of certiorari, and add only two thoughts for the future: that I do not share JUSTICE KENNEDY's seemingly flat rejection of any test of gerrymander turning on the process followed in redistricting, see *ante*, at 10–14, nor do I rule out the utility of a criterion of symmetry as a test, see, *e.g.,* King & Browning, Democratic Representation and Partisan Bias in Congressional Elections, 81 Am. Pol. Sci. Rev. 1251 (1987). Interest in exploring this notion is evident, see *ante*, at 13 (principal opinion); *ante*, at 20–23 (STEVENS, J., concurring in part and dissenting in part); *post*, at 2 (BREYER, J., concurring in part and dissenting in part). Perhaps further attention could be devoted to the administrability of such a criterion at all levels of redistricting and its review.

I join Part III of the principal opinion, in which the Court holds that Plan 1374C's District 23 violates §2 of the Voting Rights Act of 1965, 42 U. S. C. §1973, in diluting minority voting strength. But I respectfully dissent from Part IV, in which a plurality upholds the District Court's rejection of the claim that Plan 1374C violated §2 in cracking the black population in the prior District 24 and submerging its fragments in new Districts 6, 12, 24, 26, and 32. On the contrary, I would vacate the judgment and remand for further consideration.

The District Court made a threshold determination resting reasonably on precedent of this Court and on a clear rule laid down by the Fifth Circuit, see *Valdespino* v. *Alamo Heights Independent School Dist.*, 168 F. 3d 848, 852–853 (1999), cert. denied, 528 U. S. 1114 (2000): the

first condition for making out a §2 violation, as set out in
*Thornburg* v. *Gingles,* 478 U. S. 30 (1986), requires "the
minority group . . . to demonstrate that it is sufficiently
large and geographically compact to constitute a majority
in a single-member district," *id.*, at 50, (here, the old
District 24) before a dilution claim can be recognized
under §2.[1]  Although both the plurality today and our own
prior cases have sidestepped the question whether a statu-
tory dilution claim can prevail without the possibility of a
district percentage of minority voters above 50%, see *ante*,
at 37; *Johnson* v. *De Grandy*, 512 U. S. 997, 1008–1009
(1994); *Voinovich* v. *Quilter*, 507 U. S. 146, 154 (1993);
*Growe* v. *Emison*, 507 U. S. 25, 41, n. 5 (1993); *Gingles*,
*supra*, at 46, n. 12, the day has come to answer it.

  Chief among the reasons that the time has come is the
holding in *Georgia* v. *Ashcroft*, 539 U. S. 461 (2003), that
replacement of a majority-minority district by a coalition
district with minority voters making up fewer than half
can survive the prohibition of retrogression under §5 of the
Voting Rights Act, 42 U. S. C. §1973c, enforced through
the preclearance requirement, *Georgia*, 539 U. S., at 482–
483.  At least under §5, a coalition district can take on the
significance previously accorded to one with a majority-
minority voting population.  Thus, despite the independ-
ence of §§2 and 5, *id.*, at 477–479, there is reason to think
that the integrity of the minority voting population in a
coalition district should be protected much as a majority-
minority bloc would be.  While protection should begin
through the preclearance process,[2] in jurisdictions where

─────────
  [1] In a subsequent case, however, we did not state the first *Gingles*
condition in terms of an absolute majority.  See *Johnson* v. *De Grandy*,
512 U. S. 997, 1008 (1994) ("[T]he first *Gingles* condition requires the
possibility of creating more than the existing number of reasonably
compact districts with a sufficiently large minority population to elect
candidates of its choice").
  [2] Like JUSTICE STEVENS, I agree with JUSTICE SCALIA that compliance

that is required, if that process fails a minority voter has
no remedy under §5, because the State and the Attorney
General (or the District Court for the District of Columbia)
are the only participants in preclearance, see 42 U. S. C.
§1973c.  And, of course, vast areas of the country are not
covered by §5.  Unless a minority voter is to be left with no
recourse whatsoever, then, relief under §2 must be possi-
ble, as by definition it would not be if a numerical majority
of minority voters in a reconstituted or putative district is
a necessary condition.  I would therefore hold that a mi-
nority of 50% or less of the voting population might suffice
at the *Gingles* gatekeeping stage.  To have a clear-edged
rule, I would hold it sufficient satisfaction of the first
gatekeeping condition to show that minority voters in a
reconstituted or putative district constitute a majority of
those voting in the primary of the dominant party, that is,
the party tending to win in the general election.[3]

This rule makes sense in light of the explanation we
gave in *Gingles* for the first condition for entertaining a
claim for breach of the §2 guarantee of racially equal
opportunity "to elect representatives of . . . choice," 42
U. S. C. §1973: "The reason that a minority group making
such a challenge must show, as a threshold matter, that it
is sufficiently large . . . is this: Unless minority voters
possess the potential to elect representatives in the ab-

_____

with §5 is a compelling state interest.  See *ante*, at 31, n. 12 (STEVENS,
J., concurring in part and dissenting in part); *post*, at 9 (SCALIA, J.,
concurring in judgment in part and dissenting in part).

[3] I recognize that a minority group might satisfy the §2 "ability to
elect" requirement in other ways, and I do not mean to rule out other
circumstances in which a coalition district might be required by §2.  A
minority group slightly less than 50% of the electorate in nonpartisan
elections for a local school board might, for example, show that it can
elect its preferred candidates owing to consistent crossover support
from members of other groups.  Cf. *Valdespino* v. *Alamo Heights
Independent School Dist.*, 168 F. 3d 848, 850–851 (CA5 1999), cert.
denied, 528 U. S. 1114 (2000).

sence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." 478 U. S., at 50, n. 17 (emphasis deleted); see also *id.*, at 90, n. 1 (O'Connor, J., concurring in judgment) ("[I]f a minority group that is not large enough to constitute a voting majority in a single-member district can show that white support would probably be forthcoming in some such district to an extent that would enable the election of the candidates its members prefer, that minority group would appear to have demonstrated that, at least under this measure of its voting strength, it would be able to elect some candidates of its choice"). Hence, we emphasized that an analysis under §2 of the political process should be "'functional.'" *Id.*, at 48, n. 15 (majority opinion); see also *Voinovich*, *supra*, at 158 ("[T]he *Gingles* factors cannot be applied mechanically and without regard to the nature of the claim"). So it is not surprising that we have looked to political-primary data in considering the second and third *Gingles* conditions, to see whether there is racial bloc voting. See, *e.g.*, *Abrams* v. *Johnson*, 521 U. S. 74, 91–92 (1997); *Gingles*, *supra*, at 52–54, 59–60.

The pertinence of minority voters' role in a primary is obvious: a dominant party's primary can determine the representative ultimately elected, as we recognized years ago in evaluating the constitutional importance of primary elections. See *United States* v. *Classic*, 313 U. S. 299, 318–319 (1941) ("Where the state law has made the primary an integral part of the procedure of choice, or where in fact the primary effectively controls the choice, the right of the elector to have his ballot counted at the primary, is likewise included in the right protected by Article I, §2. . . . Here, . . . the right to choose a representative is in fact controlled by the primary because, as is alleged in the indictment, the choice of candidates at the Democratic primary determines the choice of the elected representative"); *id.*, at 320 ("[A] primary election which involves a

necessary step in the choice of candidates for election as representatives in Congress, and which in the circumstances of this case controls that choice, is an election within the meaning of the constitutional provision"); *Smith* v. *Allwright*, 321 U. S. 649, 660 (1944) (noting "[t]he fusing by the *Classic* case of the primary and general elections into a single instrumentality for choice of officers"); *id.*, at 661–662 ("It may now be taken as a postulate that the right to vote in such a primary for the nomination of candidates without discrimination by the State, like the right to vote in a general election, is a right secured by the Constitution. . . . Under our Constitution the great privilege of the ballot may not be denied a man by the State because of his color").[4]  These conclusions of our predecessors fit with recent scholarship showing that electoral success by minorities is adequately predictable by taking account of primaries as well as elections, among other things.  See Grofman, Handley, & Lublin, Drawing Effective Minority Districts: A Conceptual Framework and Some Empirical Evidence, 79 N. C. L. Rev. 1383 (2000–2001).[5]

I would accordingly not reject this §2 claim at step one of *Gingles*, nor on this record would I dismiss it by jumping to the ultimate §2 issue to be decided on a totality of

————————

[4] Cf. *California Democratic Party* v. *Jones*, 530 U. S. 567, 575 (2000) ("In no area is the political association's right to exclude more important than in the process of selecting its nominee.  That process often determines the party's positions on the most significant public policy issues of the day, and even when those positions are predetermined it is the nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views").

[5] One must be careful about what such electoral success ostensibly shows; if the primary choices are constrained, say, by party rules, the minority voters' choice in the primary may not be truly their candidate of choice, see McLoughlin, Note, *Gingles* In Limbo: Coalitional Districts, Party Primaries and Manageable Vote Dilution Claims, 80 N. Y. U. L. Rev. 312 (2005).

the circumstances, see *De Grandy*, 512 U. S., at 1009–1022, and determine that the black plaintiffs cannot show that submerging them in the five new districts violated their right to equal opportunity to participate in the political process and elect candidates of their choice. The plurality, on the contrary, is willing to accept the conclusion that the minority voters lost nothing cognizable under §2 because they could not show the degree of control that guaranteed a candidate of their choice in the old District 24. See *ante*, at 37–40. The plurality accepts this conclusion by placing great weight on the fact that Martin Frost, the perennially successful congressional candidate in District 24, was white. See, *e.g.*, *ante*, at 38–39 (no clear error in District Court's findings that "no Black candidate has ever filed in a Democratic primary against Frost," *Session* v. *Perry*, 298 F. Supp. 2d 451, 484 (ED Tex 2004) *(per curiam)*), and "[w]e have no measure of what Anglo turnout would be in a Democratic primary if Frost were opposed by a Black candidate," *ibid.*); *ante*, at 38–39 (no clear error in District Court's reliance on testimony of Congresswoman Eddie Bernice Johnson that "District 24 was drawn for an Anglo Democrat (Martin Frost, in particular) in 1991").

There are at least two responses. First, "[u]nder §2, it is the status of the candidate as the chosen representative of a particular group, not the race of the candidate, that is important." *Gingles*, *supra*, at 68 (emphasis deleted). Second, Frost was convincingly shown to have been the "chosen representative" of black voters in old District 24. In the absence of a black-white primary contest, the unchallenged evidence is that black voters dominated a primary that consistently nominated the same and ultimately successful candidate; it takes more than speculation to rebut the demonstration that Frost was the candi-

date of choice of the black voters.[6]  There is no indication
that party rules or any other device rigged the primary
ballot so as to bar any aspirants the minority voters would
have preferred, see n. 5, *supra*, and the uncontroverted
and overwhelming evidence is that Frost was strongly
supported by minority voters after more than two decades
of sedulously considering minority interests, App. 107
(Frost's rating of 94% on his voting record from the Na-
tional Association for the Advancement of Colored People
exceeded the scores of all other members of the Texas
congressional delegation, including black and Hispanic
members of both major parties); *id.*, at 218–219 (testimony
by State's political-science expert that Frost is the African-
Americans' candidate of choice); *id.*, at 239 (testimony by
Ron Kirk, an African-American former mayor of Dallas
and U. S. Senate candidate, that Frost "has gained a very
strong base of support among African-American . . . voters
because of his strong voting records [in numerous areas]"
and has "an incredible following and amount of respect
among the African-American community"); *id.*, at 240–241
(Kirk's testimony that Frost has never had a contested
primary because he is beloved by the African-American
community, and that a black candidate, possibly including
himself, could not better Frost in a primary because of his
strong rapport with the black community); *id.*, at 242–243
(testimony by county precinct administrator that Frost
has been the favored candidate of the African-American
community and there have been no primary challenges to
him because he "serves [African-American] interests").[7]

_____

[6] Judge Ward properly noted that the fact that Frost has gone unchal-
lenged may "reflect favorably on his record" of responding to the con-
cerns of minorities in the district.  See *Session* v. *Perry*, 298 F. Supp. 2d
451, 530 (ED Tex. 2004) (opinion concurring in part and dissenting in
part).

[7] In any event, although a history or prophecy of success in electing
candidates of choice is a powerful touchstone of §2 liability when

It is not that I would or could decide at this point whether the elimination of the prior district and composition of the new one violates §2. The other *Gingles* gatekeeping rules have to be considered, with particular attention to the third, majority bloc voting, see 478 U. S., at 51, since a claim to a coalition district is involved.[8] And after that would come the ultimate analysis of the totality of circumstances. See *De Grandy*, *supra*, at 1009–1022.

I would go no further here than to hold that the enquiry should not be truncated by or conducted in light of the Fifth Circuit's 50% rule,[9] or by the candidate-of-choice analysis just rejected. I would return the §2 claim on old District 24 to the District Court, which has already labored so mightily on this case. All the members of the three-judge court would be free to look again untethered by the 50% barrier, and Judge Ward, in particular, would

_____

minority populations are cracked or packed, electoral success is not the only manifestation of equal opportunity to participate in the political process, see *De Grandy*, 512 U. S., at 1014, n. 11. The diminution of that opportunity by taking minority voters who previously dominated the dominant party's primary and submerging them in a new district is not readily discounted by speculating on the effects of a black-white primary contest in the old district.

[8] The way this third condition is understood when a claim of a putative coalition district is made will have implications for the identification of candidate of choice under the first *Gingles* condition. Suffice it to say here that the criteria may not be the same when dealing with coalition districts as in cases of districts with majority-minority populations. All aspects of our established analysis for majority-minority districts in *Gingles* and its progeny may have to be rethought in analyzing ostensible coalition districts.

[9] Notably, under the Texas Legislature's Plan 1374C, there are three undisputed districts where African-Americans tend to elect their candidates of choice. African-Americans compose at most a citizen voting age majority (50.6%) in one of the three, District 30, see *Session*, *supra*, at 515; even there, the State's expert pegged the percentage at 48.6%, App. 185–186. In any event, the others, Districts 9 and 18, are coalition districts, with African-American citizen voting age populations of 46.9% and 48.6% respectively. *Id.*, at 184–185.

have the opportunity to develop his reasons unconstrained by the Circuit's 50% rule, which he rightly took to limit his consideration of the claim, see *Session*, 298 F. Supp. 2d, at 528–531 (opinion concurring in part and dissenting in part).

# SUPREME COURT OF THE UNITED STATES

————

Nos. 05–204, 05–254, 05–276 and 05–439

————

LEAGUE OF UNITED LATIN AMERICAN CITIZENS,
ET AL., APPELLANTS
05–204                    *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.


TRAVIS COUNTY, TEXAS, ET AL., APPELLANTS
05–254                    *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.


EDDIE JACKSON, ET AL., APPELLANTS
05–276                    *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.


GI FORUM OF TEXAS, ET AL., APPELLANTS
05–439                    *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.

ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TEXAS

[June 28, 2006]

JUSTICE BREYER, concurring in part and dissenting in part.

I join Parts II–A and III of the Court's opinion. I also join Parts I and II of JUSTICE STEVENS' opinion concurring in part and dissenting in part.

For one thing, the timing of the redistricting (between census periods), the radical departure from traditional boundary-drawing criteria, and the other evidence to which JUSTICE STEVENS refers in Parts I and II of his opinion make clear that a "desire to maximize partisan

advantage" was the "sole purpose behind the decision to promulgate Plan 1374C." *Ante*, at 12. Compare, *e.g.*, App. 176–178; *ante*, at 7–9, 13 (STEVENS, J., concurring in part and dissenting in part), with *Vieth* v. *Jubelirer,* 541 U. S. 267, 366–367 (2004) (BREYER, J., dissenting).

For another thing, the evidence to which JUSTICE STEVENS refers in Part III of his opinion demonstrates that the plan's effort "to maximize partisan advantage," *ante*, at 13 (STEVENS, J., concurring in part and dissenting in part), encompasses an effort not only to exaggerate the favored party's electoral majority but also to produce a majority of congressional representatives even if the favored party receives only a *minority* of popular votes. Compare *id.*, at 20–22 (STEVENS, J., concurring in part and dissenting in part), App. 55 (plaintiffs' expert); *id.*, at 216 (State's expert), with *Vieth*, *supra*, at 360.

Finally, because the plan entrenches the Republican Party, the State cannot successfully defend it as an effort simply to *neutralize* the Democratic Party's previous political gerrymander. Nor has the State tried to justify the plan on nonpartisan grounds, either as an effort to achieve legislative stability by avoiding legislative exaggeration of small shifts in party preferences, see *Vieth*, *supra*, at 359, or in any other way.

In sum, "the risk of entrenchment is demonstrated," "partisan considerations [have] render[ed] the traditional district-drawing compromises irrelevant," and "no justification other than party advantage can be found." 541 U. S., at 367. The record reveals a plan that overwhelmingly relies upon the unjustified use of purely partisan line-drawing considerations and which will likely have seriously harmful electoral consequences. *Ibid.* For these reasons, I believe the plan in its entirety violates the Equal Protection Clause.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 05–204, 05–254, 05–276 and 05–439

————

LEAGUE OF UNITED LATIN AMERICAN CITIZENS,
ET AL., APPELLANTS
05–204                          *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.


TRAVIS COUNTY, TEXAS, ET AL., APPELLANTS
05–254                          *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.


EDDIE JACKSON, ET AL., APPELLANTS
05–276                          *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.


GI FORUM OF TEXAS, ET AL., APPELLANTS
05–439                          *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.

ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TEXAS

[June 28, 2006]

CHIEF JUSTICE ROBERTS, with whom JUSTICE ALITO joins, concurring in part, concurring in the judgment in part, and dissenting in part.

I join Parts I and IV of the plurality opinion. With regard to Part II, I agree with the determination that appellants have not provided "a reliable standard for identifying unconstitutional political gerrymanders." *Ante*, at 16.

The question whether any such standard exists—that is, whether a challenge to a political gerrymander presents a justiciable case or controversy—has not been argued in these cases. I therefore take no position on that question, which has divided the Court, see *Vieth* v. *Jubelirer,* 541 U. S. 267 (2004), and I join the Court's disposition in Part II without specifying whether appellants have failed to state a claim on which relief can be granted, or have failed to present a justiciable controversy.

I must, however, dissent from Part III of the Court's opinion. According to the District Court's factual findings, the State's drawing of district lines in south and west Texas caused the area to move from five out of seven effective Latino opportunity congressional districts, with an additional district "moving" in that direction, to *six* out of seven effective Latino opportunity districts. See *Session* v. *Perry*, 298 F. Supp. 2d 451, 489, 503–504 (ED Tex. 2004) *(per curiam)*. The end result is that while Latinos make up 58% of the citizen voting age population in the area, they control 85% (six of seven) of the districts under the State's plan.

In the face of these findings, the majority nonetheless concludes that the State's plan somehow dilutes the voting strength of Latinos in violation of §2 of the Voting Rights Act. The majority reaches its surprising result because it finds that Latino voters in one of the State's Latino opportunity districts—District 25—are insufficiently compact, in that they consist of two different groups, one from around the Rio Grande and another from around Austin. According to the majority, this may make it more difficult for certain Latino-preferred candidates to be elected from that district—*even though Latino voters make up 55% of the citizen voting age population in the district and vote as a bloc. Id.,* at 492, n. 126, 503. The majority prefers old District 23, despite the District Court determination that new District 25 is "a more effective Latino opportunity

district than Congressional District 23 had been." *Id.,* at 503; see *id.,* at 489, 498–499. The District Court based that determination on a careful examination of regression analysis showing that "the Hispanic-preferred candidate [would win] *every* primary and general election examined in District 25," *id.,* at 503 (emphasis added), compared to the only partial success such candidates enjoyed in former District 23, *id.,* at 488, 489, 496.

The majority dismisses the District Court's careful factfinding on the ground that the experienced judges did not properly consider whether District 25 was "compact" for purposes of §2. *Ante,* at 24. But the District Court opinion itself clearly demonstrates that the court carefully considered the compactness of the minority group in District 25, just as the majority says it should have. The District Court recognized the very features of District 25 highlighted by the majority and unambiguously concluded, under the totality of the circumstances, that the district was an effective Latino opportunity district, and that no violation of §2 in the area had been shown.

Unable to escape the District Court's factfinding, the majority is left in the awkward position of maintaining that its *theory* about compactness is more important under §2 than the actual prospects of electoral success for Latino-preferred candidates under a State's apportionment plan. And that theory is a novel one to boot. Never before has this or any other court struck down a State's redistricting plan under §2, on the ground that the plan achieves the maximum number of possible majority-minority districts, but loses on style points, in that the minority voters in one of those districts are not as "compact" as the minority voters would be in another district were the lines drawn differently. Such a basis for liability pushes voting rights litigation into a whole new area—an area far removed from the concern of the Voting Rights Act to ensure minority voters an equal opportunity "to

elect representatives of their choice."  42 U. S. C. §1973(b).

I

Under §2, a plaintiff alleging "a denial or abridgement of the right of [a] citizen of the United States to vote on account of race or color," §1973(a), must show, "based on the totality of circumstances,"

> "that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  §1973(b).

In *Thornburg* v. *Gingles,* 478 U. S. 30 (1986), we found that a plaintiff challenging the State's use of multimember districts could meet this standard by showing that replacement of the multimember district with several single-member districts would likely provide minority voters in at least some of those single-member districts "the ability . . . to elect representatives of their choice." *Id.,* at 48.  The basis for this requirement was simple: If no districts were possible in which minority voters had prospects of electoral success, then the use of multimember districts could hardly be said to thwart minority voting power under §2. See *ibid.* ("Minority voters who contend that the multi-member form of districting violates §2 must prove that the use of a multimember electoral structure operates to minimize or cancel out their ability to elect their preferred candidates").

The next generation of voting rights litigation confirmed that "manipulation of [single-member] district lines" could also dilute minority voting power if it packed minority voters in a few districts when they might control more, or dispersed them among districts when they might control

some. *Voinovich* v. *Quilter,* 507 U. S. 146, 153–154 (1993). Again the basis for this application of *Gingles* was clear: A configuration of district lines could only dilute minority voting strength if under another configuration minority voters had better electoral prospects. Thus in cases involving single-member districts, the question was whether an *additional* majority-minority district should be created, see *Abrams* v. *Johnson,* 521 U. S. 74, 91–92 (1997); *Growe* v. *Emison,* 507 U. S. 25, 38 (1993), or whether *additional* influence districts should be created to supplement existing majority-minority districts, see *Voinovich, supra,* at 154.

We have thus emphasized, since *Gingles* itself, that a §2 plaintiff must at least show an apportionment that is likely to perform *better* for minority voters, compared to the existing one. See 478 U. S., at 99 (O'Connor, J., concurring in judgment) ("[T]he relative lack of minority electoral success under a challenged plan, when compared with the success that would be predicted under the measure of undiluted minority voting strength the court is employing, can constitute powerful evidence of vote dilution"). And unsurprisingly, in the context of single-member districting schemes, we have invariably understood this to require the possibility of *additional* single-member districts that minority voters might control.

*Johnson* v. *De Grandy,* 512 U. S. 997 (1994), reaffirmed this understanding. The plaintiffs in *De Grandy* claimed that, by reducing the size of the Hispanic majority in some districts, *additional* Hispanic-majority districts could be created. *Id.,* at 1008. The State defended a plan that did not do so on the ground that the proposed additional districts, while containing nominal Hispanic majorities, would "lack enough Hispanic voters to elect candidates of their choice without cross-over votes from other ethnic groups," and thus could not bolster Hispanic voting strength under §2. *Ibid.*

In keeping with the requirement that a §2 plaintiff must

show that an alternative apportionment would present
*better* prospects for minority-preferred candidates, the Court
set out the condition that a challenge to an existing set of
single-member districts must show the possibility of "creat-
ing more than the existing number of reasonably compact
districts with a sufficiently large minority population to
elect candidates of its choice." *Ibid.* *De Grandy* confirmed
that simply proposing a set of districts that divides up a
minority population in a different manner than the State
has chosen, without a gain in minority opportunity districts,
does not show vote dilution, but "only that lines could have
been drawn elsewhere." *Id.,* at 1015.

Here the District Court found that six majority-Latino
districts were all that south and west Texas could support.
Plan 1374C provides six such districts, just as its predeces-
sor did. This fact, combined with our precedent making
clear that §2 plaintiffs must show an alternative with *better*
prospects for minority success, should have resulted in
affirmance of the District Court decision on vote dilution in
south and west Texas. See *Gingles, supra,* at 79 ("[T]he
clearly-erroneous test of [Federal Rule of Civil Procedure]
52(a) is the appropriate standard for appellate review of a
finding of vote dilution. . . . [W]hether the political process
is equally open to minority voters . . . is peculiarly depend-
ent upon the facts" (internal quotation marks omitted));
*Rogers* v. *Lodge,* 458 U. S. 613, 622, 627 (1982).

The majority avoids this result by finding fault with the
District Court's analysis of one of the Latino-majority
districts in the State's plan. That district—District 25—is
like other districts in the State's plan, like districts in the
predecessor plan, and like districts in the *plaintiffs*' pro-
posed seven-district plan, in that it joins population con-
centrations around the border area with others closer to
the center of the State. The District Court explained that
such "'bacon-strip'" districts are inevitable, given the
geography and demography of that area of the State.

*Session*, 298 F. Supp. 2d, at 486–487, 490, 491, n. 125, 502.

The majority, however, criticizes the District Court because its consideration of the compactness of District 25 under §2 was deficient. According to the majority,

> "the court analyzed the issue only for equal protection purposes. In the equal protection context, compactness focuses on the contours of district lines to determine whether race was the predominant factor in drawing those lines. Under §2, by contrast, the injury is vote dilution, so the compactness inquiry embraces different considerations." *Ante*, at 26 (citation omitted).

This is simply an inaccurate description of the District Court's opinion. The District Court expressly considered compactness in the §2 context. That is clear enough from the fact that the majority *quotes* the District Court's opinion in elaborating on the standard of compactness it believes the District Court *should* have applied. See *ante*, at 18 (quoting *Session, supra,* at 502); *ante*, at 28 (quoting *Session, supra,* at 502). The very passage quoted by the majority about the different "'needs and interests'" of the communities in District 25, *ante*, at 18, appeared in the District Court opinion precisely because the District Court recognized that those concerns "bear on the extent to which the new districts"—including District 25—"are functionally effective Latino opportunity districts, important to understanding whether *dilution* results from Plan 1374C." *Session*, 298 F. Supp. 2d, at 502 (emphasis added); see also *ibid.* (noting different "needs and interests of Latino communities" in the "'bacon-strip'" districts and concluding that "[t]he issue is whether these features mean that the newly-configured districts *dilute the voting strength* of Latinos" (emphasis added)).

Indeed, the District Court addressed compactness in two

different sections of its opinion: in Part VI–C with respect to vote dilution under §2, and in Part VI–D with respect to whether race predominated in drawing district lines, for purposes of equal protection analysis. The District Court even explained, in considering in Part VI–C the differences between the Latino communities in the bacon-strip districts (including District 25) for purposes of vote dilution under §2, how the same concerns bear on the plaintiffs' equal protection claim, discussed in Part VI–D. *Id.,* at 502, n. 168. The majority faults the District Court for discussing "the relative smoothness of the district lines," because that is only pertinent in the equal protection context, *ante*, at 24, *but it was only in the equal protection context that the District Court mentioned the relative smoothness of district lines.* See 298 F. Supp. 2d*,* at 506–508. In discussing compactness in Part VI–C, with respect to vote dilution under §2, the District Court considered precisely what the majority says it should have: the diverse needs and interests of the different Latino communities in the district. Unlike the majority, however, the District Court properly recognized that the question under §2 was "whether these features mean that the newly-configured districts dilute the voting strength of Latinos." *Id.,* at 502.

The District Court's answer to that question was unambiguous:

> "Witnesses testified that Congressional Districts 15 and 25 would span *colonias* in Hidalgo County and suburban areas in Central Texas, but the witnesses testified, and the regression data show, that both districts are effective Latino opportunity districts, with the Hispanic-preferred candidate winning every primary and general election examined in District 25." *Id.,* at 503.

The District Court emphasized this point again later on:

> "The newly-configured Districts 15, 25, 27, and 28

cover more territory and travel farther north than did the corresponding districts in Plan 1151C. The districts combine more voters from the central part of the State with voters from the border cities than was the case in Plan 1151C. The population data, regression analyses, and the testimony of both expert witnesses and witnesses knowledgeable about how politics actually works in the area lead to the finding that in Congressional Districts 25 and 28, Latino voters will likely control every primary and general election outcome." *Id.,* at 503–504.

I find it inexplicable how the majority can read these passages and state that the District Court reached its finding on the effectiveness of District 25 "without accounting for the detrimental consequences of its compactness problems." *Ante*, at 35. The majority does "not question" the District Court's parsing of the statistical evidence to reach the finding that District 25 was an effective Latino opportunity district. *Ante*, at 28. But the majority nonetheless rejects that finding, based on its own theory that "[t]he practical consequence of drawing a district to cover two distant, disparate communities is that one or both groups will be unable to achieve their political goals," *ante*, at 27, and because the finding rests on the "prohibited assumption" that voters of the same race will "think alike, share the same political interests, and will prefer the same candidates at the polls," *ibid.* (citations and internal quotation marks omitted). It is important to be perfectly clear about the following, out of fairness to the District Court if for no other reason: No one has made any "assumptions" about how voters in District 25 will vote based on their ethnic background. Not the District Court; not this dissent. There was a trial. At trials, assumptions and assertions give way to facts. In voting rights cases, that is typically done through regression analyses of past voting records.

Here, those analyses showed that the Latino candidate of choice prevailed in every primary and general election examined for District 25. See *Session*, 298 F. Supp. 2d, at 499–500. Indeed, a plaintiffs' expert conceded that Latino voters in District 25 "have an effective opportunity to control outcomes in both primary and general elections." *Id.,* at 500. The District Court, far from "assum[ing]" that Latino voters in District 25 would "prefer the same candidate at the polls," concluded that they were likely to do so based on statistical evidence of historic voting patterns.

Contrary to the erroneous statements in the majority opinion, the District Court judges did *not* simply "aggregat[e]" minority voters to measure effectiveness. *Ante*, at 26. They did *not* simply rely on the "mathematical possibility" of minority voters voting for the same preferred candidate, *ante*, at 28, and it is a disservice to them to state otherwise. It is the majority that is indulging in unwarranted "assumption[s]" about voting, contrary to the facts found at trial based on carefully considered evidence.

What is blushingly ironic is that the district preferred by the majority—former District 23—suffers from the same "flaw" the majority ascribes to District 25, except to a greater degree. While the majority decries District 25 because the Latino communities there are separated by "enormous geographical distance," *ante*, at 29, and are "hundreds of miles apart," *ante*, at 35, Latino communities joined to form the voting majority in old District 23 are nearly twice as far apart. Old District 23 runs "from El Paso, over 500 miles, into San Antonio and down into Laredo. It covers a much longer distance than . . . the 300 miles from Travis to McAllen [in District 25]." App. 292 (testimony of T. Giberson); see *id.,* at 314 (report of T. Giberson) ("[D]istrict 23 in any recent Congressional plan extends from the outskirts of El Paso down to Laredo, dipping into San Antonio and spanning 540 miles"). So much for the significance of "enormous geographical distance." Or per-

haps the majority is willing to "assume" that Latinos around San Antonio have common interests with those on the Rio Grande rather than those around Austin, even though San Antonio and Austin are a good bit closer to each other (less than 80 miles apart) than either is to the Rio Grande.*

The District Court considered expert evidence on projected election returns and concluded that District 25 would likely perform impeccably for Latino voters, better indeed than former District 23. See *Session*, 298 F. Supp. 2d, at 503–504, 488, 489, 496. The District Court also concluded that the other districts in Plan 1374C would give Latino voters a favorable opportunity to elect their preferred candidates. See *id.*, at 499 (observing the parties' agreement that Districts 16 and 20 in Plan 1374C "do clearly provide effec-

————————

*The majority's fig leaf after stressing the distances involved in District 25—while ignoring the greater ones in former District 23—is to note that "it is the enormous geographical distance separating the Austin and Mexican-border communities, coupled with the disparate needs and interests of these populations—not either factor alone—that renders District 25 noncompact for §2 purposes." *Ante*, at 28, 29. Of course no single factor is determinative, because the ultimate question is whether the district is an effective majority-minority opportunity district. There was a trial on that; the District Court found that District 25 was, while former District 23 "did not perform as an effective opportunity district." *Session* v. *Perry*, 298 F. Supp. 2d 451, 496 (ED Tex. 2004) *(per curiam)*. The majority notes that there was no challenge to or finding on the compactness of old District 23, *ante*, at 29— certainly not compared to District 25—but presumably that was because, as the majority does not dispute, "[u]ntil today, no court has ever suggested that lack of compactness under §2 might invalidate a district that a State has chosen to create in the first instance." *Infra*, at 15. The majority asserts that Latino voters in old District 23 had found an "efficacious political identity," while doing so would be a challenge for such voters in District 25, *ante*, at 29, but the latter group has a distinct advantage over the former in this regard: They actually *vote* to a significantly greater extent. See App. 187 (report of R. Gaddie) (for Governor and Senate races in 2002, estimated Latino turnout for District 25 was 46% to 51%, compared to 41.3% and 44% for District 23).

tive Latino citizen voting age population majorities"); *id.,* at
504 ("Latino voters will likely control every primary and
general election outcome" in District 28, and "every primary
outcome and almost every general election outcome" in
Districts 15 and 27, under Plan 1374C). In light of these
findings, the District Court concluded that "compared to
Plan 1151C . . . Plaintiffs have not shown an impermissible
reduction in effective opportunities for Latino electoral
control or in opportunities for Latino participation in the
political process." *Ibid.*

Viewed against this backdrop, the majority's holding that
Plan 1374C violates §2 amounts to this: A State has denied
minority voters equal opportunity to "participate in the
political process and to elect representatives of their choice,"
42 U. S. C. §1973(b), when the districts in the plan a State
has created have *better* prospects for the success of minority-
preferred candidates than an alternative plan, simply be-
cause one of the State's districts combines different minority
communities, which, in any event, are likely to vote as a
controlling bloc. It baffles me how this could be vote dilu-
tion, let alone how the District Court's contrary conclusion
could be clearly erroneous.

## II

The majority arrives at the wrong resolution because it
begins its analysis in the wrong place. The majority de-
clares that a *Gingles* violation is made out "[c]onsidering"
former District 23 "in isolation," and chides the State for
suggesting that it can remedy this violation "by creating
new District 25 as an offsetting opportunity district."
*Ante*, at 22. According to the majority, "§2 does not forbid
the creation of a noncompact majority-minority district,"
but "[t]he noncompact district cannot . . . remedy a viola-
tion elsewhere in the State." *Ante*, at 24.

The issue, however, is not whether a §2 violation in
District 23, viewed "in isolation," can be remedied by the

creation of a Latino opportunity district in District 25. When the question is where a fixed number of majority-minority districts should be located, the analysis should never begin by asking whether a *Gingles* violation can be made out in any one district "in isolation." In these circumstances, it is always possible to look at one area of minority population "in isolation" and see a "violation" of §2 under *Gingles*. For example, if a State drew three districts in a group, with 60% minority voting age population in the first two, and 40% in the third, the 40% can readily claim that their opportunities are being thwarted because *they* were not grouped with an additional 20% of minority voters from one of the other districts. But the remaining minority voters in the other districts would have precisely the same claim if minority voters were shifted from their districts to join the 40%. See *De Grandy*, 512 U. S., at 1015–1016 ("[S]ome dividing by district lines and combining within them is virtually inevitable and befalls any population group of substantial size"). That is why the Court has explained that no individual minority voter has a right to be included in a majority-minority district. See *Shaw* v. *Hunt,* 517 U. S. 899, 917, and n. 9 (1996) *(Shaw II); id.,* at 947 (STEVENS, J., dissenting). Any other approach would leave the State caught between incompatible claims by different groups of minority voters. See *Session, supra,* at 499 ("[T]here is neither sufficiently dense and compact population in general nor Hispanic population in particular to support" retaining former District 23 *and* adding District 25).

The correct inquiry under §2 is not whether a *Gingles* violation can be made out with respect to one district "in isolation," but instead whether line-drawing in the challenged area as a whole dilutes minority voting strength. A proper focus on the district lines in the area as a whole also demonstrates why the majority's reliance on *Bush* v. *Vera,* 517 U. S. 952 (1996), and *Shaw II* is misplaced.

In those cases, we rejected on the basis of lack of compactness districts that a State defended against equal protection strict scrutiny on the grounds that they were necessary to avoid a §2 violation. See *Vera, supra,* at 977–981 (plurality opinion); *Shaw II, supra,* at 911, 916–918. But those cases never suggested that a plaintiff proceeding under §2 could rely on lack of compactness to prove liability. And the districts in those cases were nothing like District 25 here. To begin with, they incorporated multiple, small, farflung pockets of minority population, and did so by ignoring the boundaries of political subdivisions. *Vera, supra,* at 987–989 (Appendices A–C to plurality opinion) (depicting districts); *Shaw II, supra,* at 902–903 (describing districts). Here the District Court found that the long and narrow but more normal shape of District 25 was shared by other districts both in the state plan and the predecessor plan—not to mention the plaintiffs' own proposed plan—and resulted from the demography and geography of south and west Texas. See *Session*, 298 F. Supp. 2d*,* at 487–488, 491, and n. 125. And *none* of the minority voters in the *Vera* and *Shaw II* districts could have formed part of a *Gingles*-compliant district, see *Vera, supra,* at 979 (plurality opinion) (remarking of one of the districts at issue that it "reaches out to grab small and apparently isolated minority communities which, based on the evidence presented, could not possibly form part of a compact majority-minority district"); *Shaw II*, 517 U. S.*,* at 916–917 (describing the challenged district as "in no way coincident with the compact *Gingles* district"); while here no one disputes that at least the Latino voters in the border area of District 25—the larger concentration—*must* be part of a majority-Latino district if six are to be placed in south and west Texas.

This is not, therefore, a case of the State drawing a majority-minority district "anywhere," once a §2 violation has been established elsewhere in the State. *Id.,* at 917. The question is instead whether the State has some latitude in

deciding where to place the maximum possible number of majority-minority districts, when one of those districts contains a substantial proportion of minority voters who *must* be in a majority-minority district if the maximum number is to be created at all.

Until today, no court has ever suggested that lack of compactness under §2 might invalidate a district that a State has chosen to create in the first instance. The "geographica[l] compact[ness]" of a minority population has previously been only an element of the *plaintiff's* case. See *Gingles,* 478 U. S., at 49–50. That is to say, the §2 plaintiff bears the burden of demonstrating that "the minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.,* at 50. Thus compactness, when it has been invoked by lower courts to defeat §2 claims, has been applied to a remedial district a *plaintiff* proposes. See, *e.g., Sensley* v. *Albritton*, 385 F. 3d 591, 596–597 (CA5 2004); *Mallory* v. *Ohio*, 173 F. 3d 377, 382–383 (CA6 1999); *Stabler* v. *County of Thurston*, 129 F. 3d 1015, 1025 (CA8 1997). Indeed, the most we have had to say about the compactness aspect of the *Gingles* inquiry is to profess doubt whether it was met when the district a §2 plaintiff proposed was "oddly shaped." *Growe* v. *Emison,* 507 U. S., at 38, 41. And even then, we rejected §2 liability not because of the odd shape, but because no evidence of majority bloc voting had been submitted. *Id.,* at 41–42.

Far from imposing a freestanding compactness obligation on the States, we have repeatedly emphasized that "States retain broad discretion in drawing districts to comply with the mandate of §2," *Shaw II, supra,* at 917, n. 9, and that §2 itself imposes "no *per se* prohibitions against particular types of districts," *Voinovich* v. *Quilter,* 507 U. S., at 155. We have said that the States retain "flexibility" in complying with voting rights obligations that "federal courts enforcing §2 lack." *Vera, supra,* at 978. The majority's intrusion

into line-drawing, under the authority of §2, when the lines already achieve the maximum possible number of majority-minority opportunity districts, suggests that all this is just so much hollow rhetoric.

The majority finds fault in a "one-way rule whereby plaintiffs must show compactness but States need not," *ante*, at 25, without bothering to explain how its contrary rule of equivalence between plaintiffs litigating and the elected representatives of the people legislating comports with our repeated assurances concerning the discretion and flexibility left to the States. Section 2 is, after all, part of the Voting Rights Act, not the Compactness Rights Act. The word "compactness" appears nowhere in §2, nor even in the agreed-upon legislative history. See *Gingles*, *supra,* at 36–37. To bestow on compactness such precedence in the §2 inquiry is the antithesis of the totality test that the statute contemplates. *De Grandy*, 512 U. S*.,* at 1011 ("[T]he ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts"). Suggesting that determinative weight should have been given this one factor contravenes our understanding of how §2 analysis proceeds, see *Gingles,* 478 U. S*.,* at 45 (quoting statement from the legislative history of §2 that "'there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other'"), particularly when the proper standard of review for the District Court's ultimate judgment under §2 is clear error. See *id.,* at 78–79.

A §2 plaintiff has no legally protected interest in compactness, apart from how deviations from it dilute the equal opportunity of minority voters "to elect representatives of their choice." §1973(b). And the District Court found that any effect on this opportunity caused by the different "needs and interests" of the Latino voters within

District 25 was at least offset by the fact that, despite these differences, they were likely to prefer the same candidates at the polls. This finding was based on the evidence, not assumptions.

Whatever the competing merits of old District 23 and new District 25 at the margins, judging between those two majority-minority districts is surely the responsibility of the legislature, not the courts. See *Georgia* v. *Ashcroft,* 539 U. S. 461, 480 (2003). The majority's squeamishness about the supposed challenge facing a Latino-preferred candidate in District 25—having to appeal to Latino voters near the Rio Grande and those near Austin—is not unlike challenges candidates face around the country all the time, as part of a healthy political process. It is in particular not unlike the challenge faced by a Latino-preferred candidate in the district favored by the majority, former District 23, who must appeal to Latino voters both in San Antonio and in El Paso, 540 miles away. "[M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics." *De Grandy*, 512 U. S., at 1020. As the Court has explained, "the ultimate right of §2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *Id.,* at 1014, n. 11. Holding that such *opportunity* is denied because a State draws a district with 55% minority citizen voting-age population, rather than keeping one with a similar percentage (but lower turnout) that did not in any event consistently elect minority-preferred candidates, gives an unfamiliar meaning to the word "opportunity."

## III

Even if a plaintiff satisfies the *Gingles* factors, a finding of vote dilution under §2 does not automatically follow. In *De Grandy*, we identified another important aspect of the

totality inquiry under §2: whether "minority voters form effective voting majorities in a number of districts roughly proportional to the minority voters' respective shares in the voting-age population." 512 U. S., at 1000. A finding of proportionality under this standard can defeat §2 liability even if a clear *Gingles* violation has been made out. In *De Grandy* itself, we found that "substantial proportionality" defeated a claim that the district lines at issue "diluted the votes cast by Hispanic voters," 512 U. S*.,* at 1014–1015, even assuming that the plaintiffs had shown "the possibility of creating *more* than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Id.,* at 1008–1009 (emphasis added).

The District Court determined that south and west Texas was the appropriate geographic frame of reference for analyzing proportionality: "If South and West Texas is the only area in which *Gingles* is applied and can be met, as Plaintiffs argue, it is also the relevant area for measuring proportionality." *Session*, 298 F. Supp. 2d, at 494. As the court explained, "[l]ower courts that have analyzed 'proportionality' in the *De Grandy* sense have been consistent in using the same frame of reference for that factor and for the factors set forth in *Gingles*." *Id.,* at 493–494, and n. 131 (citing cases).

In south and west Texas, Latinos constitute 58% of the relevant population and control 85% (six out of seven) of the congressional seats in that region. That includes District 25, because the District Court found, without clear error, that Latino voters in that district "will likely control every primary and general election outcome." *Id.,* at 504. But even not counting that district as a Latino opportunity district, because of the majority's misplaced compactness concerns, Latinos in south and west Texas still control congressional seats in a markedly greater proportion—71% (five out of seven)—than their share of

the population there. In other words, in the only area in which the *Gingles* factors can be satisfied, Latino voters enjoy effective political power 46% above their numerical strength, or, even disregarding District 25 as an opportunity district, 24% above their numerical strength. See *De Grandy*, 512 U. S., at 1017, n. 13. Surely these figures do not suggest a denial of equal *opportunity* to *participate* in the political process.

The majority's only answer is to shift the focus to state-wide proportionality. In *De Grandy* itself, the Court rejected an argument that proportionality should be analyzed on a statewide basis as "flaw[ed]," because "the argument would recast these cases as they come to us, in order to bar consideration of proportionality except on statewide scope, whereas up until now the dilution claims have been litigated on a smaller geographical scale." *Id.,* at 1021–1022. The same is true here: The plaintiffs' §2 claims concern "the impact of the legislative plan on Latino voting strength *in South and West Texas*," *Session, supra,* at 486 (emphasis added), and that is the only area of the State in which they can satisfy the *Gingles* factors. That is accordingly the proper frame of reference in analyzing proportionality.

In any event, at a statewide level, 6 Latino opportunity districts out of 32, or 19% of the seats, would certainly seem to be "roughly proportional" to the Latino 22% share of the population. See *De Grandy, supra,* at 1000. The District Court accordingly determined that proportionality suggested the lack of vote dilution, even considered on a statewide basis. *Session, supra,* at 494. The majority avoids that suggestion by disregarding the District Court's factual finding that District 25 is an effective Latino opportunity district. That is not only improper, for the reasons given, but the majority's rejection of District 25 as a Latino opportunity district is also flatly inconsistent with its statewide approach to analyzing proportionality. Under the majority's view, the Latino voters in the northern end of District 25

cannot "count" along with the Latino voters at the southern
end to form an effective majority, because they belong to
different communities.  But Latino voters from everywhere
around the State of Texas—even those from areas where the
*Gingles* factors are not satisfied—can "count" for purposes of
calculating the proportion against which effective Latino
electoral power should be measured.  Heads the plaintiffs
win; tails the State loses.

\*      \*      \*

The State has drawn a redistricting plan that provides six
of seven congressional districts with an effective majority of
Latino voting-age citizens in south and west Texas, and it is
not possible to provide more.  The majority nonetheless
faults the state plan because of the *particular mix* of Latino
voters forming the majority in one of the six districts—a
combination of voters from around the Rio Grande and from
around Austin, as opposed to what the majority uncritically
views as the more monolithic majority assembled (from
more farflung communities) in old District 23.  This despite
the express factual findings, from judges far more familiar
with Texas than we are, that the State's new district would
be a more effective Latino majority district than old District
23 ever was, and despite the fact that *any* plan would neces-
sarily leave *some* Latino voters outside a Latino-majority
district.

Whatever the majority believes it is fighting with its
holding, it is not vote dilution on the basis of race or ethnic-
ity.  I do not believe it is our role to make judgments about
which *mixes* of minority voters should count for purposes of
forming a majority in an electoral district, in the face of
factual findings that the district is an effective majority-
minority district.  It is a sordid business, this divvying us up
by race.  When a State's plan already provides the maxi-
mum possible number of majority-minority effective oppor-
tunity districts, and the minority enjoys effective political

Opinion of ROBERTS, C. J.

power in the area well in *excess* of its proportion of the population, I would conclude that the courts have no further role to play in rejiggering the district lines under §2.

I respectfully dissent from Part III of the Court's opinion.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 05–204, 05–254, 05–276 and 05–439

————

LEAGUE OF UNITED LATIN AMERICAN CITIZENS,
ET AL., APPELLANTS
05–204                    *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.


TRAVIS COUNTY, TEXAS, ET AL., APPELLANTS
05–254                    *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.


EDDIE JACKSON, ET AL., APPELLANTS
05–276                    *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.


GI FORUM OF TEXAS, ET AL., APPELLANTS
05–439                    *v.*
RICK PERRY, GOVERNOR OF TEXAS, ET AL.

ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TEXAS

[June 28, 2006]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, and
with whom THE CHIEF JUSTICE and JUSTICE ALITO join as
to Part III, concurring in the judgment in part and dis-
senting in part.

## I

As I have previously expressed, claims of unconstitu-
tional partisan gerrymandering do not present a justicia-
ble case or controversy. See *Vieth* v. *Jubelirer,* 541 U. S.
267, 271–306 (2004) (plurality opinion). JUSTICE KENNEDY's

discussion of appellants' political-gerrymandering claims
ably demonstrates that, yet again, no party or judge has put
forth a judicially discernable standard by which to evaluate
them.  See *ante,* at 6–16.  Unfortunately, the opinion then
concludes that the appellants have failed to state a claim as
to political gerrymandering, without ever articulating what
the elements of such a claim consist of.  That is not an
available disposition of this appeal.  We must either con-
clude that the claim is nonjusticiable and dismiss it, or else
set forth a standard and measure appellant's claim against
it.  *Vieth, supra,* at 301.  Instead, we again dispose of this
claim in a way that provides no guidance to lower-court
judges and perpetuates a cause of action with no discernible
content.  We should simply dismiss appellants' claims as
nonjusticiable.

## II

I would dismiss appellants' vote-dilution claims prem-
ised on §2 of the Voting Rights Act of 1965 for failure to
state a claim, for the reasons set forth in JUSTICE
THOMAS's opinion, which I joined, in *Holder* v. *Hall*, 512
U. S. 874, 891–946 (1994) (opinion concurring in judg-
ment).  As THE CHIEF JUSTICE makes clear, see *ante,* p.
___ (opinion concurring in part, concurring in judgment in
part, and dissenting in part), the Court's §2 jurisprudence
continues to drift ever further from the Act's purpose of
ensuring minority voters equal electoral opportunities.

## III

Because I find no merit in either of the claims addressed
by the Court, I must consider appellants' race-based equal
protection claims.  The GI Forum appellants focus on the
removal of 100,000 residents, most of whom are Latino,
from District 23.  They assert that this action constituted
intentional vote dilution in violation of the Equal Protec-
tion Clause.  The Jackson appellants contend that the

intentional creation of District 25 as a majority-minority district was an impermissible racial gerrymander. The District Court rejected the equal protection challenges to both districts.

## A

The GI Forum appellants contend that the Texas Legislature removed a large number of Latino voters living in Webb County from District 23 with the purpose of diminishing Latino electoral power in that district. Congressional redistricting is primarily a responsibility of state legislatures, and legislative motives are often difficult to discern. We presume, moreover, that legislatures fulfill this responsibility in a constitutional manner. Although a State will almost always be aware of racial demographics when it redistricts, it does not follow from this awareness that the State redistricted on the basis of race. See *Miller* v. *Johnson*, 515 U. S. 900, 915–916 (1995). Thus, courts must "exercise extraordinary caution" in concluding that a State has intentionally used race when redistricting. *Id.*, at 916. Nevertheless, when considerations of race predominate, we do not hesitate to apply the strict scrutiny that the Equal Protection Clause requires. See, *e.g., Shaw* v. *Hunt,* 517 U. S. 899, 908 (1996) *(Shaw II); Miller*, *supra,* at 920.

At the time the legislature redrew Texas's congressional districts, District 23 was represented by Congressman Henry Bonilla, whose margin of victory and support among Latinos had been steadily eroding. See *Session* v. *Perry*, 298 F. Supp. 2d 451, 488–489 (ED Tex. 2004) *(per curiam)*. In the 2002 election, he won with less than 52 percent of the vote, *ante,* at 17 (opinion of the Court), and received only 8 percent of the Latino vote, *Session,* 298 F. Supp. 2d, at 488. The District Court found that the goal of the map-drawers was to adjust the lines of that district to protect the imperiled incumbent: "The record presents

undisputed evidence that the Legislature desired to increase the number of Republican votes cast in Congressional District 23 to shore up Bonilla's base and assist in his reelection." *Ibid.* To achieve this goal, the legislature extended the district north to include counties in the central part of the State with residents who voted Republican, adding 100,000 people to the district. Then, to comply with the one-person, one-vote requirement, the legislature took one-half of heavily Democratic Webb County, in the southern part of the district, and included it in the neighboring district. *Id.,* at 488–489.

Appellants acknowledge that the State redrew District 23 at least in part to protect Bonilla. They argue, however, that they assert an intentional vote-dilution claim that is analytically distinct from the racial-gerrymandering claim of the sort at issue in *Shaw* v. *Reno,* 509 U. S. 630, 642–649 (1993) *(Shaw I).* A vote-dilution claim focuses on the majority's intent to harm a minority's voting power; a *Shaw I* claim focuses instead on the State's purposeful classification of individuals by their race, regardless of whether they are helped or hurt. *Id.*, at 651–652 (distinguishing the vote-dilution claim in *United Jewish Organizations of Williamsburgh, Inc.* v. *Carey*, 430 U. S. 144 (1977)). In contrast to a *Shaw I* claim, appellants contend, in a vote-dilution claim the plaintiff need not show that the racially discriminatory motivation *predominated*, but only that the invidious purpose was *a* motivating factor. Appellants contrast *Easley* v. *Cromartie*, 532 U. S. 234, 241 (2001) (in a racial-gerrymandering claim, "[r]ace must not simply have been *a* motivation for the drawing of a majority-minority district, but the *predominant* factor motivating the legislature's districting decision" (citation and internal quotation marks omitted)), with *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 265–266 (1977), and *Rogers* v. *Lodge*, 458 U. S. 613, 617 (1982). Whatever the validity of

this distinction, on the facts of these cases it is irrelevant. The District Court's conclusion that the legislature was not racially motivated when it drew the plan as a whole, *Session,* 298 F. Supp. 2d, at 473, and when it split Webb County, *id.,* at 509, dooms appellants' intentional-vote-dilution claim.

We review a district court's factual finding of a legislature's motivation for clear error. See *Easley*, *supra,* at 242. We will not overturn that conclusion unless we are "'left with the definite and firm conviction that a mistake has been committed.'" *Anderson* v. *Bessemer City*, 470 U. S. 564, 573 (1985) (quoting *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 395 (1948)). I cannot say that the District Court clearly erred when it found that "[t]he legislative motivation for the division of Webb County between Congressional District 23 and Congressional District 28 in Plan 1374C was political." *Session,* 298 F. Supp. 2d, at 509.

Appellants contend that the District Court had evidence of the State's intent to minimize Latino voting power. They note, for instance, that the percentage of Latinos in District 23's citizen voting-age population decreased significantly as a result of redistricting and that only 8 percent of Latinos had voted for Bonilla in the last election. They also point to testimony indicating that the legislature was conscious that protecting Bonilla would result in the removal of Latinos from the district and was pleased that, even after redistricting, he would represent a district in which a slight majority of voting-age residents was Latino. Of the individuals removed from District 23, 90 percent of those of voting age were Latinos, and 87 percent voted for Democrats in 2002. *Id.,* at 489. The District Court concluded that these individuals were removed because they voted for Democrats and against Bonilla, not because they were Latino. *Id.*, at 473, 508–510. This finding is entirely in accord with our case law, which has

recognized that "a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Hunt* v. *Cromartie,* 526 U. S. 541, 551 (1999). See also *Bush* v. *Vera,* 517 U. S. 952, 968 (1996) (plurality opinion) ("If district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify").[1] Appellants argue that in evaluating the State's stated motivation, the District Court improperly conflated race and political affiliation by failing to recognize that the individuals moved were not Democrats, they just voted against Bonilla. But the District Court found that the State's purpose was to protect Bonilla, and not just to create a safe Republican district. The fact that the redistricted residents voted against Bonilla (regardless of how they voted in other races) is entirely consistent with the legislature's political and nonracial objective.

I cannot find, under the clear error standard, that the District Court was required to reach a different conclusion. See *Hunt, supra,* at 551. "Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel*

--------

[1] The District Court did not find that the legislature had two motivations in dividing Webb County, one invidious and the other political, and that the political one predominated. Rather, it accepted the State's explanation that although the individuals moved were largely Latino, they were moved because they voted for Democrats and against Bonilla. For this reason, appellants' argument that incumbent protection cannot be a compelling state interest is off the mark. The District Court found that incumbent protection, not race, lay behind the redistricting of District 23. Strict scrutiny therefore does not apply, and the existence *vel non* of a compelling state interest is irrelevant.

*Administrator of Mass.* v. *Feeney,* 442 U. S. 256, 279 (1979) (citation, some internal quotation marks, and foot-note omitted).  The District Court cited ample evidence supporting its finding that the State did not remove Lati-nos from the district because they were Latinos: The new District 23 is more compact than it was under the old plan, see *Session,* 298 F. Supp. 2d, at 506, the division of Webb County simply followed the interstate highway, *id.,* at 509–510, and the district's "lines did not make twists, turns, or jumps that can be explained only as efforts to include Hispanics or exclude Anglos, or vice-versa," *id.,* at 511.  Although appellants put forth alternative redistrict-ing scenarios that would have protected Bonilla, the Dis-trict Court noted that these alternatives would not have furthered the legislature's goal of increasing the number of Republicans elected statewide.  *Id.,* at 497.  See *Miller,* 515 U. S., at 915 ("Electoral districting is a most difficult subject for legislatures, and so the States must have dis-cretion to exercise the political judgment necessary to balance competing interests").  Nor is the District Court's finding at all impugned by the fact that certain legislators were pleased that Bonilla would continue to represent a nominally Latino-majority district.

The ultimate inquiry, as in all cases under the Equal Protection Clause, goes to the State's purpose, not simply to the effect of state action.  See *Washington* v. *Davis*, 426 U. S. 229, 238–241 (1976).  Although it is true that the effect of an action can support an inference of intent, see *id.,* at 242, there is ample evidence here to overcome any such inference and to support the State's political explana-tion.  The District Court did not commit clear error by accepting it.

B

The District Court's finding with respect to District 25 is another matter.  There, too, the District Court applied the

approach set forth in *Easley*, in which the Court held that race may be a motivation in redistricting as long as it is not the predominant one. 532 U. S., at 241. See also *Bush*, 517 U. S., at 993 (O'Connor, J., concurring) ("[S]o long as they do not subordinate traditional districting criteria to the use of race for its own sake or as a proxy, States may intentionally create majority-minority districts, and may otherwise take race into consideration, without coming under strict scrutiny"). In my view, however, when a legislature intentionally creates a majority-minority district, race is necessarily its predominant motivation and strict scrutiny is therefore triggered. See *id.,* at 999–1003 (THOMAS, J., joined by SCALIA, J., concurring in judgment). As in *Bush*, *id.,* at 1002, the State's concession here sufficiently establishes that the legislature classified individuals on the basis of their race when it drew District 25: "[T]o avoid retrogression and achieve compliance with §5 of the Voting Rights Act . . . , the Legislature chose to create a new Hispanic-opportunity district—new CD 25—which would allow Hispanics to actually elect its candidate of choice." Brief for State Appellees 106. The District Court similarly found that "the Legislature clearly intended to create a majority Latino citizen voting age population district in Congressional District 25." *Session, supra,* at 511. Unquestionably, in my view, the drawing of District 25 triggers strict scrutiny.

Texas must therefore show that its use of race was narrowly tailored to further a compelling state interest. See *Shaw II*, 517 U. S., at 908. Texas asserts that it created District 25 to comply with its obligations under §5 of the Voting Rights Act. Brief for State Appellees 105–106. That provision forbids a covered jurisdiction to promulgate any "standard, practice, or procedure" unless it "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race." 42 U. S. C.

§1973c. The purpose of §5 is to prevent "retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer* v. *United States,* 425 U. S. 130, 141 (1976). Since its changes to District 23 had reduced Latino voting power in that district, Texas asserts that it needed to create District 25 as a Latino-opportunity district in order to avoid §5 liability.

We have in the past left undecided whether compliance with federal antidiscrimination laws can be a compelling state interest. See *Miller*, *supra,* at 921; *Shaw II*, *supra,* at 911. I would hold that compliance with §5 of the Voting Rights Act can be such an interest. We long ago upheld the constitutionality of §5 as a proper exercise of Congress's authority under §2 of the Fifteenth Amendment to enforce that Amendment's prohibition on the denial or abridgment of the right to vote. See *South Carolina* v. *Katzenbach*, 383 U. S. 301 (1966). If compliance with §5 were not a compelling state interest, then a State could be placed in the impossible position of having to choose between compliance with §5 and compliance with the Equal Protection Clause. Moreover, the compelling nature of the State's interest in §5 compliance is supported by our recognition in previous cases that race may be used where necessary to remedy identified past discrimination. See, *e.g., Shaw II, supra,* at 909 (citing *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 498–506 (1989). Congress enacted §5 for just that purpose, see *Katzenbach*, *supra,* at 309; *Beer, supra,* at 140–141, and that provision applies only to jurisdictions with a history of official discrimination, see 42 U. S. C. §§1973b(b), 1973c; *Vera* v. *Richards*, 861 F. Supp. 1304, 1317 (SD Tex. 1994) (recounting that, because of its history of racial discrimination, Texas became a jurisdiction covered by §5 in 1975). In the proper case, therefore, a covered jurisdiction may have a compelling interest in complying with §5.

To support its use of §5 compliance as a compelling

interest with respect to a particular redistricting decision, the State must demonstrate that such compliance was its "'actual purpose'" and that it had "'a strong basis in evidence' for believing," *Shaw II, supra,* at 908–909, n. 4 (citations omitted), that the redistricting decision at issue was "reasonably necessary under a constitutional reading and application of" the Act, *Miller*, 515 U. S*.,* at 921.[2] Moreover, in order to tailor the use of race narrowly to its purpose of complying with the Act, a State cannot use racial considerations to achieve results beyond those that are required to comply with the statute. See *id.,* at 926 (rejecting the Department of Justice's policy that maximization of minority districts was required by §5 and thus that this policy could serve as a compelling state interest). Section 5 forbids a State to take action that would worsen minorities' electoral opportunities; it does not require action that would improve them.

In determining whether a redistricting decision was reasonably necessary, a court must bear in mind that a State is permitted great flexibility in deciding how to comply with §5's mandate. See *Georgia* v. *Ashcroft*, 539 U. S. 461, 479–483 (2003). For instance, we have recognized that §5 does not constrain a State's choice between creating majority-minority districts or minority-influence districts. *Id.,* at 480–483. And we have emphasized that, in determining whether a State has impaired a minority's "effective exercise of the electoral franchise," a court should look to the totality of the circumstances statewide. These circumstances include the ability of a minority group "to elect a candidate of its choice" or "to participate in the political process," the positions of legislative leadership held by individuals representing minority districts,

_____

[2] No party here raises a constitutional challenge to §5 as applied in these cases, and I assume its application is consistent with the Constitution.

and support for the new plan by the representatives previously elected from these districts. *Id.,* at 479–485.

In light of these many factors bearing upon the question whether the State had a strong evidentiary basis for believing that the creation of District 25 was reasonably necessary to comply with §5, I would normally remand for the District Court to undertake that "fact-intensive" inquiry. See *id.,* at 484, 490. Appellants concede, however, that the changes made to District 23 "necessitated creating an additional effective Latino district elsewhere, in an attempt to avoid Voting Rights Act liability." Brief for Appellant Jackson et al. in No. 05–276, p. 44. This is, of course, precisely the State's position. Brief for State Appellees 105–106. Nor do appellants charge that in creating District 25 the State did more than what was required by §5.[3] In light of these concessions, I do not believe a remand is necessary, and I would affirm the judgment of the District Court.

————————

[3] Appellants argue that in *Bush* v. *Vera,* 517 U. S. 952 (1996), we did not allow the purpose of incumbency protection in one district to justify the use of race in a neighboring district. That is not so. What we held in *Bush* was that the District Court had not clearly erred in concluding that, although the State had political incumbent-protection purposes as well, its use of race predominated. See *id.,* at 969 (plurality opinion). We then applied strict scrutiny, as I do here. But we said nothing more about incumbency protection as part of that analysis. Rather, we rejected the State's argument that compliance with §5 was a compelling interest because the State had gone beyond mere nonretrogression. *Id.,* at 983; *id.,* at, 1003 (THOMAS, J., joined by SCALIA, J, concurring in judgment).